DR.LAKSHMI ARUNACHALAM
222 Stanford Avenue, Menlo Park, CA 94025
TEL: (650) 690-0995
FAX: (650) 854-3393
Email: laks22002@yahoo.com
*Pro Se* Plaintiff

FILED

FEB 26 2018



SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| DR. LAKSHMI ARUNACHALAM,<br><br>Plaintiff,<br><br>vs.<br><br>1. APPLE, INC., ASSIGNS AND AGENTS, AND APP STORE WEB APPLICATION PROVIDERS;<br>2. SAMSUNG ELECTRONICS AMERICA, INC., ASSIGNS AND AGENTS, AND SAMSUNG'S GOOGLE PLAY WEB APPLICATION PROVIDERS;<br>3. FACEBOOK, INC., ASSIGNS AND AGENTS;<br>4. ALPHABET, INC., ASSIGNS AND AGENTS, AND GOOGLE PLAY WEB APPLICATION PROVIDERS;<br>5. MICROSOFT CORPORATION, ASSIGNS AND AGENTS, AND CUSTOMERS;<br>6. INTERNATIONAL BUSINESS MACHINES CORPORATION, ASSIGNS AND AGENTS, AND CUSTOMERS;<br>7. SAP AMERICA, INC., ASSIGNS AND AGENTS, AND CUSTOMERS;<br>8. JPMORGAN CHASE AND COMPANY, ASSIGNS AND AGENTS;<br>9. FISERV, INC., ASSIGNS AND AGENTS, AND CUSTOMERS;<br>10. WELLS FARGO BANK, ASSIGNS AND AGENTS;<br>11. CITIGROUP, CITIBANK, ASSIGNS AND AGENTS;<br>12. FULTON FINANCIAL CORPORATION, ASSIGNS AND AGENTS;<br>13. ECLIPSE FOUNDATION, INC. AND ITS MEMBERS; AND<br>DOES 1-100 INCLUSIVE,<br>                 Defendants, | **Case No.:** _____<br><br>**CV 18 1250**<br><br>**COMPLAINT FOR**<br><br>DMR<br><br>**CORRUPT ANTITRUST EXPORT/IMPORT INFRINGEMENT(S) COLORED BY LAW AND AUTHORITY TO PROTECT PLAINTIFF'S PUBLIC RIGHT AGAINST A CONSTITUTIONAL TORT**<br><br>**FILED: FEBRUARY 26, 2018**<br><br><br>**DEMAND FOR JURY TRIAL YES** |

*Omina presumuntur rite esse acta*
*A prima facie presumption of the regularity of the acts of public officers exists until the contrary appears*

## PREFACE

1.      There are certain moral attributes common to the ideal administrative adjudicator, court judge, ministerial official, and practicing attorney, a lack of which is indicated by acts of dishonesty, or (procedural) unfair dealing, of indecency or (process) indecorum or of (substantive) lawlessness, (fundamental) injustice or cruelty. Not everyone is or can be expected to meet ideal moral (or ethical) standards, but there is a limit of tolerance below which these individuals cannot fall without seriously compromising one's solemn oath and fitness to practice in the administration of public justice and enforcement of the United States Constitution and Law(s) of the Land. Constitutional dereliction(s) of imposed duty(s); ***here,*** contemplated is where one willfully or negligently fails to perform them, or performs them in a culpably inefficient manner. When the failure is with full knowledge of the solemn duty and an intention not to perform (or enforce) it, the omission is willful. When the nonperformance is the result of a lack of ordinary care, the omission is negligent. Culpable inefficiency is inefficiency for which there is no reasonable or just excuse. ***Thus***, where it appears the adjudicator(s) or attorney(s) had the ability and opportunity to perform (and enforce) their entrusted constitutional duties efficiently, but performed them inefficiently nevertheless, they are guilty of breaching their solemn oath to protect the Constitution and Laws of the Land. ***However***, where the dereliction and breach of solemn duty is caused by ineptitude [Ignorance, indifference, or sincere confusion.] rather than by willfulness, negligence, or culpable inefficiency, the breach of solemn oath will not elevate to the acceptable charge of treason on the U.S. Constitution itself, as a act of waging war on *[t]*hat document. While the former is the great weight; upon, which Plaintiff has

had to contend with [Up to and including the Supreme Court (collectively ignoring the Law of

the Land and allowing the Legislature to [De jure.] quasi-reverse the [Stare decisis.] Law of the

Land prohibiting rescinding government grants once issued.]. *[T]*he, latter has *patently* resulted

in the USPTO/PTAB (Revolving door), practicing Member Attorney(s), and the Federal Circuit

Judges creating *'Bad Case Law'* [For two centuries.] in breach of solemn oath(s) and public

trust(s) in violation of Chief Justice Marshall's *'First Impression' Constitutional Res Judicata*

Mandate prohibiting rescinding Government issued Contract Grants,  delineated in *Fletcher v.

Peck*, 10 U.S. 87  (1810).  Continuing ineptly [Now willfully.] has resulted in *a) **the Agency's**,*

demonstrated *(dishonest)* 'Breach of Public Contracting' with Inventors in fraudulently failing

*(after soliciting and inducing)* to honor the 'Patent Prosecution History Estoppel' provision [By

remaining silent as to it, as Public Fraud - on reexamination venue to the Federal Circuit.]; **b) the**

**Agency's,** *(disgraceful)* 'Conflict-of-*(Public Trust)*-Interest' in challenging the 'Construction

and Terms' of a Granted Patent  [In the instant case, Plaintiff's  patents  were  reexamined at

least thirteen (13) times .] for infringers and competitor(s) in litigation and [Emphasis added.] in

corrupt association.; **c) the Agency's,** *(disparately unjust)* 'Administrative Procedural Process'

[Notwithstanding a) and b) *(supra.)*.].  *[T]*hat, denied Plaintiff  reasonable access to the process

itself upon the question of due process *(noticed)* enforcement of the Mandate prohibiting

rescinding government grants once issued.  ***Here,*** Patent Administrative judges  refused e-filing

access, when asked to recuse due to the PTAB judge [as per his own Annual Financial

Disclosure Statement.]  having direct stock in Microsoft, the Third Party Requester of a Re-

examination of the Granted Patent;  Failed, to docket Plaintiff's filings; altered, the captions of

filings; arbitrarily, and capriciously denied motions systematically; and, collectively avoided all

filings with notice of the Agency's solemn duty to uphold the Law of the Land (respecting

*Fletcher v Peck*); while, overzealously enforcing the Legislative (Obama's) 'America Invents Act' [De jure (treasonably).] overturning *Fletcher v. Peck*.]; and, **d)** **if that's not enough, the Agency, in furtherance, failed to comply (in contempt) of** the Federal Circuit's recent (honorable) ruling in *Aqua Products Inc. v. Matal*, 15-1177, October 2017, reversing all Decisions by courts and the PTAB, including the Federal Circuit's own past rulings, that did not consider 'Patent Prosecution History'; lawlessly failing to apply this ruling to Plaintiff's case.

2.      Fundamental guarantees apply to rights as well as procedure; and, they apply to all departments of government. Citizens are entitled to protection(s) against fraud and oppression of which Plaintiff has had to contend with. Laws impairing contracts are unconstitutional; and, according to *Fletcher v. Peck*, executed grants being treated as contracts cannot be repudiated. If this stare decisis constitutional mandate is the Law of the Land; how, then can the Supreme Court find the Legislature's reexamination of existing granted patents (for the purpose of being rescinded) constitutional? Unless the Supreme Court's discretionary decision not to entertain, protect, or enforce the Law of the Land within the purview of protecting the public's right; it, certainly does not excuse the duty in relation to waiving the Breach of Solemn Oath imposed upon the constitutional tortfeasor. Clearly, it would be reasonably accurate to find (under the instant circumstances); although, hard to imagine that the entire Patent Law Administration (including the Federal Circuit and Supreme Court) have been ignorant of the law governing grants (for two centuries); or, treasonably lawless or indifferent to the rights attaching to the patent grant itself; and, creating 'Bad Law' upon which to administer injustice. It is little wonder why this issue has been avoided; and, the USPTO representing infringers, ignoring 'Patent Prosecution History Estoppel' rules of construction; and, more particularly refusing to grant Plaintiff a rehearing [It is simply too embarrassing.]. Unless

iv

*Fletcher* does not apply or has been rescinded/reversed [By the Supreme Court and not the Legislature.], this court must rule in the public's best interest; and, advise patent victims their attorneys need to refund their monies for incompetence; and, the government must reimburse patent victims for this recklessly incompetent administration of injustice.

Dated: February 26, 2018            Respectfully propounded,

*Lakshmi Arunachalam*

Dr. Lakshmi Arunachalam,
Victim

# TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
|  | Preface | ii |
|  | Table of Contents | vi |
| I. | Introduction | 1 |
| II. | Parties in the Complaint | 1 |
| III. | Jurisdiction and Venue | 6 |
| IV. | Intra-District Assignment | 7 |
| V. | Material Facts on The Products at Issue | 7 |
|  | A. Plaintiff's Inventions Power the Mobile App Ecosystem, one of the Biggest Industries on this Planet | 7 |
|  | B. Defendants Acquired Dominant Market Power by Engaging in Anticompetitive Conduct | 8 |
|  | C. Web applications in Apple's App Store and Samsung's Google Play are Unlicensed Apps — Stolen Goods — for which No Royalties have been Paid to Plaintiff | 9 |
|  | D. Defendants' Fraudulently Procured Re-examinations, IPR/CBM Reviews Caused a Substantial Anticompetitive Effect of Delay Until Patents Expire, Violating the *Walker* U. S. Supreme Court Ruling | 10 |
|  | E. Antitrust is a Foregone Conclusion (Continuing From *US v Microsoft* with Focus on Distributing Stolen License Through Eclipse by Corrupt Association-In-Fact.) | 10 |
|  | F. Similarities between Apple & Microsoft's Anti-Competitive Conduct (Domestic Antitrust In Cohort for Global Antitrust Reentering Via Apple in Furtherance Limiting Domestic Competition Without Notice.) | 16 |
| VI. | Unlawful and Unfair Acts of Defendants | 17 |
|  | A. Defendants Meet All the Elements of Antitrust Violation: Conspiring to Fix Prices and Control Access to Plaintiff's Code and Market | 17 |
|  | 1. (i) Conspiracy Among Eclipse Foundation Members and CPL License Agreement, IBM as Agreement Steward (Principal Conspirator) Are In Violation of Sherman Act Sections 1 & 2. (ii) App Store and Google Play are violations of Sherman Act Sections 1 and 2 and Evidence Conspiracy between Apple and Google with their Respective Web App Providers to Sell Stolen Unlicensed Goods in Anti-competitive Conduct. | 17 |
|  | 2. IBM and CPL License Agreement Steward to Control | 22 |

| | | | |
|---|---|---|---|
| | | Distribution — The Defendants' Fraudulent Common Public License ("Agreement") Is Further Proof of Their Conspiracy. — The Common Public License is a contract that violates Sections 1 and 2 of the Sherman Antitrust Act. | |
| | | – Likewise, the Agreement between Apple and Google with their respective App Store and Google Play Web App Providers are Each a Contract in Violation of Sections 1 and 2 of the Sherman Antitrust Act. | |
| | 3. | Eclipse Foundation Members Demonstrate Irrational Coordinated Action, Confirming their Conspiracy and Intent to Injure U.S. and Foreign Competitors, Share Editing The Eclipse Code. | 30 |
| | A) | The IBM Eclipse Foundation: (i) Acquisition and maintenance of an interest in and control of an *enterprise* engaged in a *pattern of racketeering activity* and (ii) Conspiracy to engage in a pattern of antitrust racketeering activity, as anti-competitive conduct and violations of antitrust laws | 30 |
| | B) | Eclipse Foundation Common Public License 0.5 | 32 |
| | C) | Antitrust Conspiracy Under Color of a Non-Profit Entity (!!!), to Avoid Investigation – A White Collar Crime – Yet Defendants Made Trillions of Dollars | 38 |
| | | Breach of Solemn Oath by All Defendants and DOES 1-100 | 47 |
| | | Collusive Fraud by All Defendants, DOES 1-100 and Incidentals | 48 |
| B. | | Misappropriating Plaintiff's Trade Secrets and Obstructiion of Justice | 53 |
| | 1. | Plaintiff Developed and Maintained Advanced Internet of Things, Web applications displayed on a Web Browser Trade Secrets. | 53 |
| | 2. | IBM and Microsoft Stole Plaintiff's Trade Secrets, Evident from the Eclipse Foundation Source Code | 58 |
| | 3. | Following the Trade Secret Theft from Plaintiff, At Least IBM, SAP, Microsoft, Apple, Samsung used Plaintiff's Trade Secrets to Manufacture IoT Products with Web applications in China, Vietnam, India and other foreign countries and Export Those Products to the United States, Hurting Domestic Industry | 61 |
| | 4. | Unfair Importation by Apple, Samsung | 62 |
| | 5. | False Labeling | 62 |
| C. | | Falsifying the Origin of Eclipse Code: | 62 |
| | 1. | IBM does not disclose where the underlying code comes from, namely, Plaintiff. | 62 |
| | 2. | IBM creates False Origin CPL License Agreement from Eclipse Foundation, and acts as Agreement Steward with Full Control over Distribution; | 62 |
| | 3. | IBM and other Defendants Intend for their False Origin | 63 |

|  |  | Designations with a CPL License Agreement, and Apple's App Store, Google Play, and Samsung's Google Play selling stolen goods, unlicensed Web Applications, Concealed from Consumers, to Deceive the Market and U.S. Consumers and the Competition. |  |
|---|---|---|---|
| **VII.** | Patent Infringement | | 63 |
| **VIII.** | Other Antitrust Cases against Apple, Microsoft | | 70 |
| **IX.** | Injury to Plaintiff and Market<br>1) Injury to the Domestic Industry<br>2) Plaintiff's Domestic Industry<br>3) Domestic Web Application Production and Employment of Web Application development engineers,<br>4) Domestic Web Application Distribution and Employment of Web Application Distribution Sales and Marketing people | | 76 |
|  | Injury to Competition<br>1. Lost Customers, Sales, and Profits<br>2. Import Volume, Market Penetration, and Resulting Loss of Market Share<br>3. Decreased Production and Employment<br>4. Underpricing and Ability to Further Increase Exports.<br>5. Injury Related to the Price- and Output-Fixing Cause of Action<br>6. Injury Related to the Trade Secret Cause of Action<br>7. Injury Related to the False Designation of Origin Cause of Action<br>8. Plaintiff's Trade Secrets were Stolen for the Benefit of the Entire Web Apps market. | | 77 |
| **X.** | Relevant Market Allegations | | 78 |
| **XI.** | The Need for Preliminary Relief | | 82 |
| **XII.** | Claims for Relief – Counts I - XIV | | 83 |
| **XIII.** | Prayer For Relief on Counts I - XIV | | 94 |
| Verification | | | 102 |
| Demand for Jury Trial | | | 102 |
| List of Exhibits | | | 104 |
| Declaration by Dr. Lakshmi Arunachalam | | | 106 |
| Certificate of Mailing and Service | | | 109 |
| Attachment 1: List of Incidentals/Tortfeasors, Misconduct & Basis of Liability | | | 110 |
| Exhibits | | | 132 |

Plaintiff  DR. LAKSHMI ARUNACHALAM, ("Dr. Arunachalam"), representing herself,  to secure constitutional redress for public right and royalties on Antitrust infringement, and for her Complaint against APPLE,  INC. ("Apple"),  SAMSUNG ELECTRONICS AMERICA, INC., ("Samsung"), App Store and Samsung's Google Play Web application providers, FACEBOOK, INC. ("Facebook"), ALPHABET, INC., ASSIGNS AND AGENTS, AND GOOGLE PLAY WEB APPLICATION PROVIDERS ("Google"), MICROSOFT CORPORATION ("Microsoft"), IBM, SAP AMERICA, INC. ("SAP"), JPMORGAN CHASE AND COMPANY ("JPMorgan"), FISERV INC. ("Fiserv"), WELLS FARGO BANK ("Wells Fargo"), CITI GROUP/CITIBANK ("Citi"), FULTON FINANCIAL CORPORATION ("Fulton"), ECLIPSE FOUNDATION INC. ("Eclipse"), and DOES 1-100, in corrupt association(s), each a ("Defendant"), and Incidentals (listed *infra*),  hereby alleges as follows:

## I.  **INTRODUCTION**

1.      This is an antitrust action under Sections 1 and 2 of the Sherman Act of 1890, 15 U.S.C. § 2 (2004) (the "Sherman Act"), the Clayton Act,  15  U.S.C. § 15(a); 15 U.S.C. § 26 and Cartwright Act, to restrain anti-competitive conduct by Defendants — *selling stolen goods in the largest online marketplace running on each IoT device, concealed from consumers that it is unlicensed* — to exclude Plaintiff (and others similarly situated) from the market. Their conduct in doing so caused  antitrust injury to Plaintiff.

## II.  **PARTIES IN THIS COMPLAINT**

### a.  Plaintiff

DR. LAKSHMI ARUNACHALAM
222 Stanford Avenue, Menlo Park, CA 94025; Tel: (650) 690-0995;
laks22002@yahoo.com

### b.  Defendants

**Defendant 1:** APPLE, INC., ASSIGNS AND AGENTS, AND APP STORE WEB APPLICATION PROVIDERS,
1 Infinite Loop, Cupertino, California 95014; Tel: 408.996.1010;

ATTORNEY(S) OF RECORD: WEIL. GOTSHAL & MANGES  LLP, (BRIAN E. FERGUSON, ROBERT T. VLASIS III),
2001 M Street, N.W., Suite 600, Washington DC 20036; Tel:  202.682.7000

**Defendant 2:** SAMSUNG ELECTRONICS AMERICA, INC., ASSIGNS AND AGENTS, AND SAMSUNG GOOGLE PLAY  WEB APPLICATION PROVIDERS,
85 Challenger Road, Ridgefield Park, NJ 07760; Tel: 201.229.5000;

ATTORNEY(S) OF RECORD: COVINGTON & BURLING  LLP, (STURGIS M. SOBIN, DANIEL VALENCIA, HWA YOUNG JIN),
One City Center, 850 Tenth Street, NW; Washington DC 20001; Tel:  202.682.7000

**Defendant 3:** FACEBOOK, INC., ASSIGNS AND AGENTS,
1 Hacker Way, Menlo Park, CA 94025; Tel: 650.543.4800; 650.308.7300;

ATTORNEY(S) OF RECORD: COOLEY LLP, (STEPHEN R. SMITH, LISA F. SCHWEIR, HEIDI L. KEEFE),
1299 Pennsylvania Avenue, NW, Suite 700, Washington, DC 20004; Tel: 202.842.7800

**Defendant 4:** ALPHABET, INC., ASSIGNS AND AGENTS, AND GOOGLE PLAY WEB APPLICATION PROVIDERS;
1600 Amphitheatre Parkway, Mountain View, CA 94043; Tel: 650.253.0000;

**Defendant 5:** MICROSOFT CORPORATION, ASSIGNS AND AGENTS, AND CUSTOMERS;
One Microsoft Way, Redmond, Washington 98052-6399, Tel: (425) 882-8080;

ATTORNEY(S) OF RECORD: KLARQUIST SPARKMAN LLP,(WINN GARTH)
121 SW Salmon St #1600, Portland, OR 97204; Tel: (503) 595-5300

**Defendant 6:** INTERNATIONAL BUSINESS MACHINES CORPORATION, ASSIGNS AND AGENTS, AND CUSTOMERS;
1 New Orchard Road, Armonk, New York 10504, Tel: 914. 499.6500;

ATTORNEY(S) OF RECORD: MAYNARD COOPER  & GALE, P.C. (KEVIN J. CULLIGAN),
551 Fifth Avenue, Suite 2000, New York, NY 10176, Tel: 646.609.9282
KIRKLAND & ELLIS  (EDWARD C. DONOVAN, P.C.),
655 Fifteenth Street, N.W., Washington, D.C. 20005-5793, Tel: 202.879.5289

**Defendant 7:** SAP AMERICA, INC., ASSIGNS AND AGENTS, AND CUSTOMERS;

2

3999 West Chester Pike, Newtown Square, PA 19073, Tel: +1-610-661-1000;

ATTORNEY(S) OF RECORD: STERNE KESSLER GOLDSTEIN & FOX; (LORI GORDON; ROBERT STERNE);
1100 New York Ave NW # 800, Washington, DC 20005; Tel: (202) 371-2600
JONES DAY, (GREG LANIER),
1755 Embarcadero Road, Palo Alto, CA 94303; Tel: 650.739.3941

**Defendant 8:** JPMORGAN CHASE AND COMPANY, ASSIGNS AND AGENTS;
270 Park Avenue, New York, NY, Tel: 212-270-6000;

ATTORNEY(S) OF RECORD: SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, (DOUG NEMEC, EDWARD TULIN, DANIEL A. DEVITO),
4 Times Square, New York, NY 10036; Tel: (212) 735-3000;

**Defendant 9:** FISERV, INC., ASSIGNS AND AGENTS, AND CUSTOMERS;
255 Fiserv Drive, Brookfield, Wisconsin 53045; Tel: (262) 879-5000;

ATTORNEY(S) OF RECORD: PERKINS COIE LLP, (RAMSEY M. AL-SALAM),
1201 3rd Ave #4900, Seattle, WA 98101; Tel: (206) 359-8000;

**Defendant 10:** WELLS FARGO BANK, ASSIGNS AND AGENTS,
420 Montgomery Street, San Francisco, CA 94163; Tel: 800.869.3557; 866.249.3302;

ATTORNEY(S) OF RECORD: CARLSON CASPERS (DOUGLAS J. WILLIAMS),
Capella Tower, Ste 4200, 225 S. Sixth St, Minneapolis, MN 55402, Tel.:612.436.9600

**Defendant 11:** CITIGROUP, CITIBANK, ASSIGNS AND AGENTS;
399 Park Avenue, New York, NY 10022, Tel: 212.559.1000; and
388 Greenwich Street, New York, NY 10013; Tel: 800-285-3000;

ATTORNEY(S) OF RECORD: DENTONS (MARK NELSON),
2000 McKinney Ave #1900, Dallas, TX 75201-1858; Tel: (214) 259-0900

**Defendant 12:** FULTON FINANCIAL CORPORATION, ASSIGNS AND AGENTS;
One Penn Square, P. O. Box 4887, Lancaster, Pennsylvania 17602; Tel: 717-291-2411;

ATTORNEY(S) OF RECORD: KILPATRICK TOWNSEND AND STOCKTON, LLP,
1100 Peachtree St NW #2800, Atlanta, GA 30309; Tel: (404) 815-6500

**Defendant 13:** ECLIPSE FOUNDATION, INC. AND ITS MEMBERS,
102 Centrepointe Drive, Ottawa, Ontario,Canada, K2G 6B1; Tel: 613.224.9461;

**And, DOES 1 through 100,** inclusive, and Incidentals (Listed in Attachment 1.)

3

2.   **Plaintiff, Dr. Arunachalam is an icon of America Invents**. Dr. Arunachalam, a United States citizen,  is the inventor of the Internet of Things (IoT) — Web Applications displayed on a Web browser — and IoT devices, apparatuses, machines — whose current market value far exceeds multi-trillion dollars.  She is the assignee of a portfolio of a dozen earliest Internet patents, deriving their priority date from her provisional patent application with S/N 60/006,634  filed  November 13, 1995. Her inventions created the proliferation of IoT devices, and the millennial generation. Web applications displayed on a Web browser were non-existent in 1995. What existed prior to 1995 was CGI scripts and islands of information with applications local to the Back Office of large enterprises. Dr. Arunachalam founded three start-up companies in Silicon Valley, namely, (i) Pi-Net International Inc. ("Pi-Net"),  a Web applications and solutions' company with over a hundred customers and provided services to Fortune 500 companies in the United States since 1990; (ii) WebXchange, Inc. that implemented her patents and markets IoT and Web application platform solutions, products and services, since 1996; and (iii) e-pointe, Inc., that designed and marketed IoT connectors and end-points, certified by First Data Corporation for real-time two-way credit card transactions over the Web from Web applications displayed on a Web browser. She is the assignee of  U.S. Patent Nos. 5,987,500 ('500 patent), 8,108,492 ('492 patent) and   8,037,158 ('158 patent) asserted against JPMorgan Chase and Company ("JPMorgan") in the U.S. District Court for the District of Delaware Case No. 1:12-cv-282-SLR/RGA (D.Del.); of U.S. Patent No. 7,340,506 ('506 patent) asserted against the United States in the U.S. Court of Federal Claims Case No. 1:16-cv-358c-NGF (COFC) and against IBM in the U.S. District Court for the District of Delaware Case No. 1:16-cv-281-RGA (D.Del.); of  U.S. Patent No. 8,271,339 ('339 patent) asserted against Fremont Bancorporation *et al* ("Fremont Bank") in the  U.S. District Court for the Northern District of California and Fulton

4

Financial ("Fulton Bank") in Case No. 1:14-cv-490-RGA (D.Del.); of U.S. Patent Nos. 5,778,178 ("'178 patent") and 6,212,556 ("'556 patent") asserted in the U.S. District Court for the District of Delaware against Fedex, Dell and AllState Insurance,  customers of Microsoft; and of U.S. Patent No. 7,930,340 ("the '340 patent"), asserted against Apple, Inc., Samsung, and Facebook in the USITC Case No. 337-1094.

3.       Her inventions achieved huge commercial success — Web banking, social networking, to name a few — and are mission-critical to U.S. Government's operations, including improving national security. Her patented inventions are in ubiquitous use worldwide, allowing Defendants to make $trillions. Dr. Arunachalam helped pioneer advances at the heart of IoT connectivity and Web applications and two-way real-time Web transactions from Web applications from multi-media IoT devices/apparatuses/machines.  Her inventions enabled the entire IoT device / smartphone revolution.

4.       Defendant Apple is a Delaware corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014.  Apple regularly conducts and transacts business in this District, as well as throughout the United States.  Apple manufactures, markets, and sells the iPhone, iPaD, among other IoT devices with App Store including 2M+ Web applications displayed on a Web browser.

5.       Defendant,  Samsung's  U.S. Headquarters is  located at 85 Challenger Road, Ridgefield Park, NJ 07760, USA. Samsung  offers PCs, tablets,  mobile smart Phones, and other mobile platforms, IoT devices  with Google Play including 3M+ Web applications,  utilizing Plaintiff's patents, manufactures them in Vietnam, and imports them into the U.S. for sale. It transacts business in California,  in the United States and worldwide..

6.       Defendant Facebook  is a Delaware corporation with its principal place of

business located at 1 Hacker Way, Menlo Park, California 94025.  Facebook regularly conducts

and transacts business in this District, as well as throughout the United States.  Apple

manufactures, markets, and sells the iPhone, iPaD, among other IoT devices with App Store

including 2.2 M+ Web applications, including the Facebook social networking Web application,

displayed on a Web browser.

   7.  The addresses of the Headquarters of Defendants 4-13 is provided in this Section

II *supra*.  Defendants 4 and 10 are based in California. Defendants 4-12 have offices in this

District and/or have extensive business activities in this District. Defendant 13 is The Eclipse

Foundation, Inc. based in Canada, but with many of its members headquartered in California.

### III.  JURISDICTION AND VENUE

   8.  This Court has federal question jurisdiction pursuant to the Sherman Act, the

Clayton Antitrust Act of 1914, 15 U.S.C. § 15, and pursuant to 28 U.S.C. §§ 1331 and 1337.

   9.  Plaintiff  Dr. Arunachalam is, and at all times herein mentioned a California

resident and an individual residing at 222 Stanford Avenue, Menlo Park, CA 94025. She created

prototypes of the patented technology, and installed it at beta sites in California, such as Cisco,

Stanford, and others.  She provided software solutions to complex business problems that needed

a technological solution, invented and developed Web applications such as Web banking and

other business Web applications, even prior to 1995, when one-way Web browsing was the

norm. She raised venture capital in California for her companies. *Plaintiff has provided*

*employment to many employees in California during her 28 years of being an entrepreneur and*

*running her companies in California.*

   10.  This Court has personal jurisdiction over the Defendants  by virtue of their

business activities within this judicial district; and therefore, reside here for venue purposes. The

6

bulk of the events and a substantial portion of the work and events or omissions giving rise to Plaintiffs' claims occurred in California.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Apple, Facebook, Google and Wells Fargo have their principal place of business and are subject to personal jurisdiction in this District. Plaintiff hereby incorporates paragraph 7 *supra* by reference, as if it were set forth fully herein.

## IV.    INTRADISTRICT ASSIGNMENT

12.     This lawsuit should be assigned to San Francisco Division of this Court because Apple, Facebook, Google and many of the Defendants are located or have a presence here by virtue of their business activities within this judicial district. Plaintiff lives in San Mateo County.

## V.    MATERIAL FACTS ON THE PRODUCTS AT ISSUE

### A.    PLAINTIFF'S INVENTIONS POWER THE MOBILE APP ECOSYSTEM, ONE OF THE BIGGEST INDUSTRIES ON THIS PLANET

13.     Dr. Arunachalam invented the Internet of Things (IoT), Web applications displayed on a Web browser, *without which Apple's and Samsung's devices would not be smart devices*. Specifically, the iPhone would not be a smartphone. Apple has 2.5B iPhone users. Plaintiff's patented inventions benefit billions of consumers worldwide, providing real-time Web transactional capabilities from Web applications, resulting in "*the mobile app ecosystem, one of the biggest industries on this planet*." It encapsulates millions of app developers, billions of smartphone owners who use mobile apps daily and the companies that drive this ecosystem – Apple, Samsung, Google, and the companies, namely, IBM, SAP, Microsoft, Fiserv, among others that develop Web applications for the content owners (for example, JPMorgan, Wells Fargo, CitiBank, U-Haul, Hertz, Avis, Facebook, games) with a presence in Apple's App Store and Samsung's Google Play. The Web application developers and content owners are termed

7

"Web application providers." The major distribution channel for mobile apps is an app store (or app marketplace). Two biggest app stores are the Apple iOS App Store running on Apple's IoT devices running Apple's iOS and Google's Google Play running on Android IoT devices sold by Samsung and other manufacturers. Google sees its Android app store as yet another channel to distribute software, where the company can place ads and profit on it.

14.     An IoT device is an Internet-connected device with Web applications displayed on a Web browser, necessarily utilizing Plaintiff's patented VAN Switch. For example, Apple's iPhones, iPads, with Apple's App Store with 2.2 M+ Web applications; Samsung Galaxy smartphones and tablets with Google Play with 3 M+ Web applications.

## B.     DEFENDANTS ACQUIRED DOMINANT MARKET POWER BY ENGAGING IN ANTICOMPETITIVE CONDUCT

15.     Apple is the world's largest supplier of IoT devices offering 2.2 M Web applications from the world's largest online marketplace App Store. Apple sold approximately 1.836B IoT devices in the last six years. Apple launched its first smartphone, the iPhone, on June 29, 2007. Apple built the iPhone's operating system, known as "iOS," to enable iPhone users to download from App Store and run Web applications displayed on a Web browser to do Web banking, Uber, Facebook, play games. According to IDC, in 2017, "the worldwide smartphone market saw a total of 1.472 billion units shipped." The following statistics shows Apple and Samsung have dominant market share: The total number of mobile app downloads in 2017 – 197 billion versus 149 billion in 2016, projected to be 352 billion by 2021. The total number of Android app downloads in 2016 – 90 billion; The total number of iOS app downloads in 2016 – 25+ billion; The most popular app, both iOS and Android, by penetration – Facebook (81% of users); The most popular iOS app category, by volume – Games (25%); The most

popular Android app category, by penetration – Tools (99.8%); Total number of app publishers –

968k (Google Play), 498k (App Store), 75k (Amazon AppStore). As a result of engaging in

anticompetitive schemes to monopolize the App Store with (unlicensed) Web applications,

invented by Plaintiff, from introduction of the iPhone 2G in 2007 through the present, Apple and

Samsung, control 80% of the worldwide distribution market for Web applications, with its next

two largest competitors controlling about 10% of the market. Apple's iOS App Store is the

pioneer of the mobile app ecosystem, with only 500 apps at launch, with 2.2 million as of

1/2017.   The Android Market, part of the Google Play G marketplace, was launched 3 months

after the Apple's App Store in October of 2008. By October of 2012, Google Play matched the

Apple's App Store by the number of apps. In 6/17, the number of Android apps reached 3M. The

current rate of its growth is more than *1300 apps a day*. The reason why Google Play app market

has been growing faster than the Apple's App Store is that Android OS, the operating system

that drives apps published on it, was released by Google under open source licenses. Multiple

companies sell smartphones and tablets that run Android OS and hence the overall volume of

hardware, for which Android app developers create apps, is much larger than its Apple's iOS

counterpart and also includes wearables, health care, robotics, autonomies car, smart home and

desktop applications such as Chromebook. Apple's App Store continues its domination in terms

of how much revenue it generates for app developers, but Google Play has more registered

publishers. "It is unlikely any company will be able to shake up the existing Apple-Google-

Amazon trio of the mobile application stores."

> C.   **WEB APPLICATIONS IN APPLE'S APP STORE AND SAMSUNG'S GOOGLE PLAY ARE UNLICENSED APPS — STOLEN GOODS — FOR WHICH NO ROYALTIES HAVE BEEN PAID TO PLAINTIFF**

16.     This theft generated trillions in revenue for Defendants at Plaintiff's expense and caused a substantial anti-competitive [Unjust Enrichment.] effect. Defendants violated antitrust laws in an effort to monopolize the Web applications market place, undermining fair competition.

**D.     DEFENDANTS' FRAUDULENTLY PROCURED RE-EXAMINATIONS, IPR/CBM REVIEWS CAUSED A SUBSTANTIAL ANTICOMPETITIVE EFFECT OF DELAY UNTIL PATENTS EXPIRE, VIOLATING THE *WALKER* U. S. SUPREME COURT RULING**

17.     The Supreme Court ruling in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965) applies equally to all the fraudulent petitions for re-examinations and IPR/CBM Reviews filed by Defendants Microsoft, SAP and other Corporate Defendants against Plaintiff's patents at the USPTO/PTAB, knowingly concealing (i) Patent Prosecution History Estoppel, contrary to Federal Circuit's recent ruling in *Aqua Products Inc. v. Matal*, 15-1177, 10/17 reversing all rulings that did not consider Patent Prosecution History; and (ii) U.S. Supreme Court Chief Justice Marshall's ruling in *Fletcher v. Peck*, 10 U.S. 87 (1810) prohibiting the quashing of Government issued Patent Contract Grants from the USPTO, specifically with *the goal of creating an anticompetitive effect to kill Plaintiff's valid patents and causing delay in PTAB/USITC/court adjudications till Plaintiff's patents expire as a common antitrust objective*. Hence, enforcement of a fraudulently procured Re-examination/IPR/CBM Review violated the antitrust laws and provides a basis for a claim of treble damages, because it caused a substantial anticompetitive effect.

**E.     ANTITRUST IS A FOREGONE CONCLUSION (CONTINUING FROM *US V MICROSOFT*[1] WITH FOCUS ON DISTRIBUTING STOLEN LICENSE THROUGH ECLIPSE AND APP STORES BY CORRUPT ASSOCIATION-IN-FACT.)**

---

[1] *U.S. v. Microsoft*, No. 98-1232 (TPJ); No. 98-1233 (TPJ)

18.     Plaintiff's single most important invention allows us to interact with our banks and perform Web banking transactions in real-time, tell everyone what we ate for breakfast on Facebook, and allowed our government to spy on its citizens and backdoor the World Wide Web in the name of *'National Security.'* ***In short***, just about every enterprise is infringing Plaintiff's patents.

19.     Microsoft's CTO, Gordon Bell, signed a *'Non-Disclosure Agreement'* with Plaintiff and her company, WebXchange, Inc. in 1996 and interviewed to join her company. Microsoft copied and filed for a patent two years after Plaintiff filed for her patents. Microsoft offered to buy her patents. ***That failing***, Microsoft simply infringed upon Plaintiff's patents; **converted**, it to software and eventually *(in corrupt association with IBM)* pawned it out as *'Freeware'* to monopolize the global market [Making strange bedfellows with the Government and the Courts.]. Judge Alsup ruled (**Exhibit 12**) against Microsoft, in Plaintiff's favor in Case No. C 08-05149 WHA (N. Dt. CA) on 2/17/09: "Microsoft is using counterfeit logic to manufacture a controversy where none exists."

20.     USPTO/PTAB, Federal Circuit, three Federal District Courts, U.S. Supreme Court, Legislature, USDOJ and the USITC, collectively *(and collusively)* by *'Breach of Solemn Oath'* wantonly failed to enforce the *'Law of the Land'* respecting Patent Contract Grants issued by the government; *have,* abused Plaintiff   despicably by denying her *(disparately)* access to justice by hindering such access making resort to the court's process upon the question of due process itself difficult, expensive, and hazardous.

21.     The *'Corruption and Frauds'* of the Officials above are *more concerned about disposing of Plaintiff's patents, than with the case according to the Law of the Land.* Due process does not ensure a correct decision, but only a fair hearing[2].

22.     Plaintiff's infringed patents have made trillions of dollars for Microsoft, IBM, SAP, the Banks and the rest (domestically at the start, now globally); ***and,*** are making trillions for Apple, Google, Samsung, Facebook, and the remaining infringers importing infringing smartphones and other IoT (Internet of Things) devices.

23.     ***However,*** more important than the processes compromised and corrupted; is, the Breach of Public Trust and Confidence in the Government and Courts:

a)     USPTO/PTAB [Representing the Infringers *(in this case re-examining Plaintiff's patents at least 13 times)*; and, the USITC representing the *Importing Infringers'* interest above the 'Domestic Interest' [We should build a wall at their border.].

b)     USPTO/PTAB failing to uphold their *'Public Contract'* — by remaining silent *(as Public Fraud)* to the Federal Circuit *[Adjudicating patentability of a Granted Patent in 'Breach of Solemn Oath'.*] regarding *'Patent Prosecution History Estoppel.'*

c)     *Resulting,* in *'Public Contract Fraud and Deceit'*; *with,* inventors burning their *Patents in Protest before the USPTO; **and,*** USPTO continuing to induce *(by*

---

[2] Here, SAP's attorney Lori Gordon admitted Plaintiff's discovery of U. S. Supreme Court Chief Justice Marshall's ruling in *Fletcher v. Peck* 10 U.S. 87 (1810) had never been heard of before, challenging the validity of Obama's America Invents Act of 2012; *and,* although the lot are learned, they are now either ignorant, indifferent, or sincerely confused about the *'Law of the Land'* [Delineated in *Fletcher*— prohibiting the government from rescinding grants, once issued.]

*corrupt solicitation(s))* unsuspecting inventors to contract with the USPTO under *'False Pretence of Invention Protection.'*

d)  The Legislature and Supreme Court dwelling together; *allowing*, *'Re-examination of Granted Patents'* for patentability [In contempt and violation of the Law of the Land – Even by the *'Highest Authority'* [De facto] having the legislature (AIA) reverse a Supreme Court decision.].

e)  The Government participating in *Corporate Infringers' (domestic and global) Monopoly and Antitrust; to,* spy on citizens and backdoor databases worldwide.

f)  The Courts' and PTAB Judges' *Vested Interests in Corporate Stock* in not Recusing; *outweighed*, only by his or her Breach of Solemn Oath(s).

24.  This is the State of the Union regarding *'Patent Law'* administered by a *'Criminal (Revolving-Door) Enterprise'* in corrupt association with the judiciary and legislature; creating, bad law for two centuries (ignorant or not ),  now contemptuously.

25.  The judiciary [Systematically, issuing *Erroneous and fraudulently* (collusive ) favorable Findings for the Revolving-Door USPTO/PTAB [Aiding and judicially Abetting Unfair Public  Competition.]; enforcing, the legislative enactment provision (colorfully) 'Reexamining' existing patent contract grants authorized by  the America Invents Act [Aiding and Abetting the Antitrust objective(s) of Infringers-at-Large.]; enforcing,  'Bad Law' from 'Lawless Legislation' (ignorant or not); today, (now contemptuously) effectually perpetrates the very thing entrusted to prevent by USPTO's mission statement: ***Fundamentally***,

> § 140. "…Due Process does…entitle a litigant to an honest , though not learned tribunal.  If a litigant is injured through the corruption or fraud of the court or other body disposing of his case,  She (sic) is entitled  to redress under this section  of the Constitution." [*Fallbrook Irrigation District v. Bradley*,  164, U.S. pp.1267-70.]

13

§141.  "Any legislative attempt to do this, whether by direct denial of access to the courts upon this question, or by hindering such access by making resort to the courts upon it difficult, expensive, hazardous, <u>all alike violates the constitutional provision</u>."

"On the question of 'Due Process Itself' and the State of the Union in the fair and proper administration of patent law [Vol. 12, Constitutional Law. Chapter VII, Due Process and Equal Protection of Law: Procedure. Section 1. Due Process of Law; clearly, <u>entitles Plaintiff  to Redress for this treasonous breach of Solemn Oaths to enforce rights of access</u>."

26.    These are the circumstances under which antitrust violations have occurred, namely, the entire administration failing to enforce the Law of the Land, *[Causing damage to the public itself entitled to redress from their practicing attorneys and adjudicating judges' ruling(s) without jurisdiction and immunity.]*; *or,* have been administering the patent laws corruptly in breach of the public's trust. It appears the entire administration has been ignorant of the law.

27.    Even after the Federal Circuit ruled in *Aqua Products, Inc.v. Matal*, Case No. 15-1177, October 2017 that all cases, that did not consider *'Patent Prosecution History Estoppel'* in respective USPTO/PTAB adjudications,  are warranted a reversal,  the USPTO/PTAB *(in contempt)* failed to uphold this *Aqua Products, Inc.v. Matal* ruling, discrimating against Plaintiff,  in her cases regarding her significant patents, that have benefited this entire nation and globe *(for that matter)*.

28.    This 'antitrust' complaint information is a foregone *(adjudicative)* conclusion involving repetitious wrongful *(domestic and global)* antitrust activity, resulting in the sales of defective,  infringed, unlicensed  products, unfair methods of competition, unfair acts in the unlawful importation into the United States, sale for importation into the United States, and/or sale within the United States after importation.  This complaint

14

information involves *(in furtherance)* the same wrongful antitrust objective activity[3] judicially noticed; **_colored,_** by the creation of a complex organizational structure created *(in corrupt association(s))* by Microsoft *(in partnership with Government)*, IBM, SAP, and Apple [4] **_systematically,_** organized to disseminate misleading information[5] under color of *(successfully)* distributing **'Freeware with 'Attaching (Infringed) License'.** The antitrust objective (1) restricted both domestic and international competition; (2) provided dominance and 'Backdoor Access' to its product users; and, (3) **_resulted,_** in the Government's *(associated)* ability to access data in **'Real Time'** on the World Wide Web (improving National Security).

     29.    Apple, Google, IBM, Microsoft, SAP, Fiserv, Samsung and other Defendants are each dominant suppliers of Web applications displayed on a Web browser in IoT devices and have excluded competitors and harmed competition through a set of interrelated practices:

     30.    Apple entered into exclusive dealing arrangements with IBM, a particularly important Web application provider/developer and with SAP. Defendants' predatory

---

[3] While the above court decision disclosed that as far back as 1996, Microsoft monopolized the domestic market and was indifferent to its antitrust corporate objective [Quashing competition.]; noticing, also the shift from 'Browsing Competition' to 'Licensing Antitrust' objective with its competitors [IBM, Apple, and Local Competitors.] disadvantaged; disclosing, further, Microsoft's concession(s) to share license distribution(s) with its major competitors. What the court did not know *(or find)*, was how Microsoft was able to dominate competition by its *(unprecedented)* software licensed products, post Windows 95. Product upgrades *[Revolutionized by.]* affording **'REAL TIME'** Web transactions from Web applications made possible by 'Breach of the Non-Disclosure Agreement' signed by Microsoft's CTO Gordon Bell, with Plaintiff and her company WebXchange, Inc., and thereafter, engaged in Patent Infringement of Dr. Arunachalam's **'VAN SWITCH INVENTION'** patented in 1995 [Protected by Public Contract Grant **'PROSECUTION HISTORY ESTOPPEL'** and the **'MANDATED PROHIBITION'** from rescinding the Public Contract Grant [Delineated in *Fletcher v. Peck*, 10 U.S. 87 (1810)].

[4] Corrupting the Courts and processes: At the onset (after infringement), Judges and USPTO/PTAB Administrative Judges started to invest in stock in the collusive corporations. It is little wonder why some Judges *(vested-ly interested)* would not recuse from ancillary cases relating to this complaint.

[5] Remaining silent *(as to the stolen, unlicensed, infringed product(s))*, as (Public) Fraud.

anticompetitive conduct, reminiscent of Microsoft, has already been adjudicated in *U.S. v. Microsoft* antitrust case. *The table below applies equally to Samsung.*

**F. SIMILARITIES BETWEEN APPLE & MICROSOFT'S ANTI-COMPETITIVE CONDUCT (DOMESTIC ANTITRUST IN COHORT FOR GLOBAL ANTITRUST REENTERING VIA APPLE IN FURTHERANCE LIMITING DOMESTIC COMPETITION WITHOUT NOTICE.)**

| Apple | Microsoft |
|---|---|
| TYING: of Apple's IoT devices and iOS operating system to Web applications displayed on a Web browser in Apple's App Store | TYING: of Microsoft's Internet browser to Windows 95/98 in the mid-90's |
| There are two relevant product markets: The market for IoT devices, eg, iPhones; and, The market for Web applications displayed on a Web browser. | There are two relevant product markets: The market for personal computer operating systems; and, The market for Internet browsers. |
| Apple's attempt to divide the Web applications market and induce Web application providers not to compete. | Microsoft's attempt to divide the browser market and induce Netscape not to compete. |
| The competitive threat that Web applications pose to Apple's iOS operating system. | The competitive threat that browsers pose to the Windows operating system. |
| Apple's exclusionary agreement with Web application developers and Web applications displayed on a Web browser. | Microsoft's exclusionary agreement with Internet Service Providers and on-line services. |
| Apple's contractual restrictions on Web application developers. | Microsoft's contractual restrictions on OEM modification or customization of pc boot-up sequence and pc screens. |

31.     Apple withholds entry/presence of a Web application provider into its Apple App Store unless a Web application provider accepts the terms preferred and dictated by Apple, to retain its monopoly over IoT device and Web applications' markets. This hampered their development into effective competitors. Apple's conduct has harmed competition and the competitive process. *This scenario is true for Samsung and other Defendants as well.*

## VI.    UNLAWFUL AND UNFAIR ACTS OF DEFENDANTS

**VI.A)** **DEFENDANTS MEET ALL THE ELEMENTS OF ANTITRUST VIOLATION: CONSPIRING TO FIX PRICES AND CONTROL ACCESS TO PLAINTIFF'S CODE AND MARKET:**

**1.**    **(i) CONSPIRACY AMONG ECLIPSE FOUNDATION MEMBERS AND  CPL LICENSE  AGREEMENT, IBM AS AGREEMENT STEWARD (PRINCIPAL CONSPIRATOR) ARE IN VIOLATION OF SHERMAN ACT SECTIONS 1 & 2:**

**(ii) APP STORE AND GOOGLE PLAY EVIDENCE CONSPIRACY BETWEEN APPLE AND GOOGLE WITH THEIR RESPECTIVE  WEB APP PROVIDERS AND ARE VIOLATIONS OF SHERMAN ACT SECTIONS 1 AND 2:**

32.    **1.A.)** Defendants *conspired* to control prices, violating at least Section 1 of the Sherman Act, 15 U.S.C. § 1, per se violation, by engaging in anti-competitive conduct and violations of Antitrust laws and 'ancillary processes.'  The *conspiracy* between Apple, Google, Samsung, IBM, SAP, Microsoft, Fiserv and other Defendants  was *knowingly formed* (corruptly associated-in-fact).   (i) The Eclipse Foundation was formed by IBM, SAP as founding board members, with IBM and SAP contributing $40 M  each as per their own SEC Reports  and was in existence at or about the time alleged. (ii) The *conspiracy* between Apple with Defendants in its App Store concealing from consumers that the Web applications are unlicensed  stolen goods is in violation of Antitrust laws. Likewise true for Samsung and Google.

33.    **1.B.)** Defendants Apple, Samsung, IBM, SAP, JPMorgan, Citi, Fiserv, Microsoft, Google, Facebook  (to name a few of the 191 Eclipse members in 2008) *knowingly joined the conspiracy*  in (i) each of the app stores and  (ii) in The Eclipse Foundation (prove common knowledge of infringed product example). The Executive Branch of the United States helped form the Eclipse Foundation. Incidentals Professor James P. Chandler ("Chandler"), who was

IBM's external counsel and also an Advisor to the United States, and Dave Kappos, who was IBM's internal patent counsel, knowingly joined the conspiracy.

34.    EVIDENCE OF THE CONSPIRACY ABOUNDS. IBM created The Eclipse Foundation [in corrupt association with its members and the 'National Infrastructure Assurance Counsel' [now, Advisory Counsel] [*See* EXHIBIT 2: Transcript of Kelley Clements, Executive Assistant to Chandler, Stenographer's Notebook, 8/30/2002.] to initiate a corrupt enterprise for the sole purpose of monopolizing the market for Plaintiff's Web applications displayed on a Web browser and Plaintiff's "The Internet of Things (IoT)," — examples of Web applications are Web banking, social networking — market capitalization of the social networking industry [currently estimated at $2.8 trillion.] and market capitalization of Web applications displayed on a Web browser and the IoT [currently estimated at $12.6 trillion, expected to grow to $14.4 trillion in 2022.] —  operating as the Technical Front/Business Feeder  for the Advisory Counsel; *operating*, as the "Business Feeder" [under color of a public/private enterprise assisting Government in improving National Security.]. *Specifically*,  Eclipse was required to [*overtly act.*] exploit two USPTO programs [successfully.] needed to achieve the object sought; *gaining*, lawful access to them for unlawful use [in furtherance of the conspiracy; by, inducing the public to accept their 'Open Source' (deceitfully obtained)  COPYRIGHT by the masses; *subsequently*, attaching their own Common Public License to it. Eclipse [necessarily.], focused on Plaintiff's intellectual property on Web applications displayed on a Web browser. Given away freely under their (*corrupted*) COPYRIGHT; *requiring*, concealment *coloring* of Plaintiff's code, intellectual property  and value-added network service-oriented architecture protocol for Web applications displayed on a Web browser; *disguised*, and fraudulently misrepresented as a '*Program Copyright*' activity inconsistent with legitimate intent; *propounded*, to  (and granted by) the

USPTO [crimes too small to be recognized as crimes by the USPTO.]. Initially, unwitting victims; and, subsequently, as witting participants in breach of contract on Patent Grant and duty to uphold its 'Patent Prosecution History Estoppel' [to avoid paying royalties and notice of their conspiracy.]. Compromising the USPTO's mission as well as the Court's credibility by sharing in the criminal antitrust Defendants' enterprises' collective profits [from Defendants' app stores and monopolizing Web applications unlicensed and stolen from Plaintiff.] by investment opportunities for Judges; *gained*, from the monopoly; *and*, rewards to its members [amounting to a lawful [under color of law and authority.] antitrust operation.].

35.     This corrupt organization could never have started without Plaintiff's intellectual property and theft and concealment of Plaintiff's trade secrets under color of a Copyright (admittedly) taken and used by Eclipse and its Members. Allowed to stand before this Court (admittedly) with 'unjust enrichment' seeking justice; *is*, overshadowed only by the USPTO and Courts' refusal to enforce the 'Law of the Land' (Constitutional *res judicata*) decision by U.S. Supreme Court Chief Justice Marshall in *Fletcher v. Peck*, 10 U.S. 87 (1810), respecting Government awarded grants. This Court can put an end to it all here today! By upholding the Law of the Land; and ordering Defendants to pay for the deceitful use of Plaintiff's inventions (forthwith); *along*, with punitive damages for creating and participating in the corrupt association; *with*, the unjust enrichment made over the (lawless) years they have been operating their unlawful enterprise(s) and app stores, violating Antitrust laws.

36.     The anti-competitive unlawful acts committed by Defendants alleged here cluster around at least conspiracy by, between and among the Defendants to fix the prices of Web applications displayed on a Web browser, constituting an "unreasonable" restraint on interstate commerce; the Defendants' business activities had a substantial effect on interstate commerce

and the Defendants' challenged activities involve a substantial amount of interstate commerce; and the Plaintiff suffered injury in its business or property as a proximate result of the combination or conspiracy: Defendants' conspiracy to deprive Plaintiff of her fundamental rights; defraud the Government, which is a federal offense; manipulate a Government program to make it non-effective, which is a federal offense; undermine at least two Government agencies; undermine public interests so that no one is protected any more; have the USPTO/PTAB quashing Plaintiff's patents; deprive Plaintiff of patent rights by sabotaging the object and mission of the USPTO and even the courts enforcing the law; engage in manipulation, public corruption; violate civil rights of Plaintiff; deny Plaintiff Due Process; filing false documents by Defendants and Incidentals George Pazuniak, U.S. Attorney Claire T. Cormier, which is a federal offense, aided and abetted by Incidentals Davila and Eric M. Davis; trafficking in certain goods bearing counterfeit marks; tampering with a Federal Witness as by SAP with Marvin Sirbu and JPMorgan with Ms. Spielman; **interstate and (international) transportation of stolen property (Apple from China and Samsung from Vietnam) and obstruction of justice**. *See* 18 U.S.C. §§1341, 1344, 2319-2320, 1512-1513, 2315, 1503, 1510-1511, 1581-1588. Other acts of anti-competitive misconduct, although *appearing* to be isolated events, were actually part of the overall conspiracy and *pattern of Antitrust conspiratorial activity* alleged herein.

     37. The primary objective of the Antitrust conspiratorial *enterprise* has been to control the Web applications and IoT market and to eliminate competition in Antitrust violation, even at the cost of inflicting severe and sustained economic hardship upon Plaintiff, with the intent of impairing and obstructing Plaintiff from exercising her fundamental rights and access to justice and the courts.

38.     Evidence of conspiracy with unity of purpose among competitors and a common commitment to OPEN SOURCE is clear as seen from the header files from the early Eclipse source code all marked "IBM Copyright" with code stolen from Plaintiff and others.

IBM / The Eclipse Foundation
Version 2.0.1 Source Code, August 29, 2002
http://archive.eclipse.org/eclipse/downloads/drops/R-2.0.1-200208291828/
Copyright Notice: http://www.eclipse.org/legal/cpl-v05.html
"Common Public License Version 0.5"

d) Each Contributor represents that to its
knowledge it has sufficient copyright rights
in its Contribution, if any, to grant the
copyright license set forth in this Agreement.

Update on Technology PMC: Eclipse Research Fellowship and University
Programs.
The Eclipse Technology PMC leader, Brian Barry, lead the discussion of this project. This
project is starting with an initial funding by IBM. There are 12 projects from all over the world.

39.     **1.C.)** The charged *conspiracy* substantially *affected interstate and foreign commerce* and occurred within the flow of interstate and foreign commerce. Evidence is provided by Apple, Samsung in their own SEC Reports of **interstate and (international) transportation of IoT devices with Web applications (unlicensed stolen property) pre-installed (for instance, Apple from China and Samsung from Vietnam)**.

40.     **1.D.)** The anti-competitive acts committed by Defendants include the following:

41.     **1.D.1.)** In 2001, at the same time as the founding of The IBM Eclipse Foundation by the Executive Branch of the USA, IBM, SAP and others, Delaware District Court Judge Sue L. Robinson and Jan Horbaly, the Clerk of the Federal Circuit, redefined "financial interests" contrary to the IRS definition of the term, to suit judges to have financial holdings in litigants and not recuse. IBM stock is held by at least U.S. Supreme Court Justice Breyer, who did not recuse from Plaintiff's cases at the Supreme Court.

21

**2.** **IBM AND CPL LICENSE AGREEMENT STEWARD TO CONTROL DISTRIBUTION — DEFENDANTS' FRAUDULENT COMMON PUBLIC LICENSE ("AGREEMENT") IS FURTHER PROOF OF THEIR CONSPIRACY**

42.    **Common Public License Version 0.5**   (*See* **Exhibit 1**).

6/24/2015 Common Public License Version 0.5
http://www.eclipse.org/legal/cpl-v05.html 6/6

– **THE COMMON PUBLIC LICENSE IS A CONTRACT THAT VIOLATES SECTIONS 1 AND 2 OF THE SHERMAN ANTITRUST ACT.**

– **LIKEWISE, THE AGREEMENT BETWEEN APPLE AND GOOGLE WITH THEIR RESPECTIVE APP STORE AND GOOGLE PLAY WEB APP PROVIDERS ARE EACH A CONTRACT IN VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ANTITRUST ACT.**

**15 U.S. Code § 1 states:** "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." **Section 2** of the **Sherman Act** makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . . " **15 U.S. Code § 2 - Monopolizing trade a felony; penalty.**

43.    The fraudulent Common Public License Agreement grants Plaintiff's Rights to Recipients **[DOES 1-100]**, a royalty free copyright license to Contributor's **[Stolen.]** source code and object code, without disclosing that the original Contributor is Plaintiff and a royalty-free patent license under Plaintiff's Licensed Patents to make, use, sell, offer to sell, import and

otherwise transfer the Contributor's **[Stolen.]** source code and object code. Each Defendant

fraudulently represents that to its knowledge it has sufficient copyright rights  to grant the

colored copyright license set forth in the fraudulent CPL Agreement, [herein giving away

Plaintiff's patents, code and IP for free under color of a copyright.] The object of the conspiracy

was to deprive Plaintiff of any profits. "When the Program is made available in  source code

form: …a copy of this [fraudulent] Agreement must be included with each copy of the Program.

Contributors may not remove or alter any copyright notices contained within the Program."

"…The Program is provided on an "as is" **[Stolen.]** basis, …the Agreement is copyrighted and

may only be modified in the following manner: The Agreement **Steward [principal**

**conspirator.]** reserves the right to publish new versions (including revisions) of this Agreement

**[in furtherance of Defendants' deprivation of Plaintiff's rights.]**. No one other than the

Agreement Steward  has the right to modify this Agreement. **IBM [herein admits that IBM is**

**the principal conspirator.]** is the initial Agreement Steward. IBM may assign the responsibility

to serve as the Agreement Steward to a suitable **[co-conspirator.]** separate entity **[associated-in-**

**fact.]**. Each new version of the Agreement will be given a distinguishing version number." **[to**

**continue to avoid notice of Plaintiff's patent.]**

44.     **1.D.2.)** Under CPL (Common Public License) Agreement Version 0.5, the very

agreement is copyrighted and may *only be modified* in the following manner:

> " <u>The Agreement Steward</u> reserves the right to publish new versions (including
> revisions) of this Agreement from time to time. <u>No one other than The Agreement</u>
> <u>Steward has the right to modify this Agreement.  IBM is the initial agreement</u>
> <u>steward. IBM may assign the responsibility to serve as the Agreement Steward</u>
> <u>to a suitable separate entity.</u>"

> "**2.** Grant of Rights
> a)   Subject to the terms of this Agreement, each Contributor hereby grants Recipient
>       a nonexclusive, worldwide, <u>royalty-free copyright license to reproduce,</u>

23

**prepare derivative works of publicly display, publicly perform, distribute and sublicense the Contribution of such Contributor, if any, and such derivative works, in source code and object code form."**

b) "Subject to the terms of this Agreement, each **Contributor hereby grants Recipient a nonexclusive, worldwide, royalty-free patent license under Licensed Patents to make, use, sell, offer to sell, import and otherwise transfer the Contribution of such Contributor, if any, in source code and object code form.**"

**"For example, if a third party patent license is required to allow Recipient to distribute the Program, it is Recipient's responsibility to acquire that license before distributing the Program.**"

**"Each Contributor represents that to its knowledge it has sufficient copyright rights in its Contribution, if any, to grant the copyright license set forth in this Agreement."**

45.    **1.D.3.) PRICE FIXING, BID-RIGGING  BY ANTITRUST CONSPIRACY**

between Apple, IBM, Google, Samsung, SAP, JPMorgan  and other Eclipse Foundation

members in collusion **_with Intent to Injure U.S. and Foreign Competitors_** (Operating as a front

for users to participate in controlling the infringed license by active inducement where the courts

can find as circumstantial evidence.):  The conspiracy comprises an agreement, namely, CPL

Version 0.5, between the members of the Eclipse Foundation, who are all Plaintiff's competitors,

for the purpose or with the effect of unreasonably restraining trade.  For example, IBM is the

Agreement Steward for CPL Version 0.5, **and controls the market by prohibiting anyone**

**from modifying CPL Version 0.5.**  IBM also has restricted free trade by giving away **free**

**copyright licenses and patent licenses to members of the Eclipse Foundation**, to Plaintiff's

intellectual property/software/patents.  **In the conspiracy, IBM and SAP are engaging in price**

**fixing as they are giving away a Third  party's IP/software (namely, Plaintiff's) for free,**

**thereby killing competition and making it impossible for Plaintiff  to sell Plaintiff's**

**IP/software against a giant corporation in conspiracy with other giant corporations,**

24

including the USPTO/PTAB and the courts engaged in unfair trade practices. ***The agreement itself, CPL Version 0.5, constitutes the antitrust offense***.

46.     **1.D.4.) EVIDENCE OF INTENT:** *CPL Version 0.5 is in itself proof of the existence of a price-fixing agreement* and is sufficient to establish ***intent*** to do what Defendants agreed among themselves to do.

47.     **1.D.5.) EVIDENCE OF COMMON UNLAWFUL PURPOSE:** CPL Version 0.5 constitutes a mutual understanding that Defendants have combined their efforts for ***a common, unlawful purpose***, as they have done in the instant case.  For example, Defendants withheld material facts from the courts and the PTAB, *(i)* to not consider the entire record, patent prosecution history estoppel, which readily evidences that the claim terms ruled indefinite by Incidental, Judge Robinson are *clearly* defined both in the specification and in the file history; *(ii)* to not impose the burden of proof upon the infringers/Defendants to provide at least a preponderance of evidence or clear and convincing evidence of falsely alleged invalidity of patent claims; *(iii)* to not uphold U.S. Supreme Court Chief Justice Marshall's *'First Impression'* ruling in *Fletcher v. Peck* 10 U.S. 87 (1810) which prohibits rescinding patent contract grants by the most absolute power, in breach of solemn oaths of office to not abide by the Law of the Land; ***and***, *(iv)* not reversing their erroneous rulings in Plaintiff's cases, as per the Federal Circuit's recent 10/4/17 ruling in *Aqua Products, Inc. v. Matal*, Case No. 15-1177, which reverses any decision by the PTAB or Courts, that failed to consider the entire record, patent prosecution history, and failed to require the Defendants to provide even a preponderance of evidence, let alone, clear and convincing evidence of patent invalidity.

48.     **1.D.6.) Knowingly Joined the Conspiracy:** Defendants joined the conspiracy with the intent to assist or advance the object or purpose of the conspiracy. IBM knowingly

directed all the members of the Eclipse Foundation to participate in the conspiracy as the Agreement Steward and Board Member responsible for the conduct he directed just as if he directly participated in the conduct. IBM and other members of the Eclipse Foundation joined a conspiracy, IBM and/or other members are presumed to remain members of the conspiracy until the conspiracy has been completed or abandoned or until IBM and/or other members have withdrawn from the conspiracy. It is 'First Impression Knowledge' that withdrawing from a conspiracy does not void applicable liability to its fullest extent.

49.     **1.D.7.) <u>Per Se Rule</u>:** Price fixing by Defendants, IBM, Microsoft and SAP and members of the Eclipse Foundation is an antitrust offense that is considered a **<u>per se</u>** **<u>unreasonable restraint of trade</u>**. The courts have reasoned that this practice, which invariably has the effect of raising prices to consumers, has no legitimate justification and lacks any redeeming competitive purpose and should, therefore, be considered unlawful **<u>without any</u>** **<u>further analysis of its reasonableness, economic justification, or other factors</u>**. For most other antitrust offenses, the courts have established an analytical approach labeled the "Rule of Reason." Under the Rule of Reason, the courts must undertake an extensive evidentiary study of (1) whether the practice in question in fact is likely to have a significant anticompetitive effect in a relevant market and (2) whether there are any procompetitive justifications relating to the restraint. Under the Rule of Reason, if any anticompetitive harm would be outweighed by the practice's procompetitive effects, the practice is not unlawful. *Defendants cannot claim this, by their obvious non-compliance.*

50.     **<u>Apple's and Samsung's Other Per Se Violations of the Sherman Act</u>:** Evidence of horizontal customer allocation and territorial allocation agreements by Apple and Samsung with IBM and other Eclipse Foundation members and entering into exclusionary

26

agreements with Web application developers, are per se illegal agreements among competitors that have been detected. *See* CPL License, *infra*. These are antitrust violations by Apple, Samsung, IBM and other Eclipse Foundation members and all Defendants.

51. **Horizontal customer allocation** is an agreement among competitors at the same level of distribution of a product or service that each will service certain designated customers or classes of customers, for example, restricting it to sale to customers via Apple's App Store only and will not attempt to compete by selling to those customers directly via the Web application developers' own websites, or will limit the manner in which they will compete, for the business of customers allocated to a competitor. *This is true for Samsung as well*.

52. **Horizontal territorial allocation** is an agreement among competitors at the same level of distribution of a product or service to solicit or service customers only within a certain geographic area, for example, restricting it to sale via Apple's App Store only and not via the Web application developers' websites. The competitors who agree to this type of arrangement agreed with Apple to reject business from customers in another's territory. Both customer and territorial allocation schemes result in an absence of competition in prices and choice of products for the affected customers. *This is similar for Samsung as well*

53. **1.D.8.) Interstate and Foreign Trade and Commerce:** The restraint has been shown by Plaintiff to be in the flow of, or to affect, interstate and foreign trade and commerce. For interstate commerce, this test is ordinarily satisfied by demonstrating that products involved in the case were shipped across state lines, for example, IoT devices with Web applications in app stores, that services involved interstate activities, or that significant federal funding was involved. For foreign commerce, this test can be satisfied by showing that **the conduct involved import trade or import commerce**. This element is clearly met by Defendants, as shown *infra*,

of imports from China, Vietnam and sale within the U.S by Apple, Samsung. *See* Plaintiff's

USITC Case No. 337-1094, for evidence submitted  and available right from Defendants'

websites, SEC Reports,  and product wrappers and receipts of purchase.

54.    **1.D.9.) <u>Single Versus Multiple Conspiracies</u>:** Defendants' illicit activity of

offering Web applications without a license as Antitrust  racketeering  unlawful acts and harm to

Plaintiff has been an ongoing, continuous conspiracy, continuing unabated. *See infra* about

Eclipse Foundation.

55.    **1.D.10.) <u>UNDISPUTED FACTS</u>:** IBM signed NDAs with Plaintiff  and her

companies in 1995, 2001, 2003 and stole Plaintiff's  software and gave free copyright licenses to

the stolen code from Plaintiff  and her companies and free patent licenses via CPL (*supra*), and

offered to buy her  patents in 2006, which Plaintiff turned down. IBM gave Plaintiff  and her

companies free office space in 1994 and 2005. Gordon Bell, the CTO of Microsoft, signed an

NDA with Plaintiff's  company in 1996, and then Microsoft came out with a patent application

for SOAP (a copy of Plaintiff's object routing protocols) in 1997; whereas Plaintiff's  patents

were filed in 1995, two years earlier; and then Microsoft offered to buy Plaintiff's patents in

2004/2005, which Plaintiff turned down. SAP signed NDAs with Plaintiff's company in 2003

and then offered to buy her  patents for $100M.

56.    It is clear all Defendants meet all the elements of violation of the Sherman Act,

Secs 1 &  2.

57.    <u>As Plaintiff poses  a threat to Defendants' monopoly in the market for IoT and</u>

<u>Web applications displayed on a Web browser, they conspired to kill Plaintiff's  patents in the</u>

<u>courts and PTAB.</u> By not killing Plaintiff's patents, this would have substantially reduced the

dominance of IBM's Web application platform and Defendants' app stores. Defendants

prevented and excluded competition and frustrated the efforts of other companies such as
Plaintiff's companies and those of other inventors to compete for customers in the relevant
market. They used anti-competitive means to achieve their goals. *Their conduct of withholding
material facts of patent prosecution history estoppel, Fletcher and Aqua Products, Inc. to kill
Plaintiff's patents and those of other inventors does not provide any benefits to consumers and
is against public interest*. They had no legitimate business reason for not upholding *Fletcher* or
*Aqua Products* or Patent Prosecution History Estoppel. Defendants' refusal to cooperate with
rivals constitutes anti-competitive conduct. They engaged in deceptive conduct, reasonably relied
upon by a competitor, namely, Plaintiff, that has the purpose and effect of preventing a
competitor from developing in a timely manner a product that would enhance competition by
threatening a monopolist's monopoly power in the IoT and Web applications market.

58.     *Their anti-competitive conspiratorial racketeering misconduct caused damage to
Plaintiff and killed her company and those of other inventors*. They damaged Plaintiff at the
PTAB and courts by not upholding *Fletcher, Aqua Products, Inc.*, and Patent Prosecution
History Estoppel and Section 282 of the Patent Act. *Had they not done that, Plaintiff would have
been the largest technology company in the world*. They engaged in anti-competitive conduct by
all the things they did in the courts and PTAB. *Anti-competitive conduct that damaged Plaintiff
was reasonably capable of significantly contributing to IBM, Apple, Google, Samsung and other
Defendants maintaining monopoly in the IoT market*. The Eclipse Foundation was set up as a
non-profit, yet Defendants continue to make trillions of dollars from Plaintiff's inventions. This
is truly a farce and a money-laundering scheme, run under the color of a non-profit, to avoid
investigation and obstruct justice. This is an element of white collar crime.

59.     *The law provides that Plaintiff should be fairly compensated for all damages to Plaintiff's business or property and physical health that were a direct result or consequence of their conduct.*

This Court now has the opportunity to equitably quash Defendants' antitrust scheme in the public's best interest without restriction.

**3.    ECLIPSE FOUNDATION MEMBERS DEMONSTRATE IRRATIONAL COORDINATED ACTION, CONFIRMING THEIR CONSPIRACY AND INTENT TO INJURE U.S. AND FOREIGN COMPETITORS, SHARE EDITING THE ECLIPSE CODE**

        **A)    THE IBM ECLIPSE FOUNDATION: (i) ACQUISITION AND MAINTENANCE OF AN INTEREST IN AND CONTROL OF AN *ENTERPRISE* ENGAGED IN A *PATTERN OF RACKETEERING ACTIVITY* AND (ii) CONSPIRACY TO ENGAGE IN A PATTERN OF ANTITRUST RACKETEERING ACTIVITY, AS ANTI-COMPETITIVE CONDUCT AND VIOLATIONS OF ANTITRUST LAWS**

60.     At various times and places enumerated by Plaintiff *supra and infra*, Defendants and DOES 1-100 acquired and/or maintained, directly or indirectly, an interest in or control of and associated with The IBM Eclipse Foundation, an Antitrust racketeering *enterprise* of individuals who were associated-in-fact and who engaged in, and whose activities affected, interstate and foreign commerce, and conducted and/or participated, either directly or indirectly, in the conduct of the said *enterprise*, namely, The IBM Eclipse Foundation's affairs through a *pattern of Antitrust racketeering activity,* and conspired to (i) acquire and maintain an interest in and (ii) conduct and participate in said Antitrust racketeering *enterprise* engaged in a *pattern of antitrust racketeering activity* and through a *pattern of racketeering activity,* all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(b), (c ) and (d) and the Sherman Act.

61.     IBM and SAP invested monies in the creation of the IBM Eclipse Foundation and acquired an "interest" in the Antitrust Enterprise, the IBM Eclipse Foundation.  IBM and SAP

are founding members and members of the Board of Directors from the beginning. Defendants

controlled the selection of the Board of Directors and have ongoing control of the Eclipse

Common Public License, with IBM as the License Agreement Steward. The

Common Public License states:

> "No one other than the Agreement Steward has the right to modify this
> Agreement. IBM is the initial Agreement Steward. IBM may assign the
> responsibility to serve as the Agreement Steward to a suitable
> separate entity."

62.     IBM, SAP and JPMorgan (Apple, Samsung, Facebook, Google, Wells Fargo,

Fiserv are memebrs) acquired a controlling or other interest in managing and operating the

affairs of The IBM Eclipse Foundation. IBM admits it invested $40M in creating The IBM

Eclipse Foundation. IBM's 2001 Annual Report highlights its founding role in The Eclipse

Foundation. IBM 2001 Annual Report to Shareholders, p. 21 ("No. 5 - We fought for an open

world. THE END OF PROPRIETARY COMPUTING AT IBM… We donated more than $40

million in application development tools to a new, independent, open-source software

community called Eclipse.") ftp://public.dhe.ibm.com/annualreport/2001/ibm2001.pdf#page=21



WE DONATED MORE THAN $40 MILLION IN
APPLICATION DEVELOPMENT TOOLS TO A NEW, INDEPENDENT, OPEN-SOURCE
SOFTWARE COMMUNITY CALLED ECLIPSE

Figure: IBM 2001 Annual Report to Shareholders: "No. 5 - We fought for an open world. THE
END OF PROPRIETARY COMPUTING AT IBM… We donated more than $40 million in
application development tools to a new, independent, open-source software community called
Eclipse." PDF p. 21 of 112 pgs.

63.     JPMorgan invested funds in order to create The IBM Eclipse Foundation,

maintains membership in it and was the first showcase system of the Eclipse code.

64.    Evidence of IBM's, SAP's and JPMorgan's hijacking role in The IBM Eclipse Foundation —IBM as the **"Initial Agreement Steward"**— with total control over modifications (that no other than the Agreement Steward has the right to modify the CPL Common Public License 0.5 of the Eclipse code) **is *prima facie* evidence** of IBM's leadership role in The IBM Eclipse Foundation.  SAP as a founding Board member and JPMorgan as the first showcase system of the Eclipse code, endorsed IBM's leadership, which is a matter of public record, subject to judicial notice. *King v. Baldino*, 648 F. Supp. 2d 609, 615-616 (D. Del. 2009). The following facts are material to this case:

**B)    ECLIPSE FOUNDATION COMMON PUBLIC LICENSE 0.5:**

> "…to publish new versions (including revisions) of this Agreement from time to time. No other than the Agreement Steward has the right to modify this Agreement. **IBM is the Initial Agreement Steward**. IBM may assign the                                    …"
> Source: http://www.eclipse.org/legal/cpl-vo5.html

65.    This and other references to IBM in the Common Public License 0.5 are provided below (highlighted emphasis added):

```
to publish new versions (including revisions) of this
Agreement from time to time. No one other than the
Agreement Steward has the right to modify this Agreement.
IBM is the initial Agreement Steward. IBM may assign the
clipse.org/legal/cpl-v05.html
```

**Current Issues before the Committee**
• CPL license update
New members and end-customers have recommended changes to CPL Section 7. Changes are in progress with CPL license steward (IBM) to create an EPL (Eclipse Public License) that will contain substantive changes to Section 7 of the CPL. These changes will require re-submitting Eclipse contributions under the new license.  License creation, license language and license stewardship will be submitted for approval as an e-vote to board stewards in the next 30-60 days.

- IT infrastructure migration

  The Board discussed the requirement to migrate the current web site infrastructure from
  its current **IBM** hosting facility. The key points discussed included:
  o the current bandwidth is insufficient and needs to be expanded

---

- Plan for migrating the Eclipse website from the current **IBM** infrastructure to one
  which is managed directly by Eclipse.
- Establish the Eclipse administrative systems such as banking, invoicing, payroll,
  etc.

---

The project is addressing some current issues. The code is still not in the Eclipse CVS
yet. Source is included as downloads, and development is being done on a separate site
with shadowing of source in external repositories. There are currently only **IBM**
committers.

---

However, in the short term, this will be still be quite minimal.
- o Eclipse requires its own web infrastructure, and a project to migrate it from its current
  IBM home will commence ASAP.
- o In the future, the eclipse.org website will support two distinct zones: one for the open

---

### SWT/Swing Interoperation



Dave Thomson presented SWT / Swing Interoperation discussion. This included
discussion about whether promoting SWT is good for the consortium and relations with
other companies with existing and vested interests in other technology.

There are two issues: 1) The relationship with other companies, and 2) the technical
interoperation of the SWT and SWING frameworks. The Board directed that Eclipse
must focus on efforts for interoperability. Solving the technical problem of interoperation
is dependent upon changes to the source code of some virtual machines. This will require
help from VM vendors. Member Company IBM is committing resources to work with the
**IBM** VM teams, but cannot do anything to fix it for Jrocket or Sun VMs or others.
Stewards need to tell their VM vendors that this interoperability is important.

---

### Meeting Minutes of The IBM Eclipse Foundation, September 5, 2002:

66.     The following references to IBM, JPMorgan, SAP in the IBM Eclipse Foundation

Meeting Minutes from September 5, 2002 include (highlighted emphasis added):

33

**Update on Technology PMC:  Eclipse Research Fellowship and University Programs.**
The Eclipse Technology PMC leader, **Brian Barry**, lead the discussion of this project. This project is starting with an initial funding by IBM. There are 12 projects from all over the world. The hope and expectation is other companies will also provide funding as we move forward. Because it is a technology project no Board approval is necessary.

- October 4th - Version 1.0.1
The GEF Contributions are:
  - All IBM committers

- Taking over responsibility and management for the Eclipse.org website. Our infrastructure is currently hosted and managed by IBM. Migrating to an EMO-managed location is a prerequisite to making any major investments (both software and hardware) to improve the site. In the interim, the currently dedicated IBM staff will make whatever incremental improvements which can reasonably done.

However, in the short term, this will be still be quite minimal.
- ○ Eclipse requires its own web infrastructure, and a project to migrate it from its current IBM home will commence ASAP.
- In the future, the eclipse org website will support two distinct zones: one for the open

1.  Eclipse's image in commercial end-user organizations
Eclipse was widely recognized within the tool community. This included tool providers such as tool vendors and tool builders. However, there was minimum awareness and confused identity within the end user community. Eclipse is often construed as a standard rather than a platform for tool integration. Eclipse is also viewed as inconsistent with OMG standards. Eclipse is perceived as dominated by IBM.

- ○ Authorizing the Executive Director to take action to:
  - Acquire insurance for the Corporation; and
  - Migrate Eclipse's IT and website systems from their current IBM-supported infrastructure to an Eclipse controlled site
  - Open bank accounts on behalf of the Corporation

| CISCO LOAD DIRECTOR |

Planned Architecture: IBM backend, IPF II application servers

**Eclipse Board Meeting Minutes, May 28, 2003: Eclipse Legal Committee**

67.     Mike Rank presented the report of the Legal Advisory Committee:  The Legal committee includes members: HP: Michael Rank (Chair, 2003); **IBM: Tom Callan**; OMG: Jamie Nemiah; **SAP: Michael Bechauf**.

### Eclipse Board Meeting Minutes, Sep 15, 2004:

68.     A number of resolutions were reviewed and approved by the Board. These resolutions included: **Michael Bechauf of SAP** will be taking over from Bjorn Freeman-Benson as Chairman of the Compensation Committee.

### Eclipse Board Meeting Minutes, Feb 28, 2005:

69.     Exhibit Hall Sold Out for EclipseCon.

7 Gold Sponsors: Accelerated, Actuate, Agitar, Borland, HP, **IBM, SAP**.

SAS, **SAP,** Intel, Borland, BEA sponsoring a reception.

**IBM**, Sybase and Genuitec hosting a vendor reception.

Board Membership Update Feb 2005: **Strategic developer: IBM; Strategic consumer: SAP**.

Jon Ward of IBM is leading a working group to initiate a market study… provided Eclipse a proposal for $60K to conduct this study; Working Group currently soliciting sponsors for the study from Member companies: Interested companies: **IBM, SAP**.

**Common Public License Version 0.5:** "Contributor" means any person or entity that distributes the Program. (d) Each Contributor represents that to its knowledge, it has sufficient copyright rights in its Contribution, if any, to grant the copyright license set forth in this Agreement."

### Eclipse Board Meeting Minutes, Dec 8, 2004:

70.     The Board replaced the "Legal Advisory Committee" with a new "IP Advisory Committee" chaired by Dave Thomson of IBM and including …and Michael Bechauf (SAP). (D.I. 1-4, p. 13 of 83, p. 693). Michael Bechauf (SAP) is a founding Eclipse Board of Director of

The IBM Eclipse Foundation. See Ecosystem OData- the best way to REST, showing <u>SAP, IBM</u> applications using OData-based REST services in www.sap.com  (D.I. 1-4, p. 33 of 83, p. 713).

71.     In *Reves v. Ernst & Young*, 494 U.S. 56 (1990),  the Supreme Court held that participation in the conduct of an enterprise requires an element of direction over the affairs of the enterprise. Plaintiff has already established liability on the part of Defendants because Defendants' participation in the conduct of The IBM Eclipse Foundation is clearly evidenced by an element of direction over the affairs of the enterprise. Plaintiff's Exhibits of The IBM Eclipse Foundation Meeting Minutes shows SAP was a founding Board Member, IBM was the ring leader and IBM was the Eclipse CPL 0.5 Agreement Steward and that nobody could modify the License Agreement without the approval of the Agreement Steward, namely, IBM and JPMorgan was the first showcase system of the Eclipse code, stolen property.

72.     Plaintiff's **Exhibits 1-8, 11, and 16** show by a preponderance of evidence Defendants' liability, as they meet the commerce requirement of the federal statute, the IBM Eclipse Foundation Antitrust racketeering enterprise sufficiently affected interstate commerce, see *U. S. v. Robertson,* 115 S. Ct. at 1733 (stating that a corporation is generally "engaged 'in commerce" when it is itself "directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce").

73.     That Defendants exercised sufficient "managerial or operational control" for liability under 18 U.S.C. §§ 1962 (c) is factual, of public record that the Court must take Judicial Notice of. Preponderance of evidence has established that Defendants are liable under 18 U.S.C. §§1962 (c ), and that Defendants are associated-in-fact.

74.     **Plaintiff has established by a preponderance of evidence that Defendants conspired and agreed to engage in the conduct** which violates Antitrust laws and 18 U.S.C.

§§1962(b)) and (c). IBM, SAP, JPMorgan *et al* made **an agreement to** conduct or participate in the affairs of The IBM Eclipse Foundation. In addition, Defendants agreed to commit **at least two** predicate acts which form the pattern of antitrust racketeering activity. *See* **the code changes made together by IBM and SAP of stolen property.** See **"Tentative IP Log for eclipse.platform, eclipse.jdt and eclipse.pde," Exhibit 11, pp. 15-131.** Hence, Plaintiff has shown by a preponderance of evidence that Defendants have violated 18 U.S.C. §§1962(d) and Sections 1 & 2 of the Antitrust Sherman Act.

75.    Plaintiff has provided sufficient information in her Complaint and Exhibits that established with **a preponderance of evidence the overt acts committed by Defendants in furtherance of the antitrust conspiracy**, as required in civil cases. See Exhibits 1 and 11 about IBM as the CPL Security Steward, endorsed by SAP as Board member and by JPMorgan as Eclipse showcase.

76.    For each alleged predicate act, Defendants were associated with the wrongful conduct, participated with the intent to bring it about, and sought by their actions to make it succeed. *See* **Exhibit 11, pp. 15-131 showing IBM and SAP changing code**. This is a preponderance of evidence of Defendants' aiding and abetting liability, where for each alleged predicate act, the defendant was associated with the wrongful conduct, knew of the commission of the act and acted with intent to facilitate it. *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258 (3d. Cir. 1995).

77.    **Exclusionary Agreement with IBM as Agreement Steward:** Exhibit 11 is a true copy of the CPL Agreement of Eclipse code, which shows IBM-SAP collusion from the Eclipse website. The documents in the Exhibit are true and accurate copies of files downloaded from www.eclipse.org on April 18, 2016:  2002-08-29 Common Public License (CPL) Version

0.5 http://www.eclipse.org/legal/cpl-v05.html;  2004-09-02 Tentative IP Log for

eclipse.platform, eclipse.jdt and eclipse.pde

   http://www.eclipse.org/projects/ip_log.php?projectid=eclipse.platform,eclipse.jdt,eclipse.

pde; and  2004-09-02 Eclipse CPL to EPL Transition Plan http://www.eclipse.org/legal/cpl2epl/

   78.   **Defendants committed overt acts  in furtherance of the conspiracy**, as

required in civil cases, as evidenced from their overt acts in the IBM Eclipse Foundation.

   79.   Plaintiff has already shown by a preponderance of evidence of Defendants'

liability as they meet the direct causation requirement of the RICO statute and that the injury to

Plaintiff's business or property occurred "by reason of" the RICO violation by the Defendants, as

required by 1964 (c). *See* U.S. Supreme Court ruling in *Holmes v. Securities Investors Protection*

*Corp.* 112 S. Ct. 1311 (1990).

### C) ANTITRUST CONSPIRACY UNDER COLOR OF  A NON-PROFIT ENTITY (!!!), TO AVOID INVESTIGATION – A WHITE COLLAR CRIME – YET DEFENDANTS MADE TRILLIONS OF DOLLARS:

   80.   The corporate form for The Eclipse Foundation is wholly irrelevant to claims of

racketeering. If this were true, then every organized crime syndicate in the United States would

become a not-for-profit entity. Indeed, The Eclipse Foundation as (and under color) of a not-for-

profit entity is acting as a conduit through which its members such as IBM, SAP and other

Defendants, derive trillion dollar profits by trafficking stolen goods, intellectual property and

source code belonging to Plaintiff and other inventors through the unlawful use without a

trademark or copyright license. This constitutes civil RICO as well as violation of the many

statutes of the USA, namely, Copyright and Trademark statutes, and Antitrust statutes.

   81.   The IBM Eclipse Foundation meets federal statute's requirements of a '1961(4)

"enterprise:" "...any union or group of individuals associated in fact although not a legal

entity," an amoeba-like infrastructure that controls a secret antitrust racketeering network, of companies engaged in committing the predicate acts.

82.     IBM admits that IBM funded The IBM Eclipse Foundation. *See* IBM 2001 Annual Report, PDF p. 21, *supra*. It is a matter of public record and an item subject to judicial notice that IBM, SAP and JPMorgan have acquired or maintained an interest in or control of an enterprise through a pattern of antitrust racketeering activity, by trafficking goods, intellectual property, inventions, source code belonging to Plaintiff and other inventors involving intersate and foreign commerce, and have used counterfeit marks and violated the Copyright and Trademark statutes and  Antitrust statutes.

83.     Defendants meet the 1989 U.S. Supreme Court test of <u>continuity plus relationship,</u> <u>repeated conduct that by its nature projects into the future with a threat of repetition</u>, unless this Court steps in and puts an end to their continuing antitrust conspiracy activities and continued pattern of  anti-competititve conduct. Defendants' misconduct forms a pattern by committing acts that have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events.

84.     Defendants IBM, SAP, JPMorgan *et al* acquired significant control and influence interests, such as pre-emptive controls over development and management of key governing licensing agreements and effective control of the composition of the directors, program leaders and staffing. For example, IBM designated itself as the "Initial Agreement Steward" of the Eclipse "Common Public License 0.5." Such positions constitute controlling "interest" in an enterprise under federal statutes. SAP and IBM funded The IBM Eclipse Foundation. *See* IBM 2001 Annual Report, PDF p. 21, *supra*. <u>Its members such as IBM, SAP, Apple, Samsung, Fiserv,</u>

Microsoft  and others used The Eclipse Foundation as a conduit through which they derive profit by trafficking goods, intellectual property and source code belonging to Plaintiff and other inventors through unlawful use without a copyright license. This constitutes violation of Copyright and Trademark statutes and antitrust statutes.

85.     SAP, IBM and JPMorgan obstructed Plaintiff's efforts at commercialization of her intellectual property into products and hijacked them away to their customers such as JPMorgan, Facebook, and others. SAP, IBM and JPMorgan caused financial damage to Plaintiff. SAP, IBM and JPMorgan also caused personal injury to Plaintiff by colluding and conspiring with the judiciary through Incidentals Skadden Arps, James Chandler, Dave Kappos, former internal IBM's Chief Patent Counsel assigned by IBM, to be the Director of the USPTO, Sterne Kessler, Jones Day, Kevin Turner, Jon Strang, Lori Gordon, Mike Lee, CAFC Judge K. Moore, PTAB Judges Siu and McNamara, who had direct stock in Microsoft, a litigant in Plaintiff's re-exam cases, and DOES 1-100, through wielding undue influence and power over the PTAB and CAFC against Plaintiff, and failing to abide by the Law of the Land as in the Supreme Court's *Fletcher* ruling and in the Federal Circuit's *Aqua Products* ruling on patent prosecution history estoppel.

86.     *The indelible evidence of Eclipse code version 2.0.1 incorporating the intellectual property, source code and inventions of Plaintiff cannot be disputed by Defendants. This Court should take Judicial Notice of Eclipse code version 2.0.1, a matter of public record*.

87.     That Defendants unlawfully used and trafficked goods, intellectual property, source code and inventions belonging to Plaintiff and others **without a copyright license** and using counterfeit marks, and profited from it without compensation to the inventor in violation of Antitrust laws cannot be disputed. Colluding and conspiring in an antitrust illegal trafficking of

goods belonging to others without a license to copyrights or trademarks of others by IBM and SAP cannot be disputed.

88.    Defendants injured Plaintiff, a minority-owned, woman-owned small business competitor, by crushing her and her business by antitrust racketeering activities, by using undue influence to obtain Plaintiff's intellectual property at below market prices at zero dollars and distributing it unlawfully for unjust enrichment, causing the loss of her business. IBM, JPMorgan and SAP engaged in Antitrust violation and damaged Plaintiff financially and caused to inflict bodily injury on Plaintiff. The injury caused by IBM, JPMorgan, SAP,   to Plaintiff, to her business and to her personally, is huge and measurable.

89.    Defendants made representations by mail, telephone and email. Plaintiff hereby invokes 18 U.S.C. §1962 on the basis of mail and wire fraud by Defendants, in furtherance of their antitrust racketeering conspiracy. Proof that Defendants committed common law fraud (plus the additional element of using the mails or wires) to establish these predicate acts abounds.

90.    Plaintiff has provided incontrovertible and a preponderance of evidence to prove that (1) Defendants committed the predicate acts and engaged in a pattern of racketeering activity, antitrust violations and conspiracy and proof of an "overt act" committed in furtherance of the antitrust conspiracy. Defendants engaged in a pattern of racketeering and anti-competitive activity prohibited by at least the Sherman Act and 18 U.S.C. §§1962(b) through (d).

91.    Plaintiff further alleges that Defendants and DOES 1-100 committed two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S. C. 1962(d) (Prohibited activities *supra*).

92.    During the ten (10) calendar years preceding the date of the instant Complaint,

Defendants and DOES 1-100 cooperated jointly and severally in the commission of two (2) or more of the Antitrust racketeering acts that are itemized at 18 U.S.C. §§ 1961(1)(A) and (B), in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective antitrust *racketeering activities*, and did so in violation of 18 U. S. C. 1962(b), ( c ) and (d) (Prohibited activities).

93.     Defendants received income, directly or indirectly, from a pattern of racketeering activity via The IBM Eclipse Foundation. Defendants used or invested part of such income to create The IBM Eclipse Foundation and to acquire a controlling or other interest in it. It is a matter of public record that this enterprise is engaged in activities that affect inter-state or foreign commerce.

94.     Defendants engaged  egregiously in Antitrust racketeering acts, namely: criminal infringement of a copyright (18 U.S.C. § 2319); economic espionage and theft of trade secrets (18 U.S.C. §§ 1831 and 1832); retaliating against a witness, victim, or informant (18 U.S.C. § 1513); obstruction of justice (18 U.S.C. § 1503); act or threat involving …robbery, extortion, bribery (18 U.S.C. § 201);   counterfeiting (18 U.S.C. §§ 471, 472 and 473); theft from interstate shipment (18 U.S.C. § 659); mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); obstruction of criminal investigations (18 U.S.C. § 1510);  interference with commerce, robbery, or extortion (18 U.S.C. § 1951); engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957); *interstate transportation of stolen property* (18 U.S.C. §§ 2314 and 2315); trafficking in counterfeit labels for computer programs or computer program documentation (18 U.S.C. § 2318); and  trafficking in goods or services bearing counterfeit marks (18 U.S.C. § 2320). Defendants violated the laws of the United States through willful and highly material fraud and hence are  liable under Antitrust and RICO statutes.

95.     The counterfeit marks are the unlawful selling by Defendants as SAP goods and IBM goods such as IBM WebSphere and any and all Web applications and services marketed by SAP and IBM, and AppStore, Google Play and Samsung's Google Play Web applications, and Fiserv 's Web applications, without licensing from Plaintiff.

96.     *See* items of public record, that **this Court should take judicial notice of, namely, Eclipse code version 2.0.1, CPL Common Public License 0.5 of the Eclipse code, of the Eclipse Foundation Meeting Minutes, which are matters of public record and attached as Exhibits 11, 16 and 1-8.**

97.     Plaintiff has provided incontrovertible evidence of Defendants' role in and their use of The IBM Eclipse Foundation, to hijack and distribute Plaintiff's intellectual property and that of others. In hijacking Plaintiff's inventions, Defendants violated numerous laws, including but not limited to RICO statutes, the Copyright Act, **and Antitrust** statutes. This evidence shows that the Defendants conspired and acted to design and engage in an antitrust racketeering enterprise to effect financial damage, termination of property rights without due process and infliction of bodily injury upon Plaintiff.

98.     Defendants' theft of intellectual property, source code and inventions by Plaintiff and other inventors — all important intellectual properties that IBM and its conspirators needed to form the basis of their global **"Internet of Things" scheme** — are material facts integral to the case.

99.     SAP's involvement in THE IBM Eclipse Foundation occurred long before SAP's Petition for CBM Review of Plaintiff's Patents at the PTAB. SAP was one of the Founding members of The IBM Eclipse Foundation.

100.    The IBM Eclipse Foundation and SAP's trafficking activities through this conduit, compounded by the theft of Plaintiff's intellectual property and economic espionage and theft of trade secrets by SAP (18 U.S.C. §§ 1831 and 1832),  are  a matter of public record and item of Judicial Notice and this Court must take **Judicial Notice** of such.

101.    Plaintiff clearly alleges in this complaint that IBM's sale or JPMorgan's purchase of WebSphere development tools and Web application products and services and Apple's App Store, Googles's  and Samsung's Google Play Web applications is criminal infringement of a copyright (18 U.S.C. § 2319); economic espionage and theft of trade secrets (18 U.S.C. §§ 1831 and 1832);  and a  violation of many laws, including but not limited to the Copyright Act, Antitrust statutes and civil RICO statutes.

102.    IBM cannot alter history or change facts. Items of public record and items subject to judicial notice about Defendants'  involvement in The IBM Eclipse Foundation are not items this Court may ignore. Those facts point overwhelmingly to collusion, conspiracy and a pattern of Antitrust racketeering by Defendants  in egregious violation of 18 U.S.C. §§ 1962 (b).

103.    IBM's long time former inside counsel David J. Kappos later became Director of the USPTO. It is a matter of public record that: (1) JPMorgan is IBM's customer of IBM's Web application products, tools and services; (2) that law professor emeritus James P. Chandler, III is a key figure at the Patent Office, helped IBM create and promote The IBM Eclipse Foundation. Kappos was a participant in Chandler's organization, The National Intellectual Property Law Institute (NIPLI). In these positions, it is well known in Washington, D.C. that Chandler influenced President Obama to appoint Kappos as director of USPTO  in a rare recess appointment on August 7, 2009. Incidentals Chandler and Kappos were instrumental in appointing Incidental Patent Judge Stephen C. Siu to patent reexaminations of Plaintiff and of

44

Leader Technologies (Chandler was Leader Tech's Patent Counsel at one point.). (3) PTAB Judge Siu failed to disclose that both IBM and Microsoft were his former employers, thus disqualifying him from hearing and presiding as chief judge in Plaintiff's patent reexaminations; his financial holdings in Microsoft and IBM and conflicts of interest void his ruling (because Microsoft was the Third Party Requester who initiated the re-exam) in the USPTO/PTAB invalidating Plaintiff's patent for no valid reason in violation of Patent Prosecution History Estoppel, and CAFC's ruling in *Aqua Products Inc. v Matal*, 15-1177, 10/17, and in treasonous violation of U.S. Supreme Court's Chief Justice Marshall's ruling in *Fletcher v. Peck*, 10 U.S. 87 (1810) ; (4) Incidental PTAB Judge McNamara holds direct stock in Microsoft [the Third Party Requester who initiated the re-exam against Plaintiff's patents.], which is an influential participant and collaborator, directly and through surrogates, in The IBM Eclipse Foundation and failed to recuse and thus deprived Plaintiff of her due process rights. McNamara has been unduly harsh to Plaintiff, denying her electronic filing and expunging her files for asserting her constitutional right to a neutral judge. He threatened that he would and treasonously ruled all her patents invalid in the PTAB re-exams initiated by SAP—a founding member of The IBM Eclipse Foundation. This conflict voids any and all PTAB decisions on Plaintiff's patents.

104.    The fraud-based antitrust racketeering claim includes the date, place and time of the fraud, who made a misrepresentation to whom and the general content of the misrepresentation.

105.    Colluding and conspiring in an antitrust racketeering illegal trafficking of goods belonging to others without a license to copyrights or trademarks of others by IBM and other Defendants cannot be disputed.

106.    JPMorgan knowingly engaged in obstruction of justice, in violation of the federal obstruction of justice statute, and remained silent (as fraud) of Patent Prosecution History Estoppel, in violation of CAFC's ruling in *Aqua Products Inc. v Matal*, and in treasonous violation of U.S. Supreme Court's ruling in *Fletcher v. Peck*. which affected the Plaintiff; and witnesses and the judiciary, caused her bodily injury, loss of her business and property rights and financial damage.

107.    The Court should grant Plaintiff the threefold damages Plaintiff has sustained and the cost of suit, including a reasonable attorneys' fee, as per 18 U.S. C §1964(c), because Defendants injured Plaintiff, her business and property by reason of a violation of § 1962 and of Antritrust statutes.

108.    Defendants' civil RICO predicate acts directly affected the Plaintiff and witnesses. SAP retaliated against the Plaintiff, the victim, SAP's and JPMorgan's lawyers wrote threatening letters or communication, endeavored to influence, terrorize, intimidate, impeded Plaintiff, her lawyers, officers of the Court of the United States, in the discharge of their duties. *See* Exhibit 17, a terrorizing letter by SAP's counsel to Plaintiff, and other examples of Incidental Dan DeVito of Skadden threatening Plaintiff's lawyer, Incidental Bill Weidner. Eclipse Foundation and IBM's trafficking activities through this conduit, a matter of public record and item of judicial notice, can hardly be a conclusory allegation.

109.    The legislative history of and the Anticounterfeiting Consumer Protection Act of 1996 ("ACPA"), available from the House Congressional Record dated June 4, 1996, 110 Stat. 1386, July 2, 1996 are  particularly relevant to the instant case [theft of copyright and trademark.], because it elevated copyright and trademark infringement to the status of RICO predicate acts, citing  superb reasons for doing so.

46

110.    Drawing on the Supreme Court's broad interpretation of the Commerce Clause in the U.S. Constitution, courts have held that virtually any business activity which involves the flow of goods or services in "commerce" affects interstate commerce.

111.    The injury to Plaintiff and her property occurred, as shown by a preponderance of evidence above,  by reason of the RICO violation by IBM and all the other Defendants and DOES 1-100. Defendants violated Rule 1964(c) and the Sherman Act. Plaintiff is entitled to recover threefold the damages he sustains and the cost of suit, including a reasonable attorneys' fee.

### BREACH OF SOLEMN OATH BY ALL DEFENDANTS  AND DOES 1-100

112.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.   Substance prevails over form.

113.    Incidental Judge Andrews became a trespasser of the law, engaged in treason because he knew or should have known the Supreme Law of the Land – U.S. Supreme Court Chief Justice Marshall's Ruling on '*First Impression*' Constitutional *Res Judicata* on Government 'Grants' which cannot be revoked even by the highest authority  and 'Patent Prosecution History Estoppel' – and failed to enforce it. His orders are void. **All of Judge Andrews' [and All Other Judges Similarly Situated, namely, Incidentals, Robinson, Stark, Davila, LaPorte, Gilstrap, PTAB Judges McNamara, Siu, Turner, Bisk, Braden, CAFC Judges, USPTO Re-examiner Cabrera] Orders are Void.**

114.    Any judge (Incidentals Judge Stark, Third Circuit Judges, CAFC Panel Judges and other judges) *__or attorney__* (Incidentals George Pazuniak, Sean O'Kelly, Ryan Ernst, Bielli, Defendants' lawyers, Doug Nemec, Ed Tulin, Dan DeVito, Doug Williams, Greg Lanier, Lori

Gordon, Michael Lee, Kevin Culligan,  Moore, and others) who did not report the above judges

for treason as required by law may themselves be guilty of misprision of treason, 18 U.S.C.

Section 2382. Incidentals, judges, attorneys, Administrative Agency judges and officials, and

the Defendants and their agents and assigns, are themselves guilty of breach of their solemn

oaths of office and willfully committed treason, even after the Plaintiff put them on notice of

*Fletcher,* as well as of *Aqua Products* rulings.

115.    35 U.S.C § 282 of the Patent Act allows the presumption of validity of Plaintiff's

patents, in addition to the Supreme Court ruling in *Fletcher* which prohibits the rescinding of a

Granted Patent even by the highest authority. Defendant JPMorgan did not provide clear and

convincing evidence of invalidity of her patents, U.S. patent No.  5,987,500 ('500 patent),

8,037,158 ('158 patent) and 8,108,492 ('492 patent)  in Case 1:12-cv-282 (D. Del). SAP,

Citizen's  Financial Group, CitiBank, Wells Fargo Bank, JPMorgan, Fiserv, Fulton  and Kronos

did not  provide clear and convincing evidence of invalidity of Plaintiff's '506 or '339 patent or

that they are collaterally estopped, as they obstructed justice and  remained silent (as fraud) of

patent prosecution history estoppel and U.S. Supreme Court's ruling in *Fletcher*, prohibiting the

quashing a Patent Grant  even by the highest authority. **Andrews' Ruling in the Fulton Bank**

**case involving Plaintiff's '339 Patent failed to enforce Justice Marshall's Ruling on**

**'Grants'  and 'Patent Prosecution History Estoppel' and is irrelevant to the Facts of the**

**'339 Patent and is void.**

**COLLUSIVE FRAUD BY ALL DEFENDANTS, DOES 1-100  AND INCIDENTALS**

116.    The claim term in the Plaintiff's patents, "value-added service network," is

definite because the boundaries of the patent protection sought are clear. Prosecution history

estoppel and disclaimer prevent the Court from ruling several terms indefinite, such as "value-

added service network," "service network," "value-added network switch." The District Courts' and CAFC's errors were prejudicial and willful, <u>evidencing collusion between the Court, Judge Andrews, Judge Robinson, CAFC Judges with JPMorgan, Fulton Bank, George Pazuniak, Skadden Arps, IBM , the IBM Eclipse Foundation, Judge Laporte, Fiserv, Fremont Bancorporation and Fremont Bank, and the District Court in Eastern Texas, Marshall Division</u> . "Value-added service network" is a term coined by the inventor/Plaintiff and can only take on that meaning ascribed to it by the inventor. The PTAB interpreted this claim term. Examples of claim language which have been held to be indefinite set forth in <u>MPEP § 2173.05(d)</u> are fact specific and should not be applied as per se rules. CAFC provides guidance (emphasis added):

> "The Federal Circuit's decision in *Powell v. Home Depot,* App. No. 2010-1309 (Fed. Cir. Nov 14, 2011)… reminds one "the prior art cited in the **prosecution history of a patent forms part of the intrinsic evidence** for claim construction purposes," *Kumar v. Ovonic Battery Co.,* 351 F.3d 1364, 1368 (Fed. Cir. 2003); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996))."

> "**Judge Lourie's Concurrence**…"<u>[C]laim construction is not a process that normally involves historical facts. **It primarily involves reading the patent's written description as well as the prosecution history of the patent**,</u>…"

> CAFC states:

> "cited art as intrinsic evidence for purposes of claim construction….<u>claims should be **construed in view of the prosecution history's treatment** of the prior art</u> so as to determine what the applicant gave up in obtaining allowance of the claims...<u>When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning</u>." *Arthur A. Collins, Inc. v. Northern Telecom Ltd,* 216 F 3d. 1042 (Fed. Cir. 2000)."

**SAP AND JUDGE ANDREWS' WILLFUL OMISSIONS, OBSTRUCTION OF JUSTICE, FALSE ALLEGATIONS ABOUT PLAINTIFF AND HER PATENTS AND  SAP TERRORIZING PLAINTIFF (EXHIBIT 17)  MASK**

**RACKETEERING EVIDENT FROM SAP'S FOUNDING ROLE (2001)  IN THE IBM ECLIPSE FOUNDATION, HIJACKING PLAINTIFF'S  INVENTIONS THAT CREATED THE MILLENNIAL GENERATION (EXHIBIT 16: ECLIPSE.ORG, MEMBERS, ECLIPSE CODE WHICH INCLUDES SAID INVENTIONS)**

117.    Incidental Judge  Andrews obstructed justice involving  multiple parties thus denying Plaintiff a due process hearing, without giving a chance to be heard nor being given a fair chance and due process by the Courts, using  counterfeit logic to manufacture false allegations about Plaintiff and her patents that  masks violation of U.S. laws and misrepresentation by individual lawyers, expert witnesses, judges, PTAB, enterprises and their employees, that has caused great personal, physical  and financial injury to Plaintiff.

118.    <u>SAP colluded with IBM to hijack and illegally distribute Plaintiff's code and invention to multiple IBM Eclipse Foundation members.</u>  Judge Andrews aided, abetted and colluded with them.

119.    **Exhibit 11** is a true copy of the CPL Agreement of Eclipse code, which shows IBM-SAP collusion from the Eclipse website.

120.    IBM and IBM's customer JPMorgan and SAP, Wells Fargo, CitiBank and Judge Andrews, USITC, Facebook, Apple, and Samsung  have been engaged in obstruction of justice; tampering with a witness, Marvin Sirbu by SAP, and Ms. Spielman by JPMorgan; interference with commerce, robbery and extortion; racketeering (the Hobbs Act).

121.    IBM  had a scheme to defraud and Defendant IBM's knowing participation in that scheme, as evidenced by The IBM Eclipse Foundation. IBM had a specific intent to defraud; *See* **Exhibit 11**.

122.   SAP, JPMorgan, Wells Fargo, CitiBank, Fiserv, Apple, Samsung, all of whom are members of the IBM Eclipse Foundation made false representation of material facts and made material omissions of facts; that they knew were false, that they made the material representation or omission with the intent to induce the Plaintiff/judges to rely upon, action by the Plaintiff/judges in reliance on the misrepresentation or omission, injury to the Plaintiff as a result of such reliance.

123.   IBM and SAP and their customers, JPMorgan, CitiBank, Wells Fargo and the other Defendants are engaged in monetary transactions in property derived from specified unlawful activity and interstate transportation of stolen property, by illegally distributing Eclipse code which includes Plaintiff's inventions, through the IBM Eclipse Foundation.

124.   IBM, SAP, JPMorgan, Andrews, and other Defendants have been engaged in a pattern of racketeering activity of at least two acts of racketeering activity and the last of which occurred within ten years after the commission of a prior act of racketeering activity and with the threat of continuing activity. The factor of continuity plus relationship combines to form a pattern. This is evident from the IBM Eclipse Foundation. This conduct forms a pattern as IBM and other members of the IBM Eclipse Foundation embrace unlawful acts that have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events. IBM, SAP and JPMorgan, Apple, Samsung, Fiserv and other Defendants have been engaged in such unlawful activity during a closed period of repeated conduct and also engaged in past conduct that by its nature projects into the future with a threat of repetition.

125.   The persons who committed the predicate offenses are IBM, SAP, JPMorgan, Fulton, Andrews, Apple, Google, Samsung, Facebook, Fiserv and its customer Fremont Bancorporation/Fremont Bank, other Defendants, as well as the judges, individual lawyers, expert witnesses, USPTO/PTAB and they are distinct from the "enterprise," the IBM Eclipse Foundation, which qualifies under 1961(4). '1961(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

**OBSTRUCTION OF JUSTICE BY ALL DEFENDANTS AND DOES 1-100 AND INCIDENTALS (WHO COMMITTED WILLFUL THEFT, COMMISSION OF A CRIME IN THE DELAWARE SUPERIOR COURT IN FILING FALSE ACCOUNTING AS SEALED DOCUMENTS  AND CONCEALMENT BY INCIDENTALS GEORGE PAZUNIAK, PAZUNIAK LAW OFFICE, LLC, AND O'KELLY ERNST AND JOYCE, LLC TO AID AND ABET ANTITRUST VIOLATIONS BY CORPORATE DEFENDANTS AND AIDING AND ABETTING SAID CRIME BY INCIDENTAL ERIC M. DAVIS)**

126.   Defendants committed obstruction of justice and induced Incidentals George Pazuniak, Pazuniak Law Office, LLC to  aid and abet  antitrust violations by corporate Defendants, and Defendants colluded with said Incidentals in violations of the law. Said Incidentals (i) committed obstruction of justice; (ii) argued falsely in Court, concealing that Plaintiff's patents are protected by Patent Prosecution History Estoppel and by U.S. Supreme Court's ruling in *Fletcher v. Peck* prohibiting the quashing of a Granted Patent by even the highest authority; (iii) committed willful theft of Principal-Client-Beneficiary funds collected from infringers and refused to return it to  Plaintiff for over 4 years to cover up for the malpractice George Pazuniak committed;  (iv) committed a crime in the Delaware Superior Court in filing false accounting as a sealed filing and engaged in concealment to deprive Plaintiff of monies Pazuniak has unlawfully withheld from the Client IOLTA account and has not paid

Plaintiff for over 4 years,  for which George Pazuniak should be turned over to the law

enforcement authorities; and (v) damaged Plaintiff of the order of trillions of dollars; and (vi)

Incidental Eric M. Davis aided and abetted the crime committed by George Pazuniak.

## VI.B) <u>MISAPPROPRIATING PLAINTIFF'S TRADE SECRETS AND OBSTRUCTION OF JUSTICE: DEFENDANTS MEET ALL ELEMENTS</u>

### 1. PLAINTIFF DEVELOPED AND MAINTAINED ADVANCED  INTERNET OF THINGS, WEB APPLICATIONS DISPLAYED ON A WEB BROWSER TRADE SECRETS

127.    Plaintiff hereby incorporates all the preceding paragraphs by reference, as if it

were set forth fully herein.

128.    Plaintiff is  the owner of computer code and design related to IoT devices and

components thereof— Web applications displayed on a Web browser — trade secrets,  which

Defendants  misappropriated, and improperly acquired/used/disclosed.   Evidence of this is

incontrovertible. See <u>Eclipse code version 2.0.1, CPL Common Public License 0.5 of the</u>

<u>Eclipse code, of the Eclipse Foundation Meeting Minutes, which are matters of public</u>

<u>record and attached as Exhibits 11, 16 and 1-8</u>. <u>Defendants copied Plaintiff's</u>

<u>code/inventions, which are now part of the IBM Eclipse Foundation source code available</u>

<u>for download at www. Eclipse.org</u> (eg, *see*  <u>Eclipse code version 2.0.1 that include Plaintiff's</u>

<u>inventions</u>.)

129.    **ELEMENTS:** IBM/SAP/Microsoft's  misappropriation caused Plaintiff  harm

and Defendants to be unjustly enriched.

130.    IBM, SAP, Microsoft signed NDAs with Dr. Arunachalam and her companies in

1994, 2001, 2003, and 1996, when Gordon Bell, CTO of Microsoft, signed an NDA with

WebXchange, Inc. Microsoft copied computer code and design owned by Plaintiff and filed the

SOAP Patent in 1997, two years after Dr. Arunachalam.  Microsoft offered to buy her patents in 2004-2005.  SAP offered $100M for her 3 patents in 2003, and then released products that copied computer code and design owned by Plaintiff.  IBM offered to buy her patents in 2006. IBM and SAP were founding board members of the Eclipse Foundation and contributed $40M each to create the Eclipse Foundation.  IBM is the Agreement Steward for CPL Version 0.5, that gives a free copyright license and a free patent license to Plaintiff's  computer code and design related to IoT devices and components thereof --Web applications displayed on a Web browser, and they do not allow anyone else to modify the CPL Agreement, thereby engaging in price fixing and impeding competition.  IBM, SAP, Microsoft engaged in breach of confidence, interference with contract, and unfair competition.  They stole Plaintiff's computer code and design related to IoT devices and components thereof --Web applications displayed on a Web browser.  They impeded the individual inventor, Dr. Arunachalam, from reaping the rewards of her labor by their theft of her valuable proprietary information by improper means, deception and failing to contract with her to develop and exploit the trade secret. IBM, SAP, Apple,  Microsoft did not engage in good faith and honest fair dealing.

131.    *On Nov. 29, 2001, IBM "donated" $40 million to The Eclipse Consortium (later renamed The Eclipse Foundation) to promote "open source" software (free to users without licenses). See 2001 IBM Annual Report Armonk NY, p. 21* ("We donated more than $40 million in application development tools to a new, independent, open-source software community called Eclipse."); *See* also Eclipse.org (Nov. 29, 2001). Minutes of the eclipse.org Board Meeting, Nov. 29th, 2001.

132.    On August 29, 2002, Eclipse issued version 2.0.1 of its source code (the secret sauce of a computer program). That version included all of the innovations of Plaintiff.

133.    The Aug. 28, 2002 Eclipse Version 2.0.1 carried false IBM copyright claims over

Plaintiff's innovations and innovations of other inventors like Leader's innovations and

references to an (Eclipse) Common Public License (CPL) version 0.5.

134.    By 2008, Eclipse Foundation had 191 members: a veritable *Who's Who* of

technology companies, their banks and mutual funds, and their federal government cronies,

including IBM, Google, Alphabet (Google), YouTube (Google), SAP, Oracle, Sybase, Rational,

HP, Wind River, Intel, Motorola, Hitachi, Samsung, Nokia, In-Q-Tel (C.I.A.), National Security

Agency (NSA), National Venture Capital Association (NVCA), Fidelity, T. Rowe Price,

Vanguard, Morgan Stanley, EMC, Dell, Facebook, Instagram (Facebook), LinkedIn (Facebook),

WhatsApp (Facebook), Square (Facebook), Squarespace (Facebook), PayPal, Goldman Sachs,

Togethersoft, Borland, QNX, Qualcomm, Xerox, Micron Technology, Cisco, Netflix, Apple,

AOL, Kleiner Perkins, Yahoo, Tumblr (Yahoo), Flickr (Yahoo), Twitter, Computer Associates

(CA), Microsoft (via University of Washington), Nokia (Microsoft), Siemens, IDG, BEA, AMD,

NetApp, NEC, Compuware, Novell, Blackberry, TIBCO, SAS, Toshiba, Texas Instruments,

Tsinghua University (Beijing), Wells Fargo, Honeywell, UBS, Credit Suisse, HSBC, Deutsche

Bank, Barclays, State Street Corp, Bank of America and JPMorgan.

135.    On May 27, 2004, JPMorgan's Jamie Dimon issued a $10 billion line of credit to

IBM (Mark Loughridge) while Goldman Sachs arranged debt financing for Lenovo, Beijing,

China. This meant that an underwriter engaged in double-dealing on both sides of the IBM sale

of the PC group to Lenovo on Dec. 8, 2004. IBM. (Jun. 30, 2004). Form 10-Q. SEC a04-

7971_110q, p. 17, fn. 12 ("On May 27, 2004, IBM completed the renegotiation of a new $10

billion 5-year Credit Agreement with JPMorgan Chase Bank, as Administrative Agent, and

Citibank, N.A., as Syndication Agent, replacing credit agreements of $8 billion (5-year) and $2

billion (364 day).) The Court must take judicial notice of the text of the Credit Agreement in its entirety.

136.   IBM started using the term "The Internet of Things" and cloud computing in about 2009. Today, this theme dominates IBM's market push based on Plaintiff's inventions. The U.S. Government   essentially used the power of the presidency (of Obama)  to promote IBM in evident violation of the ethics rules, namely the Standards of Ethical Conduct for Employees of the Executive Branch  (Subpart D - Conflicting Financial Interests, and Subpart E - Impartiality in Performing Official Duties).

137.   **Plaintiff now testifies that the list of acts and events now documented in Exhibit 11 constitutes probable cause for granting all relief requested *infra* in the instant COMPLAINT.**

138.   Dr. Arunachalam has shown that: *(i)* she owns the computer code and design related to IoT devices and components thereof — Web applications displayed on a Web browser, which she shared with IBM, SAP, and Microsoft under NDAs;  *(ii)* the computer code and design related to IoT devices and components thereof — Web applications displayed on a Web browser was a trade secret at the time of misappropriation; *(iii)*  IBM, SAP, Microsoft improperly acquired/used/disclosed the trade secrets at least to the Eclipse Foundation; *(iv)* Dr. Arunachalam was harmed and Defendants were unjustly enriched by trillions of dollars; *(v)* Defendants' acquisition/use/disclosure was a substantial factor in causing Dr. Arunachalam harm and for Apple,  Google,  Samsung, and other Defendants to be unjustly enriched.

139.   "A trade secret is misappropriated if a person (1) acquires a trade secret knowing or having reason to know that the trade secret has been acquired by 'improper means' or in violation of a nondisclosure obligation, (3) discloses or uses a trade secret the person knew or

56

should have known was derived from another who had acquired it by improper means or who

had a nondisclosure obligation or (4) discloses or uses a trade secret after learning that it is a

trade secret but before a material change of position." (*Ajaxo Inc. v. E*Trade Group Inc.* (2005)

135 Cal.App.4th 21, 66 [37 Cal.Rptr.3d 221].) IBM, Microsoft and SAP meet all these elements.

140.    Defendants' willful and malicious misappropriation and use of Plaintiff's Trade

Secrets without authorization from Plaintiff injured Plaintiff, who is entitled to recover damages

as remedy. Defendants engaged in mail fraud, communications fraud, and violated the National

Stolen Property Act and Section 5 of The Federal Trade Commission Act. The trade secret was a

property right of the Plaintiff which was infringed by all Defendants and IBM, Microsoft, SAP's

disclosure, breach of contract and breach of confidence by undertaking to apply it to

IBM/SAP/Microsoft's own use and disclosed it to third persons, at least to all members of The

Eclipse Foundation, without authorization from Plaintiff. IBM, SAP, Microsoft stood in

confidential relations with Plaintiff and her companies. The violation of trust and breach of faith

have injured Plaintiff, and her companies.

141.    Defendants meet the 3 essential elements: (A) The existence of a trade secret; (B)

the acquisition of the secret by IBM, Microsoft, SAP by improper conduct or unfair means; and

(C) the use and disclosure by IBM, Microsoft, SAP of the trade secret to the trade secret owner's

detriment.

142.    The Plaintiff's trade secret was not a matter of common knowledge in the trade in

1995, 1996, because what existed then was one-way browsing and CGI scripts, not real-time

two-way Web transactions from Web applications on a Web browser from multimedia IoT

devices, which was Plaintiff's trade secret, and was subject matter that would be protected as a

trade secret and reasonable precautions have been taken to maintain secrecy even before she formed her companies; and it is of immense value to Plaintiff as the market has proven.

143.    The information about Plaintiff's design acquired by IBM, Microsoft, SAP was protected against unauthorized use.  Yet, IBM, Microsoft, SAP engaged in breach of confidence, gained the information in usable form, and escaped the efforts of inspection and analysis. Plaintiff, who is the owner of the trade secret, conveyed it to IBM, SAP, Microsoft, subject to a contractual duty forbidding its use or disclosure.  IBM, Microsoft, SAP failed to meet the minimal standards of commercial morality in trade dealings.

144.    Evidence of use of the wrongfully acquired trade secret has been provided by Plaintiff in Exhibits 11, 16.   Circumstantial evidence abounds that Apple App Store and Samsung's Google Play Web application developers (namely, IBM, Microsoft, SAP)  used SOAP/REST as seen in the infringement charts Plaintiff has provided in Exhibit 4C to the USITC in Case 337-1094, incorporated by reference herein, as if it  were set forth fully herein.

## 2.  IBM AND MICROSOFT STOLE  PLAINTIFF'S TRADE SECRETS, EVIDENT FROM  THE ECLIPSE FOUNDATION SOURCE CODE

145.    Plaintiff hereby incorporates all the preceding paragraphs by reference, as if it were set forth fully herein.

146.    IBM **copied Plaintiff's inventions, which are now part of the IBM Eclipse Foundation source code available for download at www. Eclipse.org** (eg, *see*  **Eclipse code version 2.0.1 that include Plaintiff's inventions.**)

147.    IBM has been engaged in a similar pattern and copied the inventions of other inventors.

148.    IBM negotiated with Plaintiff to joint venture with her on numerous occasions between 1994 and 2011, and to promote her Web application products with which she was engaged in a pilot trial with France Telecom in 2001. IBM provided office space to Plaintiff at IBM, Sunnyvale in 1994 and also at IBM, San Mateo, CA in 2003.

149.    *IBM offered to buy Plaintiff's patent portfolio in 2006, which Plaintiff turned down.*

150.    **The Executive Branch of the U.S. Government played a very important founding role in the IBM Eclipse Foundation,** as did SAP and IBM.

151.    All of the activity of the IBM Eclipse Foundation has gone on in stealth (silence as fraud) to such an extent that not many know of the Eclipse code.

152.    IBM is the initial Agreement Steward,  commissioned along with the U.S. Government to collusively kill Plaintiff's valuable Web application patents (used by all Defendants without a license) in multiple District Courts, Appellate Courts and USPTO/ PTAB.

153.    The IBM Eclipse Foundation installed the Eclipse code at JPMorgan for Web banking applications as a showcase system and awarded JPMorgan as best of breed using Eclipse code that includes Plaintiff's patented inventions and technology without a license. *See* **Exhibit 16**.

154.    IBM and SAP held Board membership in the IBM Eclipse Foundation Board and also held strategic roles managing the IP in the IBM Eclipse Foundation. **Exhibit 16.**

155.    Both, IBM and SAP's key customer is JPMorgan and they ensured that the judges in the Delaware District Court and CAFC and the U.S. Supreme Court did not allow Plaintiff to be heard, even though JPMorgan did not provide clear and convincing evidence of invalidity of

the '500, '158 and '492 patents, contrary to the 35 U.S.C. Section 282 of the Patent Act, and

Supreme Court Ruling in *Fletcher* and Patent Prosecution *History*.

156.   **CAFC's medical interference breached multiple laws**, depriving

Plaintiff of the protections of the Bill of Rights, fourteenth Amendment, 35 U.S.C.

§282 of the Patent Act, Civil Rights Act, American Disabilities Act, FRCP Rule

60(b), 60(d). Plaintiff's need to attend to her health in medical distress is an "inalienable right,"

a fundamental and compelling interest, guaranteed by the Bill of Rights. CAFC abridged this

right, causing medical injury to Plaintiff. CAFC dismissed the case without a hearing or

an opening appeal brief, when *pro se* Plaintiff, a senior citizen with disabilities from

illness, genuinely trying to meet court rules and deadlines, was in medical distress, to

which the CAFC was notified. CAFC's dismissal did not advance a legitimate government

interest.   Where fundamental rights are infringed, strict scrutiny is the test and the challenged

law is generally struck down. *Shapiro v. Thompson*, 394 U.S. 618 (1969). CAFC's erratic and

disparate treatment of Plaintiff are the hallmarks of invidious discrimination. *Romer v. Evans*,

517 U.S. 620, 631 (1996). CAFC infringed Plaintiff's liberty-based substantive due process. In

such cases, the U.S. Supreme Court recognizes a non-textual "liberty" which then limits or voids

laws limiting that liberty. *Roe v. Wade,* 410 U.S. 113 (1973).

**CHIEF JUSTICE ROBERTS RECUSED HIMSELF IN *MICROSOFT CORP.* V. *I4I LIMITED PARTNERSHIP*, 563 U.S. (2011), DUE TO CONFLICTS OF INTEREST, MICROSOFT HOLDINGS AND HIS RELATIONSHIPS TO MICROSOFT COUNSEL THEODORE OLSON AND THOMAS HUNGAR, GIBSON DUNN & CRUTCHER LLP, BUT DID NOT RECUSE FROM PLAINTIFF'S CASE.**

157.   Microsoft is a Third Party Requester in Re-Examinations of Plaintiff's patents, in

particular, the '506 patent. Justice Roberts also has JPMorgan holdings. Eight Justices of the

U.S. Supreme Court, CAFC Panel Judges and Delaware District Court Judges have conflicts of interest (financial, relationship or other) in a litigant, JPMorgan, Microsoft, and IBM, per their own annual financial disclosure statements. They are precluded from ruling in Cases 15-691, 14-1495 and 1:12-cv-282, and any of Plaintiff's cases, voiding *ab initio* all judgments.

158. **JUDGE ANDREWS ADMITTED HE BOUGHT STOCK IN JPMORGAN DURING THE PENDENCY OF THE CASE:**

159. Delaware District Court Judges Robinson and Andrews had conflicts of interest in JPMorgan, when Judge Robinson issued the Markman ruling and judgment in favor of JPMorgan in May 2014. Plaintiff is guaranteed the protections of 28 U.S.C. §§ 455, 144 and Canons 2 and 3 and   FRCP 60(d) and 60(b) which also give the Court the power to grant relief to a party from a judgment, yet she was denied these protections. Judge Andrews admitted three years into the case he bought direct JPMorgan stock during the pendency of the JPMorgan Case No. 1:12-cv-282. **Judges have conflicts of interest in multiple litigants in Plaintiff's patent cases**.

3. **FOLLOWING THE TRADE SECRET THEFT FROM PLAINTIFF, AT LEAST IBM, SAP, MICROSOFT, APPLE, SAMSUNG USED PLAINTIFF'S TRADE SECRETS TO MANUFACTURE IOT PRODUCTS WITH WEB APPLICATIONS  IN CHINA, VIETNAM, INDIA AND OTHER FOREIGN COUNTRIES AND EXPORT THOSE PRODUCTS TO THE UNITED STATES, HURTING DOMESTIC INDUSTRY**

160. Plaintiff has provided ample evidence  to the USITC of manufacture by Defendants of IoT products with Web applications  in China, Vietnam, India and other foreign countries and export of those Products to the United States  and unfair importation by Apple, Samsung and Facebook in USITC Case No. 337-1094, upon receipt of which the USITC

instituted an investigation. Plaintiff incorporates by reference herewith that evidence provided by Plaintiff to USITC Case No. 337-1094 as if fully incorporated herein.

### 4. UNFAIR IMPORTATION BY APPLE, SAMSUNG

161.   Plaintiff has provided ample evidence to the USITC of unfair importation by Apple, Samsung and Facebook in USITC Case No. 337-1094, upon receipt of which the USITC instituted an investigation. Plaintiff incorporates by reference herewith that evidence provided by Plaintiff to USITC Case No. 337-1094 as if fully incorporated herein.

### 5. FALSE LABELING

162.   Plaintiff hereby incorporates all the preceding paragraphs by reference, as if it were set forth fully herein, in particular Section VI. A *supra*. It details Defendants' fraudulent Common Public License Agreement, unlawfully granting copyright rights. IBM copyright notice in all the header files in the Eclipse code (Plaintiff's inventions copied by IBM/Microsoft) evidences false labeling.

## VI.C) FALSIFYING THE ORIGIN OF ECLIPSE CODE:

### 1. IBM DOES NOT DISCLOSE WHERE THE UNDERLYING CODE COMES FROM, NAMELY, PLAINTIFF.

163.   Plaintiff hereby incorporates all the preceding paragraphs by reference, as if it were set forth fully herein, in particular Section VI. A *supra*. It details Defendants' fraudulent Common Public License Agreement, unlawfully granting copyright rights. Plaintiff's inventions were copied by IBM/Microsoft in the Eclipse code. Defendants remained silent (as fraud) that the Eclipse code originated from Plaintiff's inventions copied by IBM/Microsoft for the Eclipse Foundation.

### 2. IBM CREATES FALSE ORIGIN CPL LICENSE AGREEMENT FROM ECLIPSE FOUNDATION, AND ACTS AS AGREEMENT STEWARD WITH FULL CONTROL OVER DISTRIBUTION

164.    Plaintiff hereby incorporates all the preceding paragraphs by reference, as if it were set forth fully herein, in particular Section VI. A *supra*, which has detailed Defendants' fraudulent Common Public License Agreement, and IBM acting as Agreement Steward with full control over the distribution.

**3.    IBM AND OTHER DEFENDANTS INTEND FOR THEIR FALSE ORIGIN DESIGNATIONS WITH A CPL LICENSE AGREEMENT, AND APPLE'S APP STORE, GOOGLE PLAY, AND SAMSUNG'S GOOGLE PLAY SELLING STOLEN GOODS, UNLICENSED WEB APPLICATIONS, CONCEALED FROM CONSUMERS, TO DECEIVE THE MARKET AND U.S. CONSUMERS AND THE COMPETITION.**

165.    Plaintiff hereby incorporates all the preceding paragraphs by reference, as if it were set forth fully herein, in particular Section VI. A *supra*. It details Defendants' fraudulent Common Public License Agreement, remaining silent (as fraud) that the Eclipse Code originated from Plaintiff, to deceive the market, consumers and the competition of their theft and use and sale for profit of stolen code and property without paying Plaintiff any royalties for the use of her inventions and intellectual property. Likewise, Apple, Google and Samsung have concealed from the consumer that the Web applications in their respective app stores are unlicensed.

## VII.    PATENT INFRINGEMENT

166.    On April 19, 2011, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,930,340 ("the '340 Patent"), entitled "Network transaction portal to control multi-service provider transactions," to Plaintiff's company, WebXchange, Inc, in which she is the majority shareholder with 100% voting rights. Plaintiff Dr. Lakshmi Arunachalam is the inventor and assignee of all rights, title, and interest in the '340 Patent, including the right to recover damages for past infringement. A copy of the '340 Patent is attached to the Complaint as **Exhibit 18**.

167.    The '340 patent is presumed to be, and is valid and enforceable. None of the Defendants is licensed under the '340 patent.

168.    Upon information and belief, each of the Defendants has infringed and is continuing to infringe and contributorily infringes and/or induces others to infringe, one or more claims of the '340 patent by engaging in acts constituting infringement under 35 U.S.C. § 271, included but not limited to practicing one or more claims of the '340 patent, inducing others to practice one or more of the said claims, and/or contributing to another's practice of one or more of the said claims in this District and elsewhere in the United States, by means of at least IBM's WebSphere and other web application/web application development platform and tools, products and services; Apple's App Store, Google Play, Samsung's Google Play app store, and each of the Web applications in App Store and Google Play and Samsung's Google Play, and the Web applications displayed on a Web browser offered by each of the Defendants. The very fabric of each Defendant  runs on Plaintiff's patented inventions.

169.    Each Defendant provides web application development platform, tools, web applications, products and services, value-added network services, for example, online financial services via electronic means accessible through several web sites, which include, but are not limited to the following websites: http://www.ibm.com. Each Defendant's products and services enable Web applications, for example, Web banking applications and other Web financial transactional features, which are exemplified, in part, by screenshots of their opening screen which displays the various value-added network services over the Web of the inventions of the patent-in-suit, such as paying bills, transfer funds between accounts, and many, many more.

170.    As reflected in the screenshots, each Defendant's  and its customers' on-line (for example, financial system)  provides a plurality of value added network services over the Web,

applications displayed on a Web browser, for rendering value-added network services, for example, financial services, practicing the claimed inventions. For example, a user of IBM's system may choose to transfer assets between checking and savings accounts, or transfer assets to third-parties by using the application displayed on a Web browser/Web page.

171.     IBM makes, uses and sells, *inter alia*, at least WebSphere and its associated programs, and Web application products and services, which comprise the claimed inventions and operates without authority one or more apparatus, reflected in at least the websites cited above, wherein the first computer system offering the value-added network service comprising access to employee payroll information over the Web.

172.     IBM makes and uses value-added network services, which are practiced using the claimed inventions. Hereafter, the word "Service" refers to applications offered as value-added network services provided by online service portals, including at least those listed above. These sites and Services can be accessed from stationary personal computers or from mobile devices such as laptop computers, smartphones and tablets. Upon accessing these sites, IBM's clients or customers and their customers can, for example, view and service accounts; make transfers; pay and manage bills online using Bill Pay ("Bill Pay") which allows users to schedule bill payments through the Service; initiate and monitor Wire Transfer service; and make and manage investments through, for example, the brokerage services, including trading securities. Through IBM's customers' Mobile Banking websites and mobile apps, the customers or clients of IBM's customers can access their accounts, transfer funds, pay bills, place and track brokerage trades, and locate ATMs via mobile devices.

173.     Upon information and belief, each Defendant has directly infringed and is continuing to infringe one or more claims of the '340 Patent by operating without authority one

or more real-time on-line two-way transaction system(s); and/or a computer implemented method of permitting a real-time, online transaction by a user with at least one computing device on the World Wide Web; and/or a system for purchasing a vehicle on the World Wide Web; or a system for creating an online Web merchant; and/or a real-time online, two-way transaction system, operating on the World Wide Web; **reflected in the websites of each Defendant and those cited above and/or app store,** wherein the system; and/or said method; and/or system; and/or system; and/or system comprising: **IBM and each Defendant operates without authority** one or more system(s) and/or method, reflected in at least the websites of each Defendant and those cited above and each app store, wherein claims 1-40 are met, with applications and software including, but not limited to, those maintained on servers located in and/or accessible from the United States under the United States/IBM's/each Defendant's control that, as reflected in the website, *inter alia,* provide a real-time on-line two-way transaction system, the system comprising:

a first server comprising memory and a processor;

a context manager executing on the first server supporting a first web page on the World Wide Web, the context manager allowing access by a user from a multi-media device through a Web application to a plurality of possible Web transactions from a plurality of Web merchants;

a user transaction manager in the Web application allowing the user to enter into a first transaction using a second web page;

an account settling manager in the Web application allowing the user to communicate with a payment program running on a second server remote from the first server, wherein the user can settle an account relating to the first transaction;

66

a switching component in the Web application that temporarily switches the user from the first server to the second server to allow settling of the account, wherein the user directly communicates with the payment program on the second server via an object router, the object router allowing the user to perform a real-time transaction from the Web application with at least one of the Web merchants while providing interaction and management between the first and second servers.

(iii) utilized and is utilizing computer equipment, including, without limitation, computer equipment that stores, serves, and/or runs the foregoing.

174.    Plaintiff's patented IoT machines are exemplified in the following screenshot: **iOS 11 Home screen on iPhone 8 and App Store**, which has 2.2 million Web applications, pre-packaged in Shenzhen, China by Foxconn and other Apple suppliers. *See* Apple Supplier List for 2017 at https://images.apple.com/supplier-responsibility/pdf/Apple-Supplier-List.pdf. Many of Apple Suppliers are from China, such as Foxconn in Shenzhen, China, where the iPhone 8 is assembled and pre-packaged with App Store with 2.2 million Web applications in iOS 11 before it is imported into the United States.



175.    Other examples of Dr. Arunachalam's IoT machines are Web banking application IoT devices such as  Defendant  JPMorgan Chase and Company's over 7000 Web applications it advertises on its website as being part of just one Business Unit; Apple App Store Web application developers Wells Fargo Bank, Citi's, Fulton Financial Corporation's, Citizen's Financial Group's, Fiserv's, Presidio Bank's, Fremont Bank's, Bridge Bank's, SAP's financial Web applications displayed on a Web browser; social networking like Facebook's Web application, from  IoT devices, mobile electronic devices, such as smart Phones, like all Apple iPhones, iPads, iWatches,  all Samsung products.

176.    IBM's infringement is by making, using and selling without authority WebSphere and other Web application development platforms, tools, Web applications, products and services, and by making and using IBM Cloud Services. Each Defendant's infringement is  by making, using and selling without authority Web application development platforms, tools, Web applications, app stores, products and services, and by making and using Cloud Services. IBM's iand each Defedant's nfringement has injured Plaintiff. Accordingly, Plaintiff is entitled to

recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty, and an injunction to prohibit further infringement of the '340 Patent or future compensation for use of the inventions.

177.    IBM and each Defendant has directly infringed and is continuing to infringe one or more claims of the '340 Patent by operating without authority one or more online and mobile banking and other mobile Web application systems providing Services which utilize the patented inventions.

178.    Upon information and belief, IBM and each Defendant has infringed and is continuing to infringe one or more claims of the '340 patent in this District and elsewhere in the United States by practicing one or more of the claims of the '340 patent, by means of at least the IBM WebSphere and other Web application development tools, platforms, app stores and Web application products and services.

179.    IBM's and each Defendant's online practices of the patented inventions are reflected in, but not limited to, the websites http://www.ibm.com and the websites of IBM's and each Defendant and each of IBM's and each Defendant's customers. IBM's and each of Defendant's servers providing the claimed system are located in the United States under IBM's and/or each Defendant's control.

180.    Upon information and belief, IBM and each Defendant is contributing to the infringement of the '340 patent by others in this District and elsewhere in the United States by contributing to another's practice of one or more of the claims of the '340 patent. The direct infringement occurs by activities of the end users of at least IBM's and each Defendant's Web application products and services.

181.    Upon information and belief, IBM and each Defendant is inducing the

infringement of the '340  patent by others in this District and elsewhere in the United States by inducing others to  practice one or more of the claims of the '340 patent. The direct infringement occurs by activities of the end users of at least IBM's and each Defendant's Web application products and services.

182.    Upon information and belief, IBM and each Defendant, in its practicing one or more claims of the '340 patent, its inducing others to practice one or more claims of the '340 patent, and/or its contributing to another's practice of one or more claims of the '340 patent, is acting despite an objectively high likelihood that its actions constitute infringement of the '340 patent.  Thus, at least IBM's and each Defendant's ongoing infringement of the '340 patent after notice of such infringement is willful.

183.    Upon information and belief, IBM's  and each Defendant's infringement of the '340 patent will continue unless enjoined by this Court.

184.    As a direct and proximate consequence of IBM's and each Defendant's infringement of the '340 patent, Plaintiff has suffered and will continue to suffer irreparable injury and damages, in an amount to be determined at trial, for which Plaintiff is entitled to relief.

185.    Upon information and belief, IBM's and each Defendant's infringement of the '340 patent is exceptional and entitles Plaintiff to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## VIII.   OTHER ANTITRUST CASES AGAINST APPLE, MICROSOFT

186.    ***Pepper et al  v. Apple, Inc.,  4:11-cv-06714 (N.D. Ca)***:

> "In re Apple iPhone Antitrust Litigation," accusing Apple of inflating consumer prices by charging illegally high commissions on iPhone software sales through its App Store and  that it tried to

70

monopolize the market for iPhone apps from 2007 to 2013, and violated federal antitrust law. Apple charges app developers a 30 percent commission on App Store consumer purchases. ... several iPhone buyers in California federal court, allege ... Apple has monopolized the sale of apps like messaging programs and games, leading to inflated prices...the commission, which they called a "monopolistic surcharge."...Apple Inc ... monopolized the market for iPhone apps by not allowing users to purchase them outside the App Store, leading to higher prices. Apple's practice of only allowing iPhones to run apps purchased from its own App Store was anticompetitive.

It is antitrust because Apple restricts what is allowed to be sold. Apple is known to block apps that might in any way compete with its business model. For example, Apple blocked a developer from publishing an app that allowed wireless iTunes sync before later adding it as a feature exclusive to newer iPhones. Apple also blocks any apps that might compete with their NFC payments, they block voice assistants from having any meaningful functionality, and they block web browsers from having their own rendering engine.

<u>Where antitrust charge comes into play is not in the control of pricing, but the control of access to the market.</u> They have created a monopoly where they can dictate terms, fees, and other aspects of the market because the only path to that market is via their storefront.

Apple illegally monopolized the sale of software applications (commonly called "apps") for use on Apple's iPhone, pursuant to which apps purchasers paid Apple a 30% monopolistic surcharge for each app purchased. Apps purchasers bought the apps directly from the alleged monopolist on an online store (called the "App Store") owned and operated by the monopolist. Apps purchasers alleged that they paid the full price for the apps directly to the monopolist, which kept all the monopoly profits for itself and that the developers of the software applications (the "apps developers") made no payment whatsoever to Apple, other than a $99 annual registration fee.

In 2008, faced with the threat of competition from apps developers able to sell their products to iPhone users without providing any benefit to Apple, Apple made itself the exclusive distributor of iPhone apps and <u>rigorously maintained a monopoly on the sale of iPhone apps by approving only apps made by developers who gave Apple the exclusive worldwide right to distribute those apps through the Apple's App Store...**It implies controlling the market via anti-competitive practices**</u>. This is kind of like when Microsoft bundled IE to kill Netscape. They did not control a price."

187.     **Italy's antitrust probe:**

"On January 18, 2018, Italy's antitrust body opened a probe …Lawsuits have been filed against Apple in California, New York and Illinois alleging the company defrauded users by slowing down devices without warning."

188.    **France antitrust probe:**

Apple faces a legal complaint in France, where so-called "planned obsolescence" is against the law.

189.    **Apple iPod, iTunes antitrust litigation:**

The case *In re Apple iPod iTunes Antitrust Litigation* was filed as a class action in 2005 claiming Apple violated the U.S. antitrust statutes in operating a music-downloading monopoly that it created by changing its software design to the proprietary FairPlay encoding in 2004, resulting in other vendors' music files being incompatible with and thus inoperable on the iPod. The suit initially alleged that five days after RealNetworks released in 2004 its Harmony technology making its music playable on iPods, Apple changed its software such that the RealNetworks music would no longer play on iPods.

190.    **Apple and AT&T Mobility antitrust class action:**

In October 2007 (four months after the iPhone was introduced), Paul Holman and Lucy Rivello filed a class action lawsuit C07-05152 (N.D. Ca). The lawsuit referenced Apple's SIM lock on the iPhone and Apple's (at the time) complete ban on third-party apps, and alleged that the 1.1.1 software update was "expressly designed" to disable unapproved SIM cards and apps, an unfair, unlawful, and fraudulent business practice (false advertising) under California's Unfair Competition Law; that the combination of AT&T Mobility and Apple was to reduce competition and cause a monopoly in violation of California's antitrust law and the Sherman Antitrust Act; and that this disabling was a violation of the Consumer Fraud and Abuse Act. Shortly after this initial filing, other lawsuits were filed, and these were consolidated with the original Holman suit, bringing in additional plaintiffs and complaints: *Timothy Smith, et al., v. Apple, Inc. et al.,* No. C 07-05662 RMW, adding complaints related to ringtones, and *Kliegerman v. Apple, Inc.,* No. C 08-948, bringing in allegations under the federal Magnuson- Moss Warranty Act. The combined case title was changed to *"In Re Apple & AT&TM Antitrust Litigation."*

191.    **European antitrust investigation:**

In 2008, Apple agreed to cut the price UK consumers pay to download music for their iPods after a formal complaint to the European Commission from the UK consumer group *Which?* demonstrated higher prices in UK for the same iTunes songs sold elsewhere in the EU. The Commission began an antitrust investigation in 2007 of Apple's business practices after the complaint was made.

192.     **eBook price-fixing lawsuit:**

*United States v. Apple, Inc.* In April 2012, the U. S. Justice Department (USDOJ)  and 33 U.S. states brought a civil antitrust action against Apple, HarperCollins, Macmillan Publishers, Penguin Books, Simon & Schuster, and Hachette Book Group, Inc., alleging violations of the Sherman Act. The suit was filed in the S.D. of NY and alleges the defendants conspired to restrain retail price competition in the sale of e-books because they viewed Amazon's price discounting as a substantial challenge to their traditional business model. Regarding Apple in particular, the federal complaint alleged that "Apple facilitated the Publisher Defendants' collective effort to end retail price competition by coordinating their transition to an agency model across all retailers. Apple clearly understood that its participation in this scheme would result in higher prices to consumers. In such an agency-model, publishers set prices rather than sellers. Fifteen states and Puerto Rico also filed a companion federal case in Austin, Texas, against Apple, Penguin, Simon & Schuster and Macmillan. In the same month, HarperCollins, Hachette and Simon & Schuster settled with both the DOJ and the state attorneys general, with HarperCollins and Hachette agreeing to pay Texas and Connecticut $52 million in consumer restitution, leaving Apple, Penguin, and Macmillan as remaining defendants. On July 10, 2013, District Court Judge Denise Cote in Manhattan found Apple Inc. guilty of the violation of federal antitrust law, citing "compelling evidence" that Apple played a "central role" in a conspiracy with publishers to eliminate retail competition and the prices of e-books.

193.     **High-Tech Employee Antitrust Litigation:**

In 2014, Apple settled out of court both an antitrust lawsuit and a related class-action suit regarding cold calling  employees of other companies.

194.     **iTunes price-switching class action:**

In June 2009, a group of consumers filed the class action suits *Owens v. Apple, Inc.* and *Johnson v. Apple Inc.* against Apple on behalf of

American individuals who purchased iTunes gift cards and who were then unable to use the cards to purchase iTunes music at the price advertised on the card because Apple raised the price of the music after it sold the cards to consumers.

195.   **In-app purchases class action:**

In 2011, five parents filed a class action suit against Apple for "in-app" purchases, which are purchases that can be made within applications ("apps"). The parents contended that Apple had not disclosed that the "free" apps that were to be used by children had the potential to rack up fees without the parent's knowledge. Potentially 23 millions customers could make up the class. Apple offered a settlement option for customers who had fees in excess of $30. In 2011 The FTC investigated similar claims.This settled for $100 million.

196.   ***Resellers v. Apple*:**

In 2004, independent Apple resellers filed a lawsuit against Apple alleging the company used misleading advertising practices by using unfair business practices that harmed the resellers' sales while boosting Apple-owned outlets, in effect by favoring its own outlets over those of its resellers. The lawsuit claimed that Apple favored company-owned stores by providing significant discounts unavailable to independent dealers. The complaint alleged Apple's acts in favoring its own stores <u>constituted breach of contract, false advertising, fraud, trade libel, defamation, and intentional interference with prospective economic advantage</u>. As of 2006, Apple reached settlements with all of the plaintiffs.

197.   **It is profitable not to comply: Amazon "App Store":**

In 2011, Apple filed suit against Amazon.com alleging trademark infringement, unfair competition, and dilution under the Lanham Act and related California state law over Amazon's use of the "App Store" phrase relating to Amazon's "Amazon Appstore Developer Portal" and Amazon's alleged other similar uses of the phrase. …
Apple motioned the court for a preliminary injunction to bar Amazon from using the "App Store" name but, in July 2011, U.S. District Judge Phyllis Hamilton, presiding over Apple's case against Amazon, denied Apple's motion. … In July 2013, Apple dropped the lawsuit.

198.   ***U.S. v. Microsoft*, No. 98-1232 (TPJ); No. 98-1233 (TPJ):** Defendants have

74

violated the nation's antitrust laws through predatory and anticompetitive behavior and kept "an

oppressive thumb on the scale of competitive fortune," as District Court Judge Jackson stated  in

2000 in the Microsoft case. Judge Jackson's findings of fact in the Microsoft case apply equally

to Plaintiff's case herein, in that  Microsoft, IBM, SAP, Apple, Samsung, Fiserv  stifled Plaintiff

in the  Web applications and IoT market and Defendants maintained their collusive  monopoly

power by anticompetitive means and attempted to monopolize the Web applications and IoT

market as well as unlawfully tying their  Web applications  to their respective (for example, iOS)

operating system  in the IoT device market — all in violation of the Sherman Antitrust Act. Tom

Miller, the attorney general of Iowa, said, "Judge Jackson's decision is a broad-based and

compelling finding of liability, of law-breaking." Microsoft used a monopoly in personal

computer operating systems to stifle innovation and bully competitors. Likewise, **Defendants**

**used a monopoly in IoT  operating systems and Web applications to stifle innovation and**

**bully competitors**. Like Microsoft, Defendants have  "demonstrated … use …prodigious

market power and immense profits to harm any firm that insists on pursuing initiatives that could

intensify competition against one of  Defendants' "core products." A central conclusion in the

government's case — and in the judge's findings of fact — was that Microsoft tied its Web

browser to the Windows operating system to gain market share for its browser and put Netscape

at a disadvantage. Microsoft had every right to tie the browser to the operating system, if the

company could demonstrate a plausible consumer benefit. But there was no consumer benefit.

Likewise, Defendants tied  Web applications to the iOS or Android operating system and to

Apple App Store and Samsung's Google Play in IoT devices to gain market share for their Web

applications and to put Dr. Arunachalam at a disadvantage.  Defendants have not been able to

demonstrate a plausible consumer benefit or public interest, but only evidence that their  scheme

has been part of a larger campaign to quash innovation that threatens their monopoly position. "Microsoft's decision to tie Internet Explorer to Windows cannot truly be explained as an attempt to benefit consumers and improve the efficiency of the software market generally, but rather as part of a larger campaign to quash innovation that threatened its monopoly position." Microsoft's campaign against Netscape, as well as its decision to develop its own version of the Java programming language and encourage other companies to use it instead of the authorized version, prevented Netscape and Java from competing on the merits. Likewise, Defendants campaign against Plaintiff, as well as their decision to develop their own version of the CPL License Agreement from stolen code from Dr. Arunachalam, and encourage other companies to use it instead of the authorized licensed  version of Dr. Arunachalam's patented technologies, prevented Plaintiff and other small Web application developers from competing on the merits. Because, like Microsoft, Defendants "achieved this result through exclusionary acts that lacked procompetitive justification," the judge in the Microsoft case  wrote:  "the court deems Microsoft's conduct the maintenance of monopoly power by anticompetitive means"  and this court must deem Defendants' conduct "the maintenance of monopoly power by anticompetitive means." "Microsoft's anticompetitive actions," the Judge wrote, "trammeled the competitive process through which the computer software industry generally stimulates innovation" to "the optimum benefit of consumers." Likewise, Defendants' anti-competititve actions trammeled the competitive process through which the Web applications industry generally stimulates innovation to optimum benefit of consumers.

199.   **Likewise, numerous antitrust cases against Samsung, IBM, SAP, Microsoft and other Defendants abound, too numerous to be detailed here.**

## IX.   INJURY TO PLAINTIFF AND MARKET

**LIST OF VICTIM(S) & ASSOCIATED VICTIM(S) & INFLICTED INJURY(S):**

**A]** **PLAINTIFF/VICTIM:** SUBSTANTIAL FINANCIAL DAMAGE, PERSONAL AND PHYSICAL INJURY

**B]** **PROTESTING INVENTORS:** FINANCIAL DAMAGE

**C]** **INCIDENTAL COMPETING BUSINESS:** FINANCIAL DAMAGE

**D]** **THE PUBLIC TRUST & WELFARE:** FINANCIAL DAMAGE.

200.  Injury to the Plaintiff is of the order of trillions of dollars. But for the injury inflicted upon Plaintiff by each Defendant through anti-competitive conduct and antitrust violations, Plaintiff should have been the largest technology company in the world.

201.  Defendant's antitrust violations have injured Plaintiff's domestic industry and have also injured the domestic industry. Defendants' antitrust violations have injured domestic Web application development,  production and employment of Web application development engineers, domestic Web application distribution and employment of Web application distribution sales and marketing people. This has injured Plaintiff's minority-owned, woman-owned, senior citizen-owned  business by the abuse Defendants subjected Plaintiff to.

202.  Furthermore, Defendants inflicted physical injury and injury to Plaintiff's physical health and have subjected Plaintiff to emotional duress and having to work long hours that have been detrimental to Plaintiff's health and contributed to Plaintiff's illness and deterioration of Plaintiff's health, for which no amount of money Defendants pay can  restore Plaintiff's health.

203.  Defendants' antitrust violations have caused property damage, financial damage to Plaintiff and her assets, properties and  her companies and to the shareholders of her companies.

204.     Injury to Competition has been stupendous. Apple and Samsung control 80% of the market share in the IoT market and app store market, with 10% going to Amazon. This leaves only 10% left for smaller companies and other players. The injury here includes lost Customers, Sales and Profits; affecting Import Volume,  Market Penetration, and Resulting Loss of Market Share; Decreased Production and Employment; causing Underpricing and affecting Ability to Further Increase Exports; Injury Related to the Price- and Output-Fixing Cause of Action; Injury Related to the Trade Secret Cause of Action;  Injury Related to the False Designation of Origin Cause of Action;  Plaintiff's Trade Secrets were Stolen for the Benefit of the Entire Web Apps market.

205.     The same conditions – the existence of supracompetitive pricing, reduced consumer choice among market alternatives, and reduced output and supply – demonstrate that Apple's monopolistic conduct has likewise injured competition in the iPhone Web apps market.

206.     The iPhone Web apps market lacks all of the indicia of competitiveness.  Because Apple has unlawfully cornered the nationwide (and, indeed, worldwide) distribution market for iPhone Web apps, the iPhone Web apps market has been harmed generally by Apple's anticompetitive conduct, which antitrust laws were enacted to remedy.

## X.     RELEVANT MARKET ALLEGATIONS

207.     Apple did not obtain iPhone customers' knowledgeable contractual consent to Apple's monopolization of and monopoly pricing in the Web apps market.  The market for iPhone Web applications is thus an economically distinct product market, and the Web applications that are distributed within that market have no acceptable substitutes.

## ALL THE DEFENDANTS ARE ASSOCIATED IN FACT WITH CORRUPT ACTIVITY CROSSING STATE LINES AND INTERNATIONAL BORDERS

208.    This is a complex civil action for antitrust and RICO remedies authorized by the federal statutes at Sherman Act Sections 1 and 2 and 18 U. S. C. 1961 et seq.; for declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this Court deems just and proper under all circumstances which have occasioned this complaint. *See* Sherman Act Sections 1 and 2  (Antitrust) and 18 U.S.C. §§1964(a) and (c) ("Civil RICO"). This complaint is a verified complaint for declaratory and injunctive relief and damages from racketeering, conspiracy against rights by engaging in [And continuing.] a pattern of racketeering activity, treason [And misprision of treason.], antitrust  and related claims against IBM, SAP America, Inc. ("SAP"), JPMorgan Chase and Company ("JPMorgan"), Hon. Richard G. Andrews,  Apple, Samsung, Facebook, and all the Defendants, and DOES 1-100 [Corruptly associated in fact.].

209.    The primary cause of this action is a widespread criminal enterprise engaged in a *pattern of racketeering* and antitrust *activity* across State lines and international, and a conspiracy to engage in *racketeering* and antitrust *activity* involving numerous RICO predicate acts during at least the past ten (10) calendar years.

## II
## RICO OFFENSES AND ANCILLARY ELEMENTS

210.    The RICO Offenses committed by Defendants are at least:

A)      **VARIATIONS OF THE CRIMINAL ENTERPRISE OBJECTIVE**

        **1)  TO MAKE AN UNJUST ENRICHMENT ON PLAINTIFF'S PATENTS,**

        **2)  TO DISTRIBUTE PLAINTIFF'S PATENTS BY TAINTED COPYRIGHT,**

        **3)  UNDER COLOR OF A PUBLIC / PRIVATE ENTITY [ECLIPSE].**

211.    The FBI defines a criminal enterprise as a group of individuals with an identified hierarchy, or comparable structure, engaged in significant criminal activity.

212.    These organizations often engage in multiple criminal activities and have extensive

supporting networks. The terms Organized Crime and Criminal Enterprise are similar and often

used synonymously. However, various federal criminal statutes specifically define the elements

of an enterprise that need to be proven in order to convict individuals or groups of individuals

under those statutes.

**B.    TRANSNATIONAL ORGANIZED CRIME**

213.    Those self-perpetuating associations of individuals who operate transnationally for the

purpose of obtaining power, influence, and monetary and/or commercial gains, wholly or in part

by illegal means, while protecting their activities through a pattern of corruption and/or violence,

or while protecting their illegal activities through a transnational organizational structure and the

exploitation of transnational commerce or communication mechanisms.

214.    The FBI defines significant racketeering activities as those predicate criminal acts that are

chargeable under the Racketeer Influenced and Corrupt Organizations statute. These are found in

Title 18 of the United States Code, Section 1961 (1) and include the following federal crimes:

**III**
**STATUTES RELATING TO THE CRIMINAL ENTERPRISE**

215.    The RICO statute, or Title 18 of the United States Code, Section 1961(4), defines an

enterprise as "any individual, partnership, corporation, association, or other legal entity, and any

union or group of individuals associated in fact although not a legal entity."

216.    The Continuing Criminal Enterprise statute, or Title 21 of the United States Code,

Section 848(c)(2), defines a criminal enterprise as any group of six or more people, where one of

the six occupies a position of organizer, a supervisory position, or any other position of

management with respect to the other five, and which generates substantial income or resources,

and is engaged in a continuing series of violations of subchapters I and II of Chapter 13 of Title 21 of the United States Code.

1. MAIL FRAUD

2. WIRE FRAUD

3. MONEY LAUNDERING

4. OBSTRUCTION OF JUSTICE

5. TRAFFICKING IN COUNTERFEIT GOODS

6. INTERSTATE TRANSPORTATION OF STOLEN PROPERTY

i) **ANCILLARY OBJECTIVES OF THE CRIMINAL ENTERPRISE**

Conspiracy:

a) TO DEFRAUD AND CORRUPT THE USPTO

b) TO CORRUPT PUBLIC PROGRAMS

c) TO CORRUPT PUBLIC OFFICIALS

d) TO CORRUPT PUBLIC MORALS

e) TO INDUCE TREASON BY THE COURTS AND THE USPTO

f) TO INDUCE MISPRISION OF TREASON BY ATTORNEYS

g) TO INDUCE MISPRISION OF FELONY

h) TO INDUCE A BREACH OF CONTRACT TO PLAINTIFF'S DETRIMENT

i) TO INDUCE THE COURTS TO FAIL TO UPHOLD THE CONSTITUTION AND A U. S. SUPREME COURT DECISION RELATED TO GRANTS

j) TO DEPRIVE PLAINTIFF OF HER RIGHT TO PATENT PROSECUTION HISTORY ESTOPPEL

k) TO DENY RIGHTS OF OWNERSHIP

l) TO DEPRIVE PLAINTIFF OF HER RIGHT TO COLLECT ROYALTIES

m) TO INDUCE DOMESTIC & FOREIGN CONTRIBUTORS BY TAINTED COPYRIGHT COLORING PLAINTIFF'S PATENT (FALSE PRETENSE)

81

n) TO FRAUDULENTLY PROCESS A COPYRIGHT APPLICATION [FALSE FILING (PERJURY).]

o) TO WRONGFULLY CONVERT PLAINTIFF'S PATENT WITH INTENT TO PERMANENTLY DEPRIVE, COMPOUNDED BY RECEIVING STOLEN PROPERTY [THEFT OF PATENTS AND TRADE SECRETS]

## XI.   THE NEED FOR PRELIMINARY RELIEF

217.    In the absence of preliminary relief, consumers will be deprived of their choice of Web applications and consumers and the public and inventors/Web application developers will be deprived of the benefits of competition during the pendency of this action. Relief at the conclusion of this case cannot remedy the damage done to consumers and the public  and inventors/Web application competitors during the interim.

218.    In addition, the damage to competitors and competition during the pendency of this case that would occur in the absence of preliminary relief cannot practically be reversed later.

219.    Aided by Apple's and Samsung's  anticompetitive conduct, Apple's and Samsung's share of the Web applications market has increased dramatically from 500 apps  in 2007 to approximately 80% or more in 2017. In the absence of interim relief, Apple's and Samsung's  share of the Web applications market will grow substantially as a result, among other things, of Apple's and Samsung's  tying of their  Web applications  to App Store/Google Play and iOS/Android  in IoT devices and other anticompetitive practices.

220.    Apple's and Samsung's Web application competitors will be effectively foreclosed from important opportunities to supply alternative Web applications to customers so long as the tie-in and Apple's and Samsung's other exclusionary practices continue. Particularly because of the market's network effects, the significant increase in Apple's and Samsung's share

of the Web applications market that will result in the absence of preliminary relief will tip the market in Apple's and Samsung's favor and accelerate its dominance and competition's demise.

221.   In addition, the barriers that exist to the entry of new competitors or the expansion of smaller existing competitors, including network effects, mean that dominance once achieved cannot readily be reversed.

222.   In the absence of preliminary relief, the increase in Apple's and Samsung's positions that will result from their continuing illegal conduct will so entrench it (and so weaken its competitors) that the cost of reversing Apple's and Samsung's imminent domination of the Web applications' market "could be prohibitive." *See United States v. Microsoft Corporation,* 980 F. Supp. 537, 544 (D.D.C. 1997).

## XII.   CLAIMS FOR RELIEF

### COUNT I: PATENT INFRINGEMENT

223.   Plaintiff incorporates all of the above paragraphs as though fully set forth herein.

224.   Plaintiff has provided evidence, *supra,* that Defendants infringed Plaintiff's '340 patent claims.

### COUNT II: DEFENDANTS' VIOLATION OF SHERMAN ACT SECTIONS 1 AND 2

225.   Plaintiff incorporates all of the above paragraphs as though fully set forth herein.

226.   Plaintiff has provided evidence, *supra,* that Defendants violated Sherman Acts Sections 1 and 2.

### COUNT III:  ANTITRUST RACKETEERING  CONSPIRACY TO FIX PRICES AND CONTROL ACCESS TO PLAINTIFF'S CODE AND MARKET BY ALL DEFENDANTS AND DOES 1-100

227.   Plaintiff incorporates all of the above paragraphs as though fully set forth herein.

228.   Plaintiff has clearly provided a preponderance of evidence, *supra*, of:

(1)   Defendants' violations of 18 U.S.C. §§ 1962 (b), (c) and (d);

(2)   Defendants' liability under 18 U.S.C. §1964(c) for treble damages;

(3)   That Defendants conspired to engage in antitrust racketeering activity related to The IBM Eclipse Foundation in one of four ways specified in 18 U.S.C. §§1962 and the Sherman Act;

229.   Defendants' acquisition and maintenance of an interest in and control of an enterprise engaged in and conspiracy to engage in a pattern of antitrust racketeering activity under 18 U.S.C. §§ 1961(5), 1962(b), (c ) and (d)  and the Sherman Act has been detailed *supra*.

230.   Defendants' fraudulent Common Public License ("Agreement") has been shown *supra* to be further proof of their conspiracy. The  Common Public License  is a contract that violates Sections 1 and 2 of the Sherman Antitrust Act.

231.   Likewise, the  Agreement between Apple and Google with their respective App Store and Google Play Web App Providers has been shown *supra* that each is a contract in violation of Sections 1 and 2 of the Sherman Antitrust Act.

232.   It has been shown *supra* that Eclipse Foundation members demonstrate irrational coordinated action, confirming their conspiracy and intent to injure U.S. and foreign competitors, share editing The Eclipse Code.

233.   The activities of the Defendants in The IBM Eclipse Foundation violated the provisions of 18 U.S.C. §§1962 (b) or (c). The IBM Eclipse Foundation is a conspiracy amongst the Defendants to violate the provisions of 18 U.S.C. §§1962 (b) or (c) and hence of (d).

**COUNT IV: DEFENDANTS MISAPPROPRIATING PLAINTIFF'S TRADE SECRETS**

234.   Plaintiff incorporates all of the above paragraphs as though fully set forth herein.

235.   Plaintiff has provided evidence, *supra,* that Defendants meet all the elements of Trade Secret Misappropriation.

236.   Plaintiff has provided evidence, *supra,* that she developed and maintained advanced  trade secrets related to her intellectual property on the Internet of Things — Web applications displayed on a Web browser.

237.   Plaintiff has provided evidence, *supra,* that IBM and Microsoft stole  Plaintiff's trade secrets, evident  from the Eclipse Foundation.

238.   Plaintiff has provided evidence, *supra,* that following the trade secret theft from Plaintiff, at least IBM, SAP, Microsoft, Apple, Google, Samsung used Plaintiff's trade secrets to manufacture IoT products with Web applications  in China, Vietnam, India and other foreign countries and export those infringing products to the United States.

239.   Plaintiff has provided evidence, *supra,* of unfair importation by Apple, Samsung.

240.   Plaintiff has provided evidence, *supra,*  of false labeling by all Defendants.

**COUNT V: DEFENDANTS' FALSIFYING THE ORIGIN OF ECLIPSE CODE AND REMAINING SILENT (AS FRAUD) THAT WEB APPLICATIONS IN APP STORE AND GOOGLE PLAY ARE UNLICENSED**

241.   Plaintiff incorporates all of the above paragraphs as though fully set forth herein.

242.   Plaintiff has provided evidence, *supra,* that IBM did not disclose where the underlying code came from,  namely, Plaintiff.

243.   Plaintiff has provided evidence, *supra,* that IBM created false origin CPL License Agreement from Eclipse Foundation, acting as Agreement Steward with full control over distribution.

244.   Plaintiff has provided evidence, *supra,* that IBM and other Defendants intended for their false origin designations  with a CPL License Agreement to deceive the market and U.S. consumers and the competition.

245.   Plaintiff has provided evidence, *supra,* that Defendants remained silent (as fraud) that Web applications in App Store and Google Play are unlicensed, and deceived the consumers by concealing from them that they sell stolen goods.

## COUNT VI: VIOLATION OF 18 U.S.C. §§1964(c) AND DEFENDANTS FRAUDULENTLY PROCURED RE-EXAMS/IPR/CBM REVIEWS

246.   Plaintiff incorporates all of the above paragraphs as though fully set forth herein.

247.   Plaintiff has provided evidence, *supra,* that Plaintiff is entitled to treble damages under 18 U.S.C. §§1964(c). Defendants' inducing enforcement of a fraudulently procured Reexaminations/IPR/CBM Reviews violated the antitrust laws and provides a basis for a claim of treble damages, because  it caused a substantial anticompetitive effect.

## COUNT VII:  BREACH OF SOLEMN OATH OF OFFICE TO AID AND ABET ANTITRUST VIOLATIONS BY CORPORATE DEFENDANTS AND TREASON COMMITTED BY DEFENDANTS AND DOES 1-100

248.   Plaintiff incorporates all of the above paragraphs as though fully set forth herein

249.   Plaintiff has provided evidence, *supra,* that Defendants, and DOES 1-100, judges, Administrative Agency judges and officials, attorneys and the United States, USDOJ, U.S. Attorneys breached their solemn oaths of office and willfully committed treason, in not defending the Law of the Land, U.S. Supreme Court ruling in *Fletcher* prohibiting quashing a granted patent, and failing to uphold the contract terms with the inventor/Plaintiff of Patent Prosecution History Estoppel, as per CAFC ruling in *Aqua Products.*

250.   Judicial and Agency Incidentals, U.S. Attorney and Attorneys named as

Incidentals in this case (i) breached their solemn oaths of office in not enforcing U.S. Supreme Court Chief Justice Marshall's ruling in *Fletcher v. Peck*, 10 U.S. 87 (1810), prohibiting the quashing of Government-issued Patent Contract Grants, even by the highest authority; (ii) failed to abide by Patent Prosecution History Estoppel, as per the terms of the Patent Contract Grant, which has been further affirmed by the Federal Circuit's recent ruling in *Aqua Products Inc. v. Matal*, 15-1177, October 2017, reversing all Decisions by courts and the PTAB, including the Federal Circuit's own past rulings, that did not consider Patent Prosecution History; (iii) argued otherwise ignoring their solemn oaths to uphold the Law of the Land; and (iv) aided and abetted Corporate Defendants' antitrust violations. It is unconstitutional for the USPTO, PTAB or AIA or even any court, even the Supreme Court, to invalidate a Granted Patent.

251.    Judicial, Agency and Attorney Incidentals engaged in unconstitutional, anticompetitive conduct with a specific intent to aid and abet Corporate Defendants to monopolize the iPhone and other IoT devices' Web applications market.  Specifically, Defendants entered into a conspiracy and price fixing amongst IBM, SAP, Apple, Samsung, Microsoft and JPMorgan, aiding and abetting them to steal Plaintiff's patented technology and source code and distribute it without paying Plaintiff a license fee for the use of her patented technology.

### COUNT VIII: UNLAWFUL EXCLUSIVE DEALING AND OTHER EXCLUSIONARY AGREEMENTS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

252.    Plaintiff incorporates all of the above paragraphs as though fully set forth herein.

253.    Apple's agreements with Web Application developers and others pursuant to which such companies agree not to license, distribute, or promote non-Apple products (or to do so only on terms that materially disadvantage such products), and its agreements with OEMs

87

restricting modification or restrictive customization of core functions, unreasonably restrict

competition and thus violate Section 1 of the Sherman Act. These agreements unreasonably

restrain trade and restrict the access of Apple's competitors to significant channels of

distribution, thereby restraining competition in the Web applications market, among other

markets. Evidence has been provided *supra* that IBM's CPL Agreement is exclusionary in

violation of the Sherman Act.

254.     The purpose and effect of these agreements are to restrain trade and competition

in the Web applications and IoT device markets. These agreements violate Section 1 of the

Sherman Act, 15 U.S.C. § 1.

255.     Even if Apple (or IBM) modified certain of its exclusionary agreements, <u>the</u>

<u>continuing anticompetitive effect of the agreements is substantial; the modified agreements are</u>

<u>themselves anticompetitive and there is a serious threat that, unless enjoined, Apple (and IBM)</u>

<u>will reimpose the unlawful terms that it has only recently expressed an intention not to enforce.</u>

256.     Plaintiff incorporates. all of the above paragraphs as though fully set forth herein

for all the Defendants, IBM, SAP, Samsung, Microsoft, Fiserv and the rest of the Defendants.

**COUNT IX: UNLAWFUL TYING IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

257.     Plaintiff incorporates. all of the above paragraphs as though fully set forth herein.

258.     IoT devices and Apple's Web applications are separate products. They are sold in

different markets; their functions are different; there is separate demand for them; and they are

treated by Apple and by other industry participants as separate products. It is efficient for Apple

not to tie them and/or to permit OEMs to distribute IoT devices without Apple's Web

applications. Apple has tied and plans again to tie its IoT devices to its separate Web

applications, which has monopoly power, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

259.    The purpose and the effect of this tying are to prevent customers from choosing among Web applications on their merits and to foreclose competing Web apps from an important channel of distribution, thereby restraining competition in the Web apps market.

260.    Plaintiff incorporates. all of the above paragraphs as though fully set forth herein for all the Defendants, IBM, SAP, Google, Samsung, Microsoft, Fiserv and the rest of the Defendants.

## COUNT X: MONOPOLIZATION OF THE IOT
## MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

261.    Plaintiff incorporates. all of the above paragraphs as though fully set forth herein.

262.    Apple possesses monopoly power in the market for IoT devices. Through the anticompetitive conduct described herein, Apple has willfully maintained, and unless restrained by the Court will continue to willfully maintain, that power by anticompetitive and unreasonably exclusionary conduct. Apple has acted with an intent illegally to maintain its monopoly power in the IoT market, and its illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

263.    Plaintiff incorporates all of the above paragraphs as though fully set forth herein for all the Defendants, IBM, SAP, Google, Samsung, Microsoft, Fiserv and the rest of the Defendants.

## COUNT XI: ATTEMPTED MONOPOLIZATION OF THE WEB
## APPLICATIONS' MARKET IN VIOLATION OF SECTION 2 OF THE
## SHERMAN ACT (SEEKING DAMAGES AND EQUITABLE RELIEF)

264.    Plaintiff incorporates. all of the above paragraphs as though fully set forth herein.

265.     Apple has targeted Web application products that have the potential to compete with or facilitate the development of products to compete with IoT devices and thereby to erode Apple's IoT device monopoly. Apple has willfully engaged, and is engaging, in a course of conduct, including tying and unreasonably exclusionary agreements, in order to obtain a monopoly in the Web applications market, and there is a dangerous probability that, unless restrained, it will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Apple has acted with a specific intent to monopolize, and to destroy effective competition in the Web applications market.

266.     Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Web applications market. Specifically, Apple has attempted unlawfully to acquire monopoly power by: (a) designing the iPhone iOS as a closed system and installing security measures and program locks for the specific purpose of preventing Third Party App downloads; (b) establishing the App Store as the exclusive worldwide distributor of iPhone Web apps; and (c) enforcing the App Store's unlawfully acquired market position by terminating or threatening to terminate Web apps developers who sell Web apps in competition with Apple and by voiding the warranties of iPhone consumers who buy competing Web apps.

267.     Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the Web applications market because Apple has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

268.     Apple's attempted acquisition of monopoly power has reduced output and

competition and resulted in increased, supracompetitive prices for products sold in the iPhone

Web applications market and, thus, harms competition generally in that market.

269.    Plaintiff has been injured in fact by Apple's attempted monopolization because

she has been: (a) deprived of payment for use of her Web apps; (b) and she is deprived of

customers; and/or (c) consumers are subjected to a lower output and supply of Web apps, hurting

the market.

270.    Apple's attempted monopolization of the iPhone Web applications market

violates Section 2 of the Sherman Act, and its anticompetitive practices are continuing and will

continue unless they are permanently enjoined.  Plaintiff has suffered economic injury to its

property as a direct and proximate result of Apple's attempted monopolization, and Apple is

therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

271.    Plaintiff incorporates. all of the above paragraphs as though fully set forth herein

for all the Defendants, IBM, SAP, Google, Samsung, Microsoft, Fiserv and the rest of the

Defendants.

## COUNT XII:
### UNLAWFUL MONOPOLIZATION OF THE WEB APPLICATIONS MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (SEEKING DAMAGES AND EQUITABLE RELIEF)

272.    Plaintiff incorporates. all of the above paragraphs as though fully set forth herein.

273.    Apple has acquired monopoly power in the iPhone Web applications market

through unlawful, willful acquisition and maintenance of that power.  Specifically, Apple has

unlawfully acquired monopoly power by:  (a) designing the iPhone iOS as a closed system and

installing security measures and program locks for the specific purpose of preventing Web App

downloads; (b) establishing the App Store as the exclusive worldwide distributor of iPhone Web

apps; and (c) enforcing the App Store's monopoly status by terminating or threatening to terminate Web apps developers who sell Web apps in competition with Apple and by voiding the warranties of iPhone consumers who buy competing Web apps.

274.    Apple's unlawful acquisition of monopoly power has  hurt the market and, thus, harms competition generally in that market.

275.    Plaintiff has been injured in fact by Apple's unlawful monopolization because Plaintiff has  : (a)  been cut out of the Web applications market, (b) has not been paid royalties by Defendants; and (c) has been subjected to personal injury.

276.    Apple's unlawful monopolization of the iPhone Web applications market violates Section 2 of the Sherman Act, and its unlawful monopolization practices are continuing and will continue unless they are permanently enjoined.  Plaintiff has suffered economic injury to its property as a direct and proximate result of Apple's unlawful monopolization, and Apple is therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

277.    Plaintiff incorporates. all of the above paragraphs as though fully set forth herein for all the Defendants, IBM, SAP, Samsung, Microsoft, Fiserv and the rest of the Defendants.

### COUNT XIII: CONSPIRACY AND PRICE-FIXING BY APPLE  WITH IBM, SAP, MICROSOFT, JPMORGAN IN VIOLATION OF THE SHERMAN ACT

278.    Plaintiff incorporates all of the above paragraphs as though fully set forth herein.

279.    Defendant Apple has engaged in anticompetitive conduct with a specific intent to monopolize the iPhone Web applications market.  Specifically, Apple entered into a conspiracy and price fixing with IBM, SAP and JPMorgan, to steal Plaintiff's patented technology and source code and distribute it without paying Plaintiff a license fee for the use of her patented technology.

280.    Apple's conspiracy and price fixing with IBM, SAP, and JPMorgan damaged Plaintiff of the order of trillions of dollars.

281.    Plaintiff incorporates all of the above paragraphs as though fully set forth herein for all the Defendants, IBM, SAP, Samsung, Microsoft, Fiserv and the rest of the Defendants.

**COUNT XIV: OBSTRUCTION OF JUSTICE BY ALL DEFENDANTS AND DOES 1-100 AND INCIDENTALS (WHO COMMITTED WILLFUL THEFT, COMMISSION OF A CRIME IN THE DELAWARE SUPERIOR COURT IN FILING FALSE ACCOUNTING AS SEALED DOCUMENTS AND CONCEALMENT BY INCIDENTALS GEORGE PAZUNIAK, PAZUNIAK LAW OFFICE, LLC, AND O'KELLY ERNST AND JOYCE, LLC TO AID AND ABET ANTITRUST VIOLATIONS BY CORPORATE DEFENDANTS AND AIDING AND ABETTING SAID CRIME BY INCIDENTAL ERIC M. DAVIS)**

282.    Plaintiff incorporates. all of the above paragraphs as though fully set forth herein.

283.    Defendants committed obstruction of justice and induced Incidentals George Pazuniak, Pazuniak Law Office, LLC to  aid and abet  antitrust violations by corporate Defendants, and Defendants colluded with said Incidentals in violations of the law. Said Incidentals (i) committed obstruction of justice; (ii) argued falsely in Court, concealing that Plaintiff's patents are protected by Patent Prosecution History Estoppel and by U.S. Supreme Court's ruling in *Fletcher v. Peck* prohibiting the quashing of a Granted Patent by even the highest authority; (iii) committed willful theft of Principal-Client-Beneficiary funds collected from infringers and refused to return it to  Plaintiff for over 4 years to cover up for the malpractice George Pazuniak committed;  (iv) committed a crime in the Delaware Superior Court in filing false accounting as a sealed filing and engaged in concealment to deprive Plaintiff of monies Pazuniak has unlawfully withheld from the Client IOLTA account and has not paid Plaintiff for over 4 years, , for which George Pazuniak should be turned over to the law

enforcement authorities; and (v) damaged Plaintiff of the order of trillions of dollars; and (vi) Incidental Eric M. Davis aided and abetted the crime committed by George Pazuniak.

284.   Plaintiff herein alleges that obstruction of justice did in fact occur *whenever* Plaintiff was deprived of specific relief from the federal district courts in Wilmington, Delaware; in San Francisco, California; in Marshall, Texas; in the Third Circuit; the Federal Circuit and the U.S. Supreme Court, and the USPTO/PTAB.

### 285.   **PRAYER FOR RELIEF**

### **ON COUNT 1 FOR PATENT INFRINGEMENT**

286.   ***WHEREFORE***, Plaintiff asks this Court to enter judgment against each and everyone of the Defendants and against each Defendant's subsidiaries, affiliates, agents, servants, employees and all persons in active concert or participation with them, in the amount of five billion dollars to be paid by each Defendant, based on the number of Web transactions per application displayed on a Web browser, as each of Defendants' and each Defendant's customers' web sites has an infinite number of applications displayed on a Web browser and an infinite number of transactions from said application(s), granting the following relief:

A.   Enter judgment that each Defendant has infringed and continues to infringe Plaintiff's '340 (the 7,930,340 patent) and all of her other remaining of her 11 patents in the same patent portfolio deriving a priority date of 11/13/1995 from her provisional patent application with S/N 60/006,634;

B.   Enter judgment that the '340 and all of Plaintiff's 11 patents are valid and enforceable, as per Supreme Court ruling in *Fletcher,* prohibiting the quashing of a granted patent, even by the highest authority;

C.   Enter a preliminary and permanent injunction restraining and enjoining each

94

Defendant and its officers, agents, servants, employees, attorneys, and any persons in active

concert or participation with them who receive actual notice of the order by personal service or

otherwise, from any further manufacture, use, sales, offers to sell, or importations of any and all

of the products identified above;

   D.  An award of damages adequate to compensate Plaintiff for the infringement that

has occurred, together with prejudgment interest from the date infringement of the '340  and all

of Plaintiff's 11 Patents began, based on the number of Web transactions per application

displayed on a Web browser per each Defendant's  and its customers' website(s), as each web

site has an infinite number of applications displayed on a Web browser offered as an online

service on the Web and an infinite number of transactions, totaling to at least $5 billion; for

example, *one* of IBM's  customers, namely, JPMorgan states on its website: "We process 50% of

all U.S. ecommerce volume including Amazon and Apple transactions." and that it has 7000+

business Web applications.

   E.  An award to Plaintiff of all remedies available under 35 U.S.C. § 284, up to treble

damages, pre-judgment and post-judgment interest and costs and all other remedies available

under 35 U.S.C. § 284;

   F.  An award to Plaintiff of all remedies available under 35 U.S.C. § 285;

   G.  A permanent injunction under 35 U.S.C. § 283 prohibiting further infringement of

the '340 and all of Plaintiff's 11 Patents, and, in the alternative, in the event injunctive relief is

not granted as requested by Plaintiff, an award of a compulsory future royalty, based on the

number of Web transactions per application displayed on a Web browser per each of IBM's and

its customers' web sites, as each of the IBM's  and its customers' web sites  has an infinite

number of applications displayed on a Web browser offered as an online service on the Web and

an infinite number of transactions, totaling to at least $5 billion; and

H.    Such other and further relief as this Court or a jury may deem proper and just;

287.    **And *Wherefore*,** pursuant to the statutes at 18 U. S. C. 1964(a) and (c), Plaintiff requests judgment against all Defendants and DOES 1 -100 as follows:

**ON COUNTS II, VIII-XIII: DEFENDANTS' VIOLATIONS OF SHERMAN ACT SECTIONS 1 AND 2, AND ON COUNT III: CIVIL RACKETEERING/ANTITRUST CONSPIRACY TO FIX PRICES AND CONTROL ACCESS TO PLAINTIFF'S CODE AND MARKET BY ALL DEFENDANTS  AND DOES 1-100**

288.    That each Defendant's  conduct  violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

289.    That each Defendant  attempted to monopolize the market for Web apps  in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

290.    That  each Defendant has willfully maintained its monopoly in the market for IoT devices in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

291.    Permanently enjoining each  Defendant from monopolizing or attempting to monopolize the IoTdevice  Web applications market or, minimally, restraining each  Defendant from selling or distributing  IoT devices without first obtaining a license from Plaintiff to the Web applications in their app stores and without obtaining the consumers' express contractual consent to (a) each  Defendant's monopolization of and charging of monopoly prices in the IoT devices' Web apps market;

292.    That the Court enter such other preliminary and permanent relief as is necessary and appropriate to restore competitive conditions in the markets affected by each Defendant's unlawful conduct.

293.    Awarding Plaintiff license fees per Web transaction per Web application per IoT devbice to be paid by each Defendant, but not less than $5B;

294.    Awarding Plaintiff a sum of $1B for personal injury to her health caused by Defendants' misconduct and medical interference that caused Plaintiff the medical injury to her health;

295.    Awarding Plaintiff $1B for the harassment that Plaintiff was subjected to by Defendants;

296.    That the Plaintiff recover the costs of this action.

297.    Awarding Plaintiff treble damages for injuries caused by each Defendant's violations of the federal and state antitrust and other laws;

298.    Awarding Plaintiff reasonable attorneys' fees and costs; and

299.    Granting such other and further relief as the Court may deem just and proper.

**ON COUNT IV: DEFENDANTS MISAPPROPRIATING PLAINTIFF'S TRADE SECRETS**

300.    Plaintiff incorporates the relief requested under the section On Counts II, VIII-XIII and III *supra*, as though fully set forth herein.

**ON COUNT V: DEFENDANTS' FALSIFYING THE ORIGIN OF ECLIPSE CODE AND REMAINING SILENT (AS FRAUD) THAT WEB APPLICATIONS IN APP STORE AND GOOGLE PLAY ARE UNLICENSED**

301.    Plaintiff incorporates the relief requested under the section On Counts II, VIII-XIII and III *supra*, as though fully set forth herein.

**ON COUNT VI: VIOLATION OF 18 U.S.C. §1964(c) AND SHERMAN ACT AND DEFENDANTS FRAUDULENTLY PROCURED RE-EXAMS/IPR/CBM REVIEWS**

302.    That this Court liberally construe the RICO and Antitrust laws and thereby find that Defendants and DOES 1-100, both jointly and severally, have acquired and maintained, both

directly and indirectly, or have conspired to acquire and maintain an interest in and/or control of and/or conspired to acquire and maintain control of, and/or have associated with an Antitrust RICO *enterprise* of *persons* and of other individuals who were associated-in-fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce, and/or engaged in a *pattern of racketeering activity* and/or have conducted and/or participated, directly or indirectly, or conspired to conduct and participate in the affairs of said RICO *enterprise* through a *pattern of racketeering activity;* in violation of 18 U.S.C. §§ 1961(5) ("pattern" defined) and 18 U. S. C. 1962(b), (c) and (d) and Antitrust laws (Prohibited activities).

303.    That Defendants and DOES 1-100 and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from acquiring or maintaining or from conspiring to acquire or maintain, whether directly or indirectly, any interest in or control of any Antitrust RICO *enterprise* of *persons*, or of other individuals associated-in-fact or that engages in a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5) and 1962(b), (c), (d); or from conducting or participating or from conspiring to conduct or participate in, either directly or indirectly, in the conduct of the affairs of or benefit in any manner from any RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5) and 1962(b), (c), (d); and from committing any more predicate acts in furtherance of the Antitrust RICO *enterprise*, in violation of Antitrust laws, who are engaged in, or whose activities do affect, interstate or foreign commerce, or alleged in Section VI and COUNTs VI and II *supra.*.

304.   That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of *racketeering activity* in violation of 18 U. S. C. 1962(b), (c) and (d) and Antitrust laws and from all other violation(s) of applicable State and federal law(s).

305.   That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U. S. C. 1962(b), (c) and (d) and Antitrust laws, according to the best available proof, but not less than $5B each.

306.   That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U. S. C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U. S. C. 1962(b), (c) and (d) and Antitrust laws, according to the best available proof, but not less than $5B each.

307.   That Defendants' inducing enforcement of a fraudulently procured Reexaminations/IPR/CBM Reviews violated the antitrust laws and provides a basis for a claim of treble damages, because it caused a substantial anticompetitive effect and that all Defendants pay to Plaintiff treble (triple) damages.

308.   That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U. S. C. 1962(b), (c) and (d) and Antitrust laws, according to the best available proof, but not less than $5B each.

309.   That all Defendants pay to Plaintiff her costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a minimum of $690.00 per hour worked (Plaintiff's standard professional rate at start of this action).

310.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U. S. C. 1962(b), (c) and (d) Antitrust laws  and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, Her heirs and assigns.

311.     That Plaintiff have such other and further relief as this Court deems just and proper, under the circumstances of this action.

## ON COUNT VII:  BREACH OF SOLEMN OATH AND TREASON COMMITTED BY DEFENDANTS, AND DOES 1-100

312.     That this Court report to the FBI and USDOJ that Defendants and DOES 1-100 and Incidentals, judges, Administrative Agency judges and officials, attorneys, U.S. Attorneys have breached their solemn oaths of office and willfully committed acts of treason in not upholding the Law of the Land and Supreme Court ruling in *Fletcher* and CAFC's ruling in *Aqua Products*  on Patent Prosecution History Estoppel and that each of them be stripped of their bar licenses to practice law.

313.     That judgment be entered  that all Orders in any and all of Plaintiff's cases in any and all  Courts and Admministrative Agencies are void, as the judges lost their jurisdiction and immunity.

314.     That the Judges and USPTO/PTAB lost their jurisdiction and immunity and therefore, their orders are void;

315.     That the Court  have  attorneys, judicial and agency Incidentals who breached their solemn oaths of office in not enforcing the Law of the Land  disbarred from practicing law;

316.    That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U. S. C. Section 2382 and Treasons laws of the United States *supra*, according to the best available proof, but not less than $5B each.

317.    That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U. S. C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U. S. C. Section 2382 and Treasons laws of the United States *supra*, according to the best available proof, but not less than $5B each.

318.    That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U. S. C. Section 2382 and Treasons laws of the United States *supra*, according to the best available proof,  but not less than $5B each.

319.    That all Defendants pay to Plaintiff  Her costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a minimum of $690.00 per hour worked (Plaintiff's standard professional rate at start of this action).

320.    That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of 18 U. S. C. Section 2382 and Treasons laws of the United States *supra* and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, Her heirs and assigns.

321.    That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

**ON COUNT XIV: OBSTRUCTION OF JUSTICE BY ALL DEFENDANTS AND DOES 1-100**

322.    That the Court  turn over any and all Defendants and DOES 1-100 and Incidentals engaged in obstruction of justice and aiding and abetting antitrust violations by Defendants and crimes committed by Incidentals and Defendants to Law Enforcement and FBI and that they lose their bar license to practice law.

323.    That the Court have Incidentals George Pazuniak, Pazuniak Law Office and O'Kelly Ernst and Joyce LLC and U.S. DOJ Attorney Claire T. Cormier each pay Plaintiff $100M for crimes committed against  Plaintiff.

324.    That the Court  turn George Pazuniak  and USDOJ Attorney Claire T. Cormier to Law Enforcement  for each committing a crime and turn  O'Kelly Ernst and Joyce LLC, and Eric M. Davis  to Law Enforcement for aiding and abetting a crime committed by George Pazuniak.

Dated: February 26,  2018              Respectfully submitted,

*Lakshmi Arunachalam*

Lakshmi-Arunachalam, Ph.D.
222 Stanford Avenue, Menlo Park, CA 94025
650 690 0995; Laks22002@yahoo.com

## VERIFICATION

I, Dr. Lakshmi Arunachalam, Plaintiff in the above entitled action, hereby verify under penalty of perjury, under the laws of the United States of America, that the above statement of facts and laws is true and correct, according to the best of my current information, knowledge, and belief, so help me God, pursuant to 28 U.S.C. 1746(1). See the Supremacy Clause in the Constitution for the United States of America, as lawfully amended (hereinafter "U. S. Constitution").

Dated: February 26, 2018

Signed: _Lakshmi Arunachalam_

Printed: Dr. Lakshmi Arunachalam

## DEMAND FOR TRIAL BY JURY

325.    Plaintiffs hereby demand a trial by jury on all issues so triable.

326.    Pursuant to 18 U.S.C. 1961(9), Plaintiff now formally incorporates by reference all of the following Exhibits, as if set forth fully herein, to wit: Exhibits 1-8, 11, H, 12, 14-18 and the Eclipse code version 2.0.1, which is available for download at www.eclipse.org, which incorporates the inventions of Plaintiff and others, demonstrating a pattern of antitrust racketeering activity by Defendants.

327.    Attachments I of List of Incidentals/Tortfeasors, Misconduct & Basis of Liability, is incorporated by reference herein, as if fully incorporated herein, and is attached herewith.

DATED: February 26, 2018                Respectfully submitted,

_Lakshmi Arunachalam_

222 Stanford Avenue                Dr. Lakshmi Arunachalam
Menlo Park, CA 94025               Individual
650 690 0995                       _Plaintiff_
laks22002@yahoo.com                _Dr. Lakshmi Arunachalam_

103

# **List of Exhibits**

**Exhibit 1:** 2002-08-29-Common-Public-License-Version-0-5-IBM-Eclipse-Foundation accessed-Jun-24-2015-Aug-29-2002 (1)

**Exhibit 2:** Evidence on Chandler

**Exhibit 3:** 2002-09-05-Minutes-of-the-Eclipse-Board-Meeting-Sep-05-2002 (1)

**Exhibit 4:** 2003-05-28-Minutes-of-the-Eclipse-Board-Meeting-May-28-2003 (1)

**Exhibit 5:** 2003-06-25-Minutes-of-the-Eclipse-Board-Meeting-Jun-25-2003 (1)

**Exhibit 6:** 2004-09-15-Minutes-of-the-Eclipse-Board-Meeting-Sep-15-2004 (1)

**Exhibit 7:** 2005-02-28-Minutes-of-the-Eclipse-Board-Meeting-Feb-28-2005 (1)

**Exhibit 8:** 2002-09-03-Instantiations-IBM-Partnership-Sep-03-2002 (1)

**Exhibit 11:** CPL Agreement of Eclipse code, which shows IBM-SAP collusion from the Eclipse website. The documents in the Exhibit are true and accurate copies of files downloaded from www.eclipse.org on April 18, 2016:  2002-08-29 Common Public License (CPL) Version 0.5 http://www.eclipse.org/legal/cpl-v05.html ;  2004-09-02 Tentative IP Log for eclipse.platform, eclipse.jdt and eclipse.pde http://www.eclipse.org/projects/ip_log.php?projectid=eclipse.platform,eclipse.jdt,eclipse.pde ; and  2004-09-02 Eclipse CPL to EPL Transition Plan http://www.eclipse.org/legal/cpl2epl/

**Exhibit H:** Excerpts from the priority Provisional Application 60/006,634 as filed in the USPTO dated 11/13/1995, from which Plaintiff's portfolio of a dozen patents derive their priority date.

**Exhibit 12:**  Judge William Alsup's Order in Case No. C 08-05149 WHA (N. Dt. CA) on February 17, 2009.

**Exhibit 14:** excerpts pp. 175-181, 189-191 of the prosecution history of the related U.S. Patent No. 6,212,556, the ('556) patent in the same priority chain as the '506 patent.

Exhibit **15:**  excerpts pp 82-93 from the prosecution history of the parent U.S. Patent No. 5,778,178, the ('178) patent in the same priority chain as the '506 patent.

**Exhibit 16:**  is a true and correct copy of the web page for eclipse.org where Eclipse code is available for download including Plaintiff's inventions;  list of members showing SAP, JPMorgan, IBM  as members;  board of directors showing SAP as a Board member; board meeting minutes of Dec 8, 2004 showing SAP's lead role;  Eclipse awarded JPMorgan "Best Deployment of Eclipse Technology in an enterprise"  at EclipseCon  March 6, 2007; article entitled "JPMorgan raises the Bar for Banking Applications;"  Amendment No. 8 to Form S-1 Registration statement for Facebook, Inc. showing JPMorgan, BofA, Barclays, Citigroup, Wells Fargo; and list of tutorials, sample code on Eclipse SOAP, REST, OData services from SAP. **Eclipse code version 2.0.1 is available for download at www.eclipse.org.**

**Exhibit 17:**  SAP's Letter to Dr. Lakshmi terrorizing her.

**Exhibit 18:**  Plaintiff's  U.S. Patent No. 7,930,340.

## DECLARATION OF DR. LAKSHMI ARUNACHALAM IN SUPPORT OF PLAINTIFF'S ANTITRUST COMPLAINT

I, Dr. LAKSHMI ARUNACHALAM, , declare:

I am the inventor and assignee of the patents-in-suit in the JPMorgan case 1:12-cv-282 (D.Del.), and of U.S. Patent No. 7,930,340 ('340) and the 13 patents and applications, all of which derive their priority date from my provisional patent application with S/N 60/006,634 filed November 13, 1995. I reside at 222 Stanford Avenue, Menlo Park, CA 94025. I am *pro se* Plaintiff in the above-captioned action. I make this declaration based on personal knowledge and, if called upon to do so, could testify competently thereto.

1. Attached as **Exhibit 1** is a true and correct copy of : 2002-08-29-Common-Public-License-Version-0-5-IBM-Eclipse-Foundation accessed-Jun-24-2015-Aug-29-2002 (1).

2. Attached as **Exhibit 2** is a true and correct copy of Evidence on Chandler.

3. Attached as **Exhibit 3** is a true and correct copy of 2002-09-05-Minutes-of-the-Eclipse-Board-Meeting-Sep-05-2002 (1).

4. Attached as **Exhibit 4** is a true and correct copy of 2003-05-28-Minutes-of-the-Eclipse-Board-Meeting-May-28-2003 (1).

5. Attached as **Exhibit 5** is a true and correct copy of 2003-06-25-Minutes-of-the-Eclipse-Board-Meeting-Jun-25-2003 (1).

6. Attached as **Exhibit 6** is a true and correct copy of 2004-09-15-Minutes-of-the-Eclipse-Board-Meeting-Sep-15-2004 (1).

7. Attached as **Exhibit 7** is a true and correct copy of 2005-02-28-Minutes-of-the-Eclipse-Board-Meeting-Feb-28-2005 (1).

8. Attached as **Exhibit 8** is a true and correct copy of 2002-09-03-Instantiations-IBM-Partnership-Sep-03-2002 (1).

9. Attached as **Exhibit 11 is** a true and correct copy of  CPL Agreement of Eclipse code, which shows IBM-SAP collusion from the Eclipse website. These documents are true and accurate copies of files downloaded from www.eclipse.org on April 18, 2016:  2002-08-29 Common Public License (CPL) Version 0.5 http://www.eclipse.org/legal/cpl-v05.html ;  2004-09-02 Tentative IP Log for eclipse.platform, eclipse.jdt and eclipse.pde http://www.eclipse.org/projects/ip_log.php?projectid=eclipse.platform,eclipse.jdt,eclipse.pde ; and  2004-09-02 Eclipse CPL to EPL Transition Plan http://www.eclipse.org/legal/cpl2epl/

10. Attached as **Exhibit H** is a true and correct copy of Excerpts from the priority Provisional Application 60/006,634 as filed in the USPTO dated 11/13/1995, from which Plaintiff's portfolio of a dozen patents derive their priority date.

11. Attached as **Exhibit 12** is a true and correct copy of Judge William Alsup's Order in Case No. C 08-05149 WHA (N. Dt. CA) on February 17, 2009.

12. Attached as **Exhibit 14** is a true and correct copy of excerpts pp. 175-181, 189-191 of the prosecution history of the related U.S. Patent No. 6,212,556, the ('556) patent in the same priority chain as the '506 patent.

13. Attached as Exhibit **15** is a true and correct copy of excerpts pp 82-93 from the prosecution history of the parent U.S. Patent No. 5,778,178, the ('178) patent in the same priority chain as the '506 patent.

14. Attached as **Exhibit 16** is a true and correct copy of the web page for eclipse.org where Eclipse code is available for download including Plaintiff's inventions;  list of members

showing SAP, JPMorgan, IBM as members; board of directors showing SAP as a Board

member; board meeting minutes of Dec 8, 2004 showing SAP's lead role; Eclipse

awarded JPMorgan "Best Deployment of Eclipse Technology in an enterprise" at

EclipseCon March 6, 2007; article entitled "JPMorgan raises the Bar for Banking

Applications;" Amendment No. 8 to Form S-1 Registration statement for Facebook, Inc.

showing JPMorgan, BofA, Barclays, Citigroup, Wells Fargo; and list of tutorials, sample

code on Eclipse SOAP, REST, OData services from SAP.

15. Attached as **Exhibit 17** is a true and correct copy of SAP's terrorizing Letter to Dr.

Arunachalam.

16. Attached as **Exhibit 18** is a true and correct copy of Plaintiff's U.S. Patent No.

7,930,340.

17. Attached as **Attachment I** is a true and correct copy of List of Incidentals/Tortfeasors,

Misconduct & Basis of Libility.

18. I also certify that that the eclipse code, all versions, including version 2.0.1 is available

for download at www.eclipse.org.

   I declare under the penalty of perjury under the laws of the United States and the

State of California and Delaware that the foregoing is true and correct. Executed this 26th day

of February, 2018 in Menlo Park, California.

222 Stanford Avenue
Menlo Park, CA 94025
650 690 0995, laks22002@yahoo.com

*Lakshmi Arunachalam*

Dr. Lakshmi Arunachalam

## CERTIFICATE OF MAILING

I, Dr. Lakshmi Arunachalam, hereby certify that on February 26, 2018, I filed in person an original and 18 copies of the attached Complaint, Dr. Arunachalam's Declaration and Verification in support thereof, Exhibits 1-8, 11, H, 12, 14-18, Attachment I, Civil Cover Sheet and 13 copies of Form A0-440, Summons in a Civil Action with the Clerk of the Court, United States District Court for the Northern District of California, San Francisco Division at 450 Golden Gate Avenue, San Francisco, CA for filing and docketing in this case.

*Lakshmi Arunachalam*                Date: February 26, 2018

*/s/Lakshmi Arunachalam/*
Signature of Plaintiff
Dr. Lakshmi Arunachalam
222 Stanford Ave,
Menlo Park, CA 94025
650 690 0995
Laks22002@yahoo.com

**ATTACHMENT 1: LIST OF INCIDENTALS/TORTFEASORS, MISCONDUCT & BASIS OF LIABILITY**

a)      **PRINCIPAL ATTORNEY(S) OF RECORD FOR CORPORATE DEFENDANTS:**

**Incidental 1:** Apple's ATTORNEY(S) OF RECORD: **WEIL. GOTSHAL & MANGES LLP**,
**Incidental 2: BRIAN E. FERGUSON,**
**Incidental 3: ROBERT T. VLASIS III,**
2001 M Street, N.W., Suite 600, Washington DC 20036; Tel: 202.682.7000

**Incidental 4:** Microsoft's ATTORNEY(S) OF RECORD: **KLARQUIST SPARKMAN LLP**,
**Incidental 5: WINN GARTH**
(BREACH OF SOLEMN OATH; TREASON; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE USPTO MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS; OBSTRUCTION OF JUSTICE.)
121 SW Salmon St #1600, Portland, OR 97204; Tel: (503) 595-5300

**Incidental 6:** IBM's ATTORNEY(S) OF RECORD: **MAYNARD COOPER & GALE, P.C.**
**Incidental 7: KEVIN J. CULLIGAN**
551 Fifth Avenue, Suite 2000, New York, NY 10176; Tel: 646.609.9282
**Incidental 8: KIRKLAND & ELLIS**
**Incidental 9: EDWARD C. DONOVAN, P.C.,**
655 Fifteenth Street, N.W., Washington, D.C. 20005-5793; Tel: 202.879.5289

**Incidental 10: SAMIR PANDYA;**
(ANTITRUST CO-CONSPIRATORS; INFRINGER, BREACH OF SOLEMN OATH, TREASON; CIVIL RICO),
3999 West Chester Pike, Newtown Square, PA 19073, Tel: +1-610-661-1000;

**Incidental 11:** SAP's ATTORNEY(S) OF RECORD: **STERNE KESSLER GOLDSTEIN & FOX**;
**Incidental 12: LORI GORDON;**
**Incidental 13: ROBERT STERNE;**
(BREACH OF SOLEMN OATH; TREASON; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE USPTO MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS; OBSTRUCTION OF JUSTICE; INDUCED FALSE TESTIMONY BY EXPERT WITNESS MARVIN SIRBU TO USPTO AND COURT ON MATERIAL FACTS AND LAW. COMMITTED WHITE COLLAR

CRIME; HARRASSED AND ABUSED SENIOR CITIZEN FEMALE
INVENTOR/PLAINTIFF;)
1100 New York Ave NW # 800, Washington, DC 20005; Tel: (202) 371-2600
**Incidental 14: JONES DAY**,
**Incidental 15: GREG LANIER**,
1755 Embarcadero Road, Palo Alto, CA 94303; Tel: 650.739.3941

**Incidental 16: MICHAEL PEARCE**;
(INFRINGER,  ANTITRUST CO-CONSPIRATORS, BREACH OF SOLEMN OATH,
TREASON, CIVIL RICO);
270 Park Avenue, New York, NY, Tel: 212-270-6000;

**Incidental 17:** JPMorgan's ATTORNEY(S) OF RECORD: **SKADDEN, ARPS,
SLATE, MEAGHER & FLOM,  LLP**,
**Incidental 18: DOUG NEMEC**,
**Incidental 19: EDWARD TULIN**,
**Incidental 20: DANIEL A. DEVITO**,
(BREACH OF SOLEMN OATH; TREASON: WILLFUL MISREPRESENTATION,
MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS;
COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE FEDERAL
CIRCUIT AND TO THE DELAWARE DISTRICT COURT  MATERIAL TO THE
ADJUDICATION OF THE CASE, NAMELY,  PATENT PROSECUTION HISTORY
ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN
*FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS;  OBSTRUCTION OF
JUSTICE; INDUCED FALSE TESTIMONY BY EXPERT WITNESS TO COURT ON
MATERIAL FACTS AND LAW. COMMITTED WHITE COLLAR CRIME.)
4 Times Square, New York, NY 10036; Tel: (212) 735-3000;

**b) ATTORNEY(S) OF RECORD ASSOCIATED-IN-FACT FOR MEMBER CORPORATION(S):**

**Incidental 21:** Samsung's ATTORNEY(S) OF RECORD: **COVINGTON &
BURLING  LLP**,
**Incidental 22: STURGIS M. SOBIN**,
**Incidental 23: DANIEL VALENCIA**,
**Incidental 24: HWA YOUNG JIN**
One City Center, 850 Tenth Street, NW; Washington DC 20001; Tel:  202.682.7000

**Incidental 25:** Facebook's ATTORNEY(S) OF RECORD: **COOLEY LLP**
**Incidental 26: STEPHEN R. SMITH**,
**Incidental 27: LISA F. SCHWEIR**,
**Incidental 28: HEIDI L. KEEFE**
1299 Pennsylvania Avenue, NW, Suite 700, Washington, DC 20004;
Tel: 202.842.7800; 650.843.5000

**Incidental 29:** Fiserv's ATTORNEY(S) OF RECORD: **PERKINS COIE LLP**,
**Incidental 30: RAMSEY M. AL-SALAM**,

111

(BREACH OF SOLEMN OATH; TREASON; WILLFUL MISREPRESENTATION, MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE DISTRICT COURT  AND TO THE FEDERAL CIRCUIT  AND USITC MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY,  PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS;  OBSTRUCTION OF JUSTICE; HARRASSED AND ABUSED SENIOR CITIZEN FEMALE INVENTOR/PLAINTIFF)
1201 3rd Ave #4900, Seattle, WA 98101; Tel: (206) 359-8000;

**Incidental 31: MICHAEL GALLAGHER;**
(INFRINGER; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH, TREASON);
420 Montgomery Street, San Francisco, CA 94163; Tel: 800.869.3557; 866.249.3302;

**Incidental 32:** Wells Fargo's ATTORNEY(S) OF RECORD: **CARLSON CASPERS**
**Incidental 33: DOUGLAS J.  WILLIAMS,**
(BREACH OF SOLEMN OATH; TREASON; WILLFUL MISREPRESENTATION, MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE DELAWARE DISTRICT COURT  MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY,  PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS;  OBSTRUCTION OF JUSTICE.)
Capella Tower, Suite 4200, 225 South Sixth Street, Minneapolis, MN 55402 USA
Tel. 612.436.9600

**Incidental 34:** Citigroup's ATTORNEY(S) OF RECORD: **DENTONS**
**Incidental 35: MARK NELSON,**
(BREACH OF SOLEMN OATH; WILLFUL MISREPRESENTATION, MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE DELAWARE DISTRICT COURT  MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY,  PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS;  OBSTRUCTION OF JUSTICE.)
2000 McKinney Ave #1900, Dallas, TX 75201-1858; Tel: (214) 259-0900

**c) AGENCY(S) 'ADVERSELY DOMINATED' & 'CORRUPTLY ASSOCIATED-IN-FACT':**

       **[1]**   **USPTO:**
       **[2]**   **PTAB:**
       **[3]**   **USITC:**
       **[4]**   **US DEPT. OF JUSTICE:**

Incidental 36: **THE UNITED STATES PATENT AND TRADEMARK OFFICE**,

Incidental 37: **PATENT TRIAL AND APPEALS BOARD**,

Incidental 38: **BRIAN P. MCNAMARA**,

Incidental 39: **STEPHEN C. SIU**,

Incidental 40: **KEVIN TURNER**,

Incidental 41: **JENNIFER BISK**,

Incidental 42: **SARAH CRAVEN**,

Incidental 43: **NATHAN KELLY**,

Incidental 44: **ZOILA CABRERA**,

(INFRINGERS; ANTITRUST CO-CONSPIRATORS, BREACH OF SOLEMN OATH; TREASON; IN CORRUPT ASSOCIATION; OBSTRUCTION OF JUSTICE; BREACH OF CONTRACT; BREACH OF PUBLIC TRUST; FALSE ADVERTISING; LURED INVENTOR INTO FILING FOR A PATENT APPLICATION AND FAILED TO UPHOLD PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO UPHOLD AND DISCLOSE INFORMATION MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS; DENIED DUE PROCESS TO PLAINTIFF; DENIED FUNDAMENTAL RIGHTS TO EMERGENCY MEDICAL CARE AND ACCESS TO THE COURT AND TO JUSTICE TO PLAINTIFF; FAILED TO RECUSE DESPITE HOLDING STOCK IN LITIGANT AND 'SANCTIONED' PLAINTIFF BY NOT PERMITTING HER ACCESS TO ELECTRONIC FILING AND SUBJECTED HER TO CIVIL RIGHTS DISCRIMINATION REQUIRING HER TO CALL A TELECONFERENCE CALL WITH THE PTAB AND PARTIES TO REQUEST ENTRY OF FILINGS IN DOCKET, IN RETALIATION AGAINST PLAINTIFF FOR FILING A MOTION TO RECUSE THE JUDGES WITH DIRECT STOCK IN A LITIGANT AND FINANCIAL CONFLICTS OF INTEREST; HARRASSED AND ABUSED SENIOR CITIZEN FEMALE INVENTOR/PLAINTIFF; AIDED WHITE COLLAR CRIME BY SAP, MICROSOFT. COMMITTED WHITE COLLAR CRIME.)

PO Box 1450, Alexandria, VA 22313-1450; Tel: 571.272.7000; 571.272.7822

Incidental 45: **U.S. DEPARTMENT OF JUSTICE**:

Incidental 46: **UNITED STATES**

(IN CORRUPT ASSOCIATION; INFRINGERS; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH; TREASON; OBSTRUCTION OF JUSTICE; CIVIL RICO; THE UNITED STATES ATTORNEY MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE DISTRICT COURT AND TO THE FEDERAL CIRCUIT MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY

CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS; **AIDED AND ABETTED WHITE COLLAR CRIME BY U.S. ATTORNEY**);

**Incidental 47: U.S. ATTORNEY: CLAIRE T. CORMIER**
U.S. Attorney,
(BREACH OF SOLEMN OATH; TREASON; OBSTRUCTION OF JUSTICE;MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION MATERIAL TO CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810), TO THE DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IN THE CASES AGAINST THE USPTO/PTAB; THE JUDGES, AND THE UNITED STATES; FRAUDULENT OMISSIONS; **COMMITTED WHITE COLLAR CRIME**.)
150 Almaden Blvd Ste 900, San Jose, CA 95113-2009; Tel: (408) 535-5082.

**Incidental 48: USDOJ ATTORNEY: ALICE JOU**
(BREACH OF SOLEMN OATH; TREASON; OBSTRUCTION OF JUSTICE;MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION MATERIAL TO CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810), TO THE COURT OF FEDERAL CLAIMS; FRAUDULENT OMISSIONS.)
Office of the Attorney General, U.S. Department of Justice
950 Pennsylvania Avenue, NW, Washington, DC 20530-0001, Tel: 202.514.2000;

**Incidental 49: U.S. INTERNATIONAL TRADE COMMISSION,**
**Incidental 50: JEFFREY HSU,**
**Incidental 51: CHARLES E. BULLOCK,**
(**MISFEASANCE; BREACH OF PUBLIC TRUST; (B) NONFEASANCE,
(C) MISFEASANCE;**
(IN CORRUPT ASSOCIATION; INFRINGER; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH; OBSTRUCTION OF JUSTICE;
MADE MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS;  DENIED DUE PROCESS TO PLAINTIFF;)
500 E Street,SW, Washington, DC 20436; Tel: 202.205.2000

d)     COURT(S) 'ADVERSELY DOMINATED' & 'CORRUPTLY ASSOCIATED-IN-FACT':
    **[5]   FEDERAL CIRCUIT:**
    **[6]   SUPREME COURT:**
    **[7]   STATE COURT:**
    **[8]   FEDERAL DISTRICT COURTS:**

**Incidental 52: THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT (CAFC),**

**MAL-ADMINISTRATION OF JUSTICE**
**[(A) BREACH OF SOLEMN OATH,**
**(B) NONFEASANCE,**
**(C) MISFEASANCE,**
**(D) MALFEASANCE]**
(IN CORRUPT ASSOCIATION; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH; OBSTRUCTION OF JUSTICE; MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE TO THE FEDERAL CIRCUIT  INFORMATION MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY,  PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS;  DENIED DUE PROCESS TO PLAINTIFF; DENIED FUNDAMENTAL RIGHTS TO EMERGENCY MEDICAL CARE AND ACCESS TO THE COURT AND TO JUSTICE TO PLAINTIFF; HARRASSED AND ABUSED SENIOR CITIZEN FEMALE INVENTOR/PLAINTIFF; AIDED WHITE COLLAR CRIME BY SAP, JPMORGAN).

**Incidental 53: CAFC JUDGES**
(LOST JURISDICTION AND IMMUNITY;
**MAL-ADMINISTRATION OF JUSTICE**
**[(A) BREACH OF SOLEMN OATH,**
**(B) NONFEASANCE,**
**(C) MISFEASANCE,**
**(D) MALFEASANCE]**
CONFLICTS OF INTEREST)
717 Madison Place N.W., Washington, D.C. 20439, Tel: 202.275.8000.

**Incidental 54: SUPREME COURT OF THE UNITED STATES,**
**(BREACH OF PUBLIC TRUST AND**
**(B) NONFEASANCE,**
**(C) MISFEASANCE**
1 First St NE, Washington, DC 20543, Tel: (202) 479-3000

**Incidental 55: THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE,**

**Incidental 56: RICHARD G. ANDREWS,**

**Incidental 57: LEONARD P. STARK,**
**(MAL-ADMINISTRATION OF JUSTICE**
**[(A) BREACH OF SOLEMN OATH,**
**(B) NONFEASANCE,**
**(C) MISFEASANCE,**

115

**(D) MALFEASANCE]**
(IN CORRUPT ASSOCIATION;
ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH; TREASON;
OBSTRUCTION OF JUSTICE; MADE AFFIRMATIVE MISREPRESENTATIONS AND
MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE
INFORMATION TO THE DISTRICT COURT   MATERIAL TO THE ADJUDICATION OF
THE CASE, NAMELY,  PATENT PROSECUTION HISTORY ESTOPPEL AND U.S.
SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10
U.S. 87 (1810); FRAUDULENT OMISSIONS;  DENIED DUE PROCESS TO PLAINTIFF;
DENIED ACCESS TO THE COURT AND TO JUSTICE AND TO THE RIGHT TO
APPEAL  TO PLAINTIFF. HARRASSED AND ABUSED SENIOR CITIZEN FEMALE
INVENTOR/PLAINTIFF; AIDED WHITE COLLAR CRIME BY GEORGE PAZUNIAK,
JPMORGAN.)
844 N. King Street, Wilmington, DE 19801, Tel: 302.573.6170

**Incidental 58: <u>THE UNITED STATES DISTRICT COURT FOR THE</u>**
**<u>NORTHERN DISTRICT OF CALIFORNIA</u>**, AND
**Incidental 59: <u>EDWARD J. DAVILA</u>**, AND
**Incidental 60: <u>ELIZABETH D. LAPORTE</u>**,
**(MAL-ADMINISTRATION OF JUSTICE**
**[(A) BREACH OF SOLEMN OATH,**
**(B) NONFEASANCE,**
**(C) MISFEASANCE,**
**(D) MALFEASANCE]**
LOST JURISDICTION AND IMMUNITY;  CONFLICTS OF INTEREST;
IN CORRUPT ASSOCIATION;
ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH; TREASON;
OBSTRUCTION OF JUSTICE; MADE AFFIRMATIVE MISREPRESENTATIONS AND
MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE
INFORMATION TO THE DISTRICT COURT   MATERIAL TO THE ADJUDICATION OF
THE CASE, NAMELY,  PATENT PROSECUTION HISTORY ESTOPPEL AND U.S.
SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10
U.S. 87 (1810); FRAUDULENT OMISSIONS;  HARRASSED AND ABUSED SENIOR
CITIZEN FEMALE INVENTOR/PLAINTIFF; DENIED DUE PROCESS TO PLAINTIFF;
DENIED ACCESS TO THE COURT AND TO JUSTICE TO APPEAL  TO
PLAINTIFF. AIDED WHITE COLLAR CRIME BY U.S. ATTORNEY CLAIRE CORMIER.)
280 S 1st St, San Jose, CA 95113; Tel: (408) 535-5363; and
450 Golden Gate Ave, San Francisco, CA 94102; Tel: (415) 522-2000

**Incidental 61: <u>U.S. DISTRICT COURT FOR THE EASTERN DISTRICT</u>**
**<u>OF TEXAS, MARSHALL DIVISION</u>**, AND
**Incidental 62: <u>J. RODNEY GILSTRAP</u>,**

**(MAL-ADMINISTRATION OF JUSTICE**
**[(A) BREACH OF SOLEMN OATH,**

**(B) Nonfeasance,**
**(C) Misfeasance,**
**(D) Malfeasance]**
IN CORRUPT ASSOCIATION;
ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH; TREASON,
OBSTRUCTION OF JUSTICE; MADE AFFIRMATIVE MISREPRESENTATIONS AND
MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE TO THE
DISTRICT COURT   INFORMATION MATERIAL TO THE ADJUDICATION OF THE
CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME
COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87
(1810); FRAUDULENT OMISSIONS;  DENIED DUE PROCESS TO PLAINTIFF;)
100 E Houston St, Marshall, TX 75670, Tel: (903) 935-2912

Incidental 63: **SUE L. ROBINSON**,
(LOST JURISDICTION AND IMMUNITY;
BREACH OF SOLEMN OATH; TREASON; OBSTRUCTION OF JUSTICE; MADE
AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED
FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE DISTRICT COURT   IN
THE JPMORGAN CASE  MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY,
PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY
CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT
OMISSIONS);
919 North Market Street, 12th Floor, Wilmington, DE 19801,Tel: 302-777-0331

Incidental 64: **DELAWARE STATE SUPERIOR COURT, NEWCASTLE
COUNTY**, AND
Incidental 65: **ERIC  M. DAVIS**,
(MALADMINISTRATION OF JUSTICE;
**(B) Nonfeasance,**
**(C) Misfeasance,**
**(D) Malfeasance**
IN CORRUPT ASSOCIATION;
ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH; OBSTRUCTION
OF JUSTICE; MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL
OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION
MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY,  PATENT
PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF
JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT
OMISSIONS;  DENIED DUE PROCESS TO PLAINTIFF; ENGAGED IN
CORRUPTION AND AIDED AND ABETTED WHITE COLLAR CRIME BY
GEORGE PAZUNIAK;
HARRASSED AND ABUSED SENIOR CITIZEN FEMALE INVENTOR/PLAINTIFF;)
500 N King St, Wilmington, DE 19801, Tel: (302) 255-0800

## ADDITIONAL INCIDENTALS/WRONGDOERS & ASSIGNED MISCONDUCT:

| INCIDENTALS/TORTFEASORS | CORRUPT ASSOCIATION(S) |
|---|---|
| **LEGISLATIVE AGENT(S)** | BREACH OF SOLEMN OATH<br>[(A) BREACH OF SOLEMN OATH,<br>(B) SEPARATION OF POWERS<br>(C) REVERSING '*FLETCHER V PECK*,<br>(1810)] |
| **LEAHY-SMITH AMERICA INVENTS ACT (AIA)** SPONSOR 1:<br>Incidental 66: **BARACK OBAMA**,<br>The Office of Barack and Michelle Obama<br>P.O. Box 91000,<br>Washington, DC 20066<br>Tel: 202-464-6903 | BREACH OF SOLEMN OATH |
| **AIA BILL SPONSOR 2:**<br>Incidental 67: **JAMES P. CHANDLER**,<br>10813 Tara Rd<br>Potomac, MD 20854,<br>(301) 765-0501 | BREACH OF SOLEMN OATH |
| **AIA BILL SPONSOR 3:**<br>Incidental 68: **SEN. LEAHY, PATRICK J. [D-VT]**<br>437 Russell Senate Bldg<br>United States Senate<br>Washington, DC 20510<br>Phone: (202) 224-4242 | BREACH OF SOLEMN OATH |
| **AIA BILL SPONSOR 4:**<br>Incidental 69: **VISHAL AMIN**,<br>Intellectual Property Enforcement Coordinator,<br>The White House,<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500,<br>Tel: 202-456-1111 | BREACH OF SOLEMN OATH |

**Incidental 70:** Citizen's ATTORNEY(S) OF RECORD: **JONES DAY**
**Incidental 71: GREG LANIER**,

1755 Embarcadero Road, Palo Alto, CA 94303; Tel: 650.739.3941;

**Incidental 72:** Fulton's ATTORNEY(S) OF RECORD: **KILPATRICK TOWNSEND AND STOCKTON, LLP,**
**(BREACH OF SOLEMN OATH; TREASON**, WILLFUL
MISREPRESENTATION, MADE AFFIRMATIVE MISREPRESENTATIONS AND
MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE
INFORMATION TO THE DELAWARE DISTRICT COURT  MATERIAL TO THE
ADJUDICATION OF THE CASE, NAMELY,  PATENT PROSECUTION HISTORY
ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN
*FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS; **OBSTRUCTION
OF JUSTICE**.)
1100 Peachtree St NW #2800, Atlanta, GA 30309; Tel: (404) 815-6500

**Incidental 73: FREMONT BANCORPORATION AND FREMONT BANK,**
ASSIGNS AND AGENTS;
(INFRINGERS; ANTITRUST CO-CONSPIRATORS, BREACH OF SOLEMN OATH,
TREASON);
39150 Fremont Blvd, Fremont, CA 94538; Tel: (510) 505-5221;

**Incidental 74:** Fremont Bank's ATTORNEY(S) OF RECORD: **PERKINS COIE LLP,**
**Incidental 75:** **RAMSEY M. AL-SALAM,**

**Incidental 76: OFFICE OF DISCIPLINARY COUNSEL,**
(IN CORRUPT ASSOCIATION;
BREACH OF SOLEMN OATH; TREASON; OBSTRUCTION OF JUSTICE; MADE
AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED
FRAUD AND FAILED TO DISCLOSE INFORMATION MATERIAL TO THE
ADJUDICATION OF THE CASE, NAMELY,  PATENT PROSECUTION HISTORY
ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN
*FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS;  AIDED AND
ABETTED WHITE COLLAR CRIME COMMITTED BY GEORGE PAZUNIAK;
DENIED DUE PROCESS TO PLAINTIFF.)
405 North King Street, Suite 420, Wilmington, Delaware 19801, Tel: (302) 651-3931

**Incidental 77: O'KELLY. ERNST AND JOYCE, LLC**
(BREACH OF SOLEMN OATH; TREASON; OBSTRUCTION OF JUSTICE; MADE
AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED
FRAUD AND FAILED TO DISCLOSE INFORMATION TO DISCLOSE INFORMATION TO
THE DELAWARE DISTRICT COURT IN THE JPMORGAN CASE AND FULTON BANK
CASE MATERIAL TO THE CASES, ,NAMELY,  PATENT PROSECUTION HISTORY
ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN
*FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS;  AIDED AND
ABETTED WHITE COLLAR CRIME BY GEORGE PAZUNIAK);
901 N Market St #1000, Wilmington, DE 19801, Tel: (302) 295-4905

**Incidental 78: GEORGE PAZUNIAK,** AND

**Incidental 79: PAZUNIAK LAW OFFICE, LLC,**

**(COMMITTED WHITE COLLAR CRIME, ELDER ABUSE, THEFT OF PRINCIPAL-CLIENT-BENEFICIARY'S FUNDS; HARRASSED AND ABUSED SENIOR CITIZEN FEMALE INVENTOR/PLAINTIFF; BREACH OF SOLEMN OATH; TREASON; OBSTRUCTION OF JUSTICE**; MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE PATENT RE-EXAMINER MATERIAL TO THE PROSECUTION OF THE '556 AND '178 PATENTS; AND FAILED TO DISCLOSE INFORMATION TO THE DELAWARE DISTRICT COURT IN THE JPMORGAN CASE AND FULTON BANK CASE MATERIAL TO THE CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS)

1201 N Orange St #7114, Wilmington, DE 19801, Tel: (302) 478-4230

**Incidental 80: TRELLIS INTELLECTUAL PROPERTY LAW GROUP, PC,**

**Incidental 81: CHARLES J. KULAS,**

**Incidental 82: VICTORIA E. BRIEANT,**

**Incidental 83: JOHN W. CARPENTER,**

1900 Embarcadero Rd # 109, Palo Alto, CA 94303, Tel: (650) 842-0300;
VICTORIA E. BRIEANT,
4000 Ponce de Leon Boulevard, Suite 470, Coral Gables, FL 33146, Tel: 305.421.7200;
JOHN W. CARPENTER,
829 Baronne St, New Orleans, LA 70113-1102,Tel: (415) 577-0698
(BREACH OF SOLEMN OATH**; OBSTRUCTION OF JUSTICE**;
MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS;
COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION MATERIAL TO CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810), TO THE FEDERAL CIRCUIT; FRAUDULENT OMISSIONS; **AIDED AND ABETTED WHITE COLLAR CRIME BY GEORGE PAZUNIAK.**)

 **Incidental 84: WILLIAM J. WEIDNER, JR.,**
(BREACH OF SOLEMN OATH; OBSTRUCTION OF JUSTICE;
MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS;
COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION MATERIAL TO CASE, NAMELY, U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810), TO THE FEDERAL CIRCUIT; FRAUDULENT OMISSIONS; **AIDED AND ABETTED WHITE COLLAR CRIME BY SKADDEN ARPS, DAN DEVITO AND GEORGE PAZUNIAK.**)
1011 Commercial Street, North East Salem, OR 97308- 0749, Tel: 503.581.1501

**Incidental 85: HOPKINS & CARLEY**,

**Incidental 86: JOHN V. PICONE III**,

**Incidental 87: JENNIFER S. COLEMAN**,

**Incidental 88: CHRISTOPHER HOHN**,

(BREACH OF SOLEMN OATH; TREASON;**OBSTRUCTION OF JUSTICE**; MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION MATERIAL TO CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810), TO THE DISTRICT COURT IN EASTERN DISTRICT OF TEXAS; FRAUDULENT OMISSIONS; **COMMITTED WHITE COLLAR CRIME; HARRASSED AND ABUSED SENIOR CITIZEN FEMALE INVENTOR/PLAINTIFF**)

70 S 1st St, San Jose, CA 95113, Tel: (408) 286-9800

**Incidental 89: RATNER PRESTIA**;

**Incidental 90: REX A. DONNELLY**,

**Incidental 91: STEPHEN J.WEED**,

**Incidental 92: BENJAMIN A. LEACE**,

Nemours Building, 1007 Orange Street, Suite 205, Wilmington, DE 19899,Tel: 302.778.2500

**Incidental 93: KENNETH N. NIGON**,

1235 West Lakes Drive, Berwyn, PA 19312, Tel: 612.371.2130; 610. 407.0701;

(BREACH OF SOLEMN OATH; TREASON; **OBSTRUCTION OF JUSTICE**: MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION MATERIAL TO CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810), TO THE USPTO AND PTAB AND DELAWARE DISTRICT COURT; FRAUDULENT OMISSIONS; **AIDED AND ABETTED WHITE COLLAR CRIME COMMITTED BY GEORGE PAZUNIAK**.)

**Incidental 94: J.C.PENNEY CORPORATION, INC.** AND ITS ATTORNEY

**Incidental 95: DIANE LETTELIER**,

(INFRINGER; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH; TREASON; WILLFUL MISREPRESENTATION, MADE AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO THE DISTRICT COURT IN THE EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION, MATERIAL TO THE ADJUDICATION OF THE CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S. SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10 U.S. 87 (1810); FRAUDULENT OMISSIONS; **OBSTRUCTION OF JUSTICE;**

**AIDED AND ABETTED IN WHITE COLLAR CRIME COMMITTED BY HOPKINS CARLEY**).
6501 Legacy Dr, Plano, TX 75024, Tel: (972) 431-1000

Incidental 96: **U-HAUL INTERNATIONAL, INC**, Subsidiary of AMERCO,
(INFRINGER; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH)
2727 N Central Ave, Phoenix, AZ 85004, Tel:  (602) 263-6811

Incidental 97: **AVIS RENT A CAR SYSTEM LLC,**
Incidental 98: **AVIS BUDGET GROUP,**
Incidental 99: **PAYLESS CAR RENTAL,**
(INFRINGERS; ANTITRUST CO-CONSPIRATORS, BREACH OF SOLEMN OATH)
6 Sylvan Way, Parsippany, NJ 07054, Tel: 973-496-3500

Incidental 100:**HERTZ GLOBAL HOLDINGS, INC.**
Incidental 101:**THE HERTZ CORPORATION**,
Incidental 102:**DOLLAR RENT A CAR**,
Incidental 103:**THRIFTY CAR RENTAL**,
(INFRINGERS; ANTITRUST CO-CONSPIRATORS, BREACH OF SOLEMN OATH)
8501 Williams Road, Estero, Florida 33928, Tel: (239) 301-7000

Incidental 104: **ACE RENT A CAR**,
(INFRINGER; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH)
4529 West 96th Street, Indianapolis, IN 46268, Tel: 1-317-248-5686

Incidental 105: **ENTERPRISE HOLDINGS**,
Incidental 106: **ENTERPRISE RENT-A-CAR,**
Incidental 107: **NATIONAL CAR RENTAL**,
Incidental 108: **ALAMO RENT A CAR**,
(INFRINGERS; ANTITRUST CO-CONSPIRATORS, BREACH OF SOLEMN OATH)
600 Corporate Park Drive, Clayton/St. Louis, Missouri 63105, Tel: (314) 512-5000

Incidental 109: **PRESIDIO BANK**,
(INFRINGER; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH)
One Montgomery Tower, San Francisco, CA 94111, Tel: 415.229.8400

Incidental 110: **HERITAGE BANK OF COMMERCE**,
(INFRINGER; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH)
150 S Almaden Blvd, San Jose, CA 95113, Tel: 408.947.6900

Incidental 111: **BRIDGE BANK**,

(INFRINGER; ANTITRUST CO-CONSPIRATOR, BREACH OF SOLEMN OATH)
55 S Almaden Blvd, San Jose, CA 95113, Tel: 408.423.8500

**Incidental 112: GRANT & EISENHOFER P.A.
(BREACH OF SOLEMN OATH; TREASON; OBSTRUCTION OF
JUSTICE**; COMMITTED FRAUD AND FAILED TO DISCLOSE INFORMATION TO
THE DELAWARE DISTRICT COURT IN THE DELL and FEDEX CASES MATERIAL TO
THE CASE, NAMELY, PATENT PROSECUTION HISTORY ESTOPPEL AND U.S.
SUPREME COURT RULING BY CHIEF JUSTICE MARSHALL IN *FLETCHER V. PECK* 10
U.S. 87 (1810); FRAUDULENT OMISSIONS; **AIDED AND ABETTED IN THE
WHITE COLLAR CRIME AND MALPRACTICE COMMITTED BY
GEORGE PAZUNIAK**; )
123 Justison St, Wilmington, DE 19801, Tel: (302) 622-7000;

## GIVEN THE CURRENT FACT PATTERN, JUDGE ANDREWS HAD A DUTY TO BOW OUT OF THE CASE AND FAILED TO DO SO FOR VESTED INTERESTS, PERSONAL TO HIM.

328. According to Congress, U.S. Supreme Court case law and Delaware's canons of judicial

ethics, a judge must bow out of hearing any case in which his or her impartiality might

reasonably be questioned. The Canons of Judicial Conduct say that judges must avoid all

impropriety and appearance of impropriety.

> "The test for appearance of impropriety is whether the conduct
> would create in reasonable minds a perception that the judge's
> ability to carry out judicial responsibilities with integrity,
> impartiality and competence is impaired."

## JUDICIAL IMMUNITY IS A MOOT ARGUMENT
## (JUDGE ANDREWS DOES NOT HAVE JUDICIAL IMMUNITY)

329. Judge Andrews has no judicial immunity for his criminal acts, aiding and abetting a

criminal RICO association, by sanctioning the corrupt organization's scheme to deprive Plaintiff

of her rights with the Court's color of law and authority, or for his administrative/ministerial

duties. When Judge Andrews has a duty to act, he does not have discretion — he is then not

performing a judicial act, he is performing a ministerial act.

### i) **Judge Andrews Willfully Failed to Uphold the Constitution – the Law of the Land – which is Deemed Treason.**

330.   Judge Andrews violated the law, failed in his duty to uphold the Constitution, refused to enforce U. S. Supreme Court Chief Justice Marshall's Ruling on 'First Impression' Constitutional '*Res Judicata*' on Government 'Grants' — the Law of the Land — and wantonly, willfully and knowingly failed to uphold 'Patent Prosecution History Estoppel' in all of Plaintiff's patent cases, and denied Plaintiff Due Process and Equal Protection of the Law in violation of the 14th Amendment and violated Plaintiff's right to free speech of the 1st Amendment and her property rights of the 5th Amendment, by collusively blocking access to justice and refusing to enforce Chief Justice Marshall's Ruling. Judge Andrews aided and abetted JPMorgan, SAP, IBM, Fulton Bank and Bank Defendants in affording them a monopoly over the market, which is in violation of Antitrust laws in allowing them to control the market, sanctioning the corrupt organization's scheme to deprive Plaintiff of her rights with the Court's color of law and authority. Defendants' lawyers failed in their duty to report Judge Andrews of his treasonous conduct and therefore are guilty of misprision of treason. Judge Andrews has no judicial immunity for damages sustained by Plaintiff who has been harmed by Judge Andrews' connivance with, aiding and abetting, IBM's criminal activity, Defendants' Antitrust violation and civil RICO.

### ii) **Judge Andrews is a Trespasser of the Law and is Engaged in Treason:**

331.   Judge Andrews failed to uphold the Law of the Land and all his Orders and Judgments are void, and form no bar to the recoveries sought by Plaintiff, even prior to a reversal in opposition to them.   The Seventh Circuit Court of Appeals held that the Circuit Court of Cook

County is a criminal enterprise. *U.S. v. Murphy*, 768 F.2d 1518, 1531 (7th Cir. 1985), affirmed by the U. S. Supreme Court, following "a labyrinthine federal investigation of judicial corruption in Chicago." U.S. Supreme Court stated that if a court is "without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void; and form no bar to a recovery sought, even prior to a reversal in opposition to them. They constitute no justification; and all persons concerned in executing such judgments or sentences, are considered, in law, as trespassers." *Elliot v. Piersol*, 1 Pet. 328, 340, 26 U.S. 328, 340 (1828). Judge Andrews acted when he did not have jurisdiction to act, and also enforced a void order in the *JPMorgan* case 12-282-SLR/RGA (D.Del.) (an order issued by Judge Sue Robinson without jurisdiction), he became a trespasser of the law, and is engaged in treason because he knew or should have known the Law of the Land and failed to enforce it for reasons best known to him.  When Judge Andrews acted as a trespasser of the law, and did not follow the law, Judge Andrews lost subject-matter jurisdiction and Judge Andrews' orders are void, of no legal force or effect. The Court in *Yates v. Village of Hoffman Estates*, Illinois, 209 F.Supp. 757 (N.D. Ill. 1962) held that "not every action by a judge is in exercise of his judicial function. ... it is not a judicial function for a judge to commit an intentional **[constitutional]**  tort even though the tort occurs in the courthouse." Judge Andrews committed many intentional **[constitutional]** [sic.] torts against Plaintiff.

### iii)    <u>Judge Andrews is In Violation of His Oath of Office to Support the Constitution of the United States against All Enemies, Foreign or Domestic and to  Bear True Faith and Allegiance to the Same</u>

332.    U.S. Supreme Court has stated that "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." *Cooper v.*

*Aaron*, 358 U.S. 1, 78 S. Ct. 1401 (1958). Any judge who does not comply with his oath to the Constitution of the United States wars against that Constitution **and engages in acts in violation of the Supreme Law of the Land**. If a judge does not fully comply with the Constitution, then his orders are void, *In re Sawyer*, 124 U.S. 200 (1888), s/he is without jurisdiction, and s/he has engaged in an act or acts of treason.

333.    When a judge acts where s/he does not have jurisdiction to act, the judge is engaged in an act or acts of treason. *U.S. v. Will*, 449 U.S. 200, 216, 101 S. Ct. 471, 66 L.Ed.2d 392, 406 (1980); *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 404, 5 L. Ed 257 (1821).

334.    Any judge (Judge Stark, Third Circuit Judges, CAFC Panel Judges and other judges) *or attorney* (George Pazuniak, Sean O'Kelly, Ryan Ernst, Mr. Bielli, Defendants' lawyers, Doug Nemec, Ed Tulin, Dan DeVito, Greg Lanier, Lori Gordon, Michael Lee, Kevin Culligan, Mr. Moore, and others) who does not report the above judges (Judge Andrews, Judge Robinson, CAFC Panel Judges, PTAB Judges McNamara and Stephen Siu) for treason as required by law may themselves be guilty of misprision of treason, 18 U.S.C. Section 2382.

### IV) JUDGE ANDREWS WILLFULLY DEPRIVED PLAINTIFF OF HER RIGHTS UNDER COLOR OF LAW

335.    Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States.

> "For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within the their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include ...judges... who are acting as public officials. It is not necessary that the

126

crime be motivated by animus toward the race, color, religion, sex, handicap, familial status or national origin" of the victim/Plaintiff.

### v) JUDGE ANDREWS IS A CO-CONSPIRATOR IN THE ANTITRUST CONSPIRACY

336.    Judge Andrews has shown a pattern of behaving or ruling in a manner that is preventing or hindering Plaintiff from receiving full, fair, impartial hearings or the full, fair, impartial administration of justice. Judge Andrews engaged in prosecutorial misconduct and did not FAITHFULLY and CONSISTENTLY adhere to his oath of office nor did he aggressively pursue justice for ALL. **His conduct amounts to being a co-conspirator or having a vested interest in the conspiracy.**

### A)    COMPOUNDING TREASON

337.    Judge Andrews suppressed and oppressed Plaintiff and violated the laws of the United States. Judge Andrews engaged in a conspiracy [in whole or in part] with George Pazuniak in the *Fulton Bank* Case 14-490-RGA (D. Del.), in which Judge Andrews knew or should have known that Plaintiff's U.S. Patent No. 8,271,339 ('339 patent) was protected by 'Patent Prosecution History Estoppel' respecting the patent 'Grant' in front of him  and failed to enforce the Constitution and Justice Marshall's Ruling on 'Grants' in violation of Plaintiff's rights to be protected by it.

### B)           MISPRISION OF TREASON

"Very few practicing lawyers are willing or able to expose corrupt Judges publicly, for they are at great risk when they must later appear again before the exposed misbehaving  Judge. Exposure of rotten judicial apples offends and embarrasses the entire judiciary. When a lawyer, in diligent pursuit of his client's interests, dares stand up to Bad Judges, the "system" locks arms, and seeks to punish or suppress the iconoclastic lawyer,"

in this case, Dr. Lakshmi Arunachalam.

"The system's resistance to admitting the existence of a bad judge can be astounding. Yet someone must stand up to challenge this cancer within the Judiciary. Failing to do so is a misprision of treason."

### vi) **All of Judge Andrews' [and All Other Judges Similarly Situated] Orders are Void**

338.    U.S. Supreme Court, in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 1687 (1974) stated that "when a state officer acts under a state law in a manner violative of the Federal Constitution, he "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." [Emphasis supplied in original]. By law, a judge is a state officer.  The judge then acts not as a judge, but as a private individual (in his person).

## VII
## JUDGE ANDREWS IS GUILTY OF
## NOT PROVIDING HONEST JUDICIAL SERVICES

339.    As a Federal District Court  Judge, Judge Andrews has a fiduciary relationship with the United States and its citizens who have a reasonable expectation of honest judicial services, disinterested decision-making when performing his official duties, full disclosure of the potential motivation behind, and material information relevant to, his official acts, including full disclosure of conflicts of interest, which would provide the citizens of the United States with the information necessary to evaluate his  motivations for official acts.

340.    From November 2011 through April 2017, Judge Andrews engaged in a scheme and artifice to defraud and deprive the United States and its citizens, particularly Lakshmi-Arunachalam, Ph.D., of her intangible right to his honest services. Judge Andrews is alleged to

have accomplished this by holding direct stock in Fedex, buying stock in JPMorgan during the pendency of the case and concealing it from the citizens of the United States, particularly Dr. Lakshmi Arunachalam. After buying stock in the litigants Fedex and JPMorgan in Plaintiff's patent cases, Judge Andrews continued to preside as a District Court Judge over pending and newly filed cases involving JPMorgan, Fedex, Fulton Bank and Bank Defendants. Judge Andrews lacked subject matter jurisdiction, as he failed to enforce U.S. Supreme Court Justice Marshall's ruling on Constitutional *Res Judicata* on Government 'Grants' and failed to abide by 'Patent Prosecution History Estoppel' in all of Plaintiff's Patent cases and collusively engaged in a conspiracy [in whole or in part] with George Pazuniak in dismissing the Fulton Bank case 14-490-RGA (D.Del.) based on an alleged collateral estoppel which did not apply because of U.S. Supreme Court Justice Marshall's ruling on Constitutional *Res Judicata* on Government 'Grants' and 'Patent Prosecution History Estoppel.'

341.    Defendant Judge Andrews failed to disclose to the public, his fellow District Court Judges, the parties of pending civil cases, and other government officials his financial relationship with Fedex and JPMorgan and subject matter conflict of interest [from the Fulton Bank case.] in cases pending before the Delaware District Court. He concealed the nature of his role by not disclosing his self-enrichment and conflicts of interest while serving as a District Court Judge.

342.    The citizens of the United States, particularly, Dr. Lakshmi Arunachalam, suffer when elected officials violate the public trust. When Judge Andrews is charged with the responsibility of doing justice is alleged to have violated that trust, this Court must act swiftly to investigate and have Judge Andrews prosecuted and to restore confidence in the judicial system. None of the

Courts have demonstrated a commitment to investigating and prosecuting allegations of corruption in the Delaware District Court.

343.    Judge Andrews must be charged with one count of obstructing justice, in violation of Title 18, Section 1512(c)(2) under this fact pattern.

344.    At the heart of our democracy is an independent judiciary, free from outside influence or corruption. When that is compromised, this Court must take steps to restore the community's faith in the judicial system and have Judge Andrews prosecuted as such a cleansing step, with an investigation by the FBI and the staff of the office of the United States Attorney to uphold our system of justice with tenacity. This Court must provide this service to our court system and our citizens that depend upon it.

345.    Public corruption in any form cannot be tolerated in our society. Such crimes strike at the core of America's basic principles of democracy. Elected and appointed officials must act impartially, without influence or bias. Their inability or failure to do so jeopardizes the confidence placed in them by the public they are entrusted to serve. This Court must have the FBI aggressively investigate public corruption with regard to the Delaware District Court, Judge Andrews, Judge Stark and Judge Robinson. Such crimes undermine the strength of our democracy and, left unchecked, threaten our government and our way of life.

346.    Judge Andrews engaged in Conspiracy to defraud and oppress the public and Plaintiff of Honest Judicial Services by willful nonfeasance, misfeasance, and malfeasance in office, under color of law and authority [in contempt] of U.S. Supreme Court Justice Marshall's Ruling on Constitutional *Res Judicata* on Government 'Grants' and 'Patent Prosecution History Estoppel;' to cover-up corrupt misconduct - in breach of his Oaths of Office; and, his duty and public charge.

**A. Judge Andrews' ruling in the Fulton Bank case on Plaintiff's '339 patent evidences total abuse of power, abuse of discretion, bias and invidious discrimination against and harassment of Plaintiff.**

*B.* **Courts must examine changed factual circumstances. Judge Andrews failed to do so with regard to the '339 Patent. Judge Andrews Invoked Neither Equity nor the Law.**

**C. Judge Andrews neither examined the facts nor did he exercise the application of the law to the facts. His ruling in the *Fulton Bank* case on the '339 patent was illogical, implausible, and is without support in inferences that may be drawn from the facts in the record.**

347.    Judge Andrews failed to enforce Justice Marshall's ruling on 'Grants' and U.S. Supreme Court's Rulings on Patent Prosecution History Estoppel.

**D. Judge Andrews' Ruling in the *Fulton Bank* case on the '339 Patent is contrary to U.S. Supreme Court Rulings and <u>must be vacated</u>.**

348.    Judge Andrews failed to enforce Justice Marshall's ruling on 'Grants' and U.S. Supreme Court's Rulings on Patent Prosecution History Estoppel.

349.    CAFC Judge O'Malley cites several law review articles for the proposition that

> "<u>Claim construction disputes are very fact specific</u>—.... Claims are drafted, redrafted, and amended in ways intended to reflect and capture particular inventions in a particular field, **to avoid very specific prior art**, and to respond to the rejections of the unique patent examiner involved in the application process. ...we know how to <u>delve into the "very fact specific"</u> record, to trace the prosecution history of a claim that was "<u>drafted, redrafted, and amended,</u>" to understand the "<u>particular inventions</u>" and the <u>distinguishing features from the "very specific prior art</u>."

350.    In Plaintiff's parent 6,212,556 ('556) patent prosecution history (**Exhibit 14**), the inventor, Plaintiff distinguished her invention over the cited art, U.S. Patent No. 5,828,666 ("Focsaneanu"). **<u>Judge Andrews willfully colluded with JPMorgan, Wells Fargo Bank, Citi Bank and SAP in their willful omissions</u>** that prosecution history estoppel already has established that the term "value-added network switch" is not indefinite and relates to

application layer network switches, not with a network layer switch; and that prior art is not only cited, but also discussed in detail in the specification of the '556 patent. <u>The claim language, disclosure in the written description, and the meaning to persons of ordinary skill</u> are <u>fact specific.</u> Both Judge Robinson and Judge Andrews engaged in racketeering with JPMorgan, IBM, the IBM Eclipse Foundation, in their willful actions and omissions with regard to the claim terms "value-added network switch" and "service network." They did not construe these terms in view of the prosecution history's treatment of the prior art and because prior art sheds light on the meaning of a term as cited by the patentee.

351.   Judge Andrews' willful abuse of discretion and ruling without investigating the facts and dismissing a case based on collateral estoppel that did not apply to the '339 patent is collusion with Fulton Bank, a customer of IBM, and with JPMorgan. <u>Defendant Judge Andrews' willful acts and omissions and refusal to uphold the Constitution have injured Plaintiff financially and also her health.</u>

**E. This pattern of racketeering by Judge Andrews and Judge Robinson with IBM has gone on several times during the course of the last ten years. Judge Andrews willfully dismissed the *Dell* and *Fedex* cases, without being a trier of facts.**

352.   Dell and Fedex are both customers of IBM and Microsoft, who are members of the IBM Eclipse Foundation. <u>This was particularly egregious because Judge Andrews held direct stock in Fedex when he dismissed Plaintiff's case against Fedex and Dell, as seen from his own annual financial disclosure statements and his Testimony at his Senate Confirmation Hearing.</u> This Court must take judicial notice of all his Orders and Memorandum of Opinion in the JPMorgan case 1:12-cv-282, Citizens' Financial Group case 1:12-cv-355, the Fulton Bank case, the Dell and Fedex cases and in Plaintiff's case 1:15-cv-259 against Pazuniak *et al*, and all of

132

Plaintiff's cases, incorporated by reference herein, his financial disclosure statements, his Senate Confirmation Hearing, SEC reports and the fact that he worked at Mayer Brown by which Judge Andrews was conflicted from presiding over those cases.

**F. Andrews' actions and omissions have been egregious and erratic and evidence collusion with IBM, JPMorgan, Wells Fargo, Citibank and Fulton Bank, who are all IBM customers and members of the IBM Eclipse Foundation**

1. **Andrews' Own Admissions of Owning Direct Stock in JPMorgan:**

   Andrews admitted he bought <u>direct stock in JPMorgan during the pendency of the case,</u> in addition to him admitting he had other financial holdings in the litigants via mutual funds.

2. **Andrews' Refusal to Recuse Multiple Times Despite Appearance of Bias:**

   Andrews refused to recuse numerous times on multiple Plaintiff's cases and continues to preside over these cases, where he is biased in favor of the litigants, such as JPMorgan, CitiBank, Wells Fargo and SAP, as well as in Plaintiff's malpractice case against Pazuniak *et al.*

3. <u>**Andrews dismissed Plaintiff's 60(b), 60(d) motions for fraud on the court**</u> in the JPMorgan case and in the Citizens Financial Group, Wells Fargo, CitiBank, Kronos cases <u>**for no valid reason, but for a self-serving reason of obstruction of justice of his own wrongdoings.**</u>

**G. Andrews manipulated the Court Hearing transcripts of the Hearing held in Delaware in September 2014 in the Citizens' Financial Group, Wells Fargo, CitiBank, Kronos cases.**

353.   Plaintiff clearly stated in the Court that she was delivering the 60 (b), 60(d)(3) motion at the Court, which set the tone of the Court that day at the Hearing and after which the Court went into pin drop silence. The Court transcripts have <u>removed the statement made by</u>

Plaintiff that the Motion papers being delivered in the Court Hearing and which Andrews asked

Plaintiff to serve on the Defendants while the Court Hearing was in session, involved a 60(b)

60(d)(3) Motion for fraud on the court.

**H. Andrews' erratic and disparate treatment of Plaintiff are the hallmarks of invidious discrimination.**

354.    Andrews infringed Plaintiff's liberty-based substantive due process and has

violated the laws of the United States. In such cases, the U.S. Supreme Court recognizes a non-

textual "liberty" which then limits or voids laws limiting that liberty. Also, Andrews' untimely

and erratic admission almost 3 years after the case has been going on of buying direct stock in

JPMorgan was shocking.

355.    Plaintiff's need to attend to her health to avert a medical emergency is an

"inalienable right," a fundamental and compelling interest, guaranteed by the Bill of Rights.

Andrews abridged this right, causing medical and other injury to Plaintiff. Andrews threatened

to hurt Plaintiff's case against Pazuniak, when *pro se* Plaintiff, a senior citizen with

disabilities from illness, genuinely trying to meet court rules and deadlines, informed

the Court that she has a need for a medical leave of absence with three letters, two

from her Doctors and one from her church friend who is a Stanford doctor. Andrews'

threats and egregious actions toward Plaintiff did not advance a legitimate government interest.

Where fundamental rights are infringed, strict scrutiny is the test and the challenged law is

generally struck down. *Shapiro v. Thompson*, 394 U.S. 618 (1969); *Shaw v. Hunt*, 517 U.S. 899,

908 (1996); *Vacco v. Quill*, 521 U.S. 793, 799 (1997). Andrews' erratic and disparate treatment

of Plaintiff are the hallmarks of invidious discrimination. *Romer v. Evans*, 517 U.S. 620, 631

(1996). Andrews infringed Plaintiff's liberty-based substantive due process. In such cases, the

U.S. Supreme Court recognizes a non-textual "liberty" which then limits or voids laws limiting

that liberty. *Roe v. Wade,* 410 U.S. 113 (1973). <u>Andrews' medical interference and</u>

<u>harassment of Plaintiff when she notified him of a medical need   breached multiple</u>

<u>laws, depriving  Plaintiff of the protections of the Bill of Rights, fourteenth</u>

<u>Amendment, 35 U.S.C. §282 of the Patent Act, Civil Rights Act, American</u>

<u>Disabilities Act, FRCP Rule 60(b), 60(d).</u>

**I.   Andrews Bullied and Harassed Plaintiff, Refused to grant her extension of time to file amended complaint against Pazuniak et al for medical reasons and grant her unrestricted medical leave of absence, as the other courts have.**

356.   When all the other Courts in the Federal Circuit in the SAP and Fremont Bank

case appeals and the USPTO re-examination case appeals granted Plaintiff her medical leave of

absence and enlarged the time to file her briefs, Andrews has been biased in favor of Pazuniak

and refused to give Plaintiff her much needed extension of time for medical leave of absence.

Instead, he let Defendants Pazuniak *et al* lie to the Court about Plaintiff Plaintiff's physician, a

very dedicated Board-certified Endocrinologist affiliated with Stanford Hospital, Sequoia

Hospital and the VA Hospital, and did not sanction them for lying. Instead Judge Andrews

bullied Plaintiff and had her write several briefs and he has still not given her the unrestricted

leave of absence she so desperately needed without requiring her to file her amended complaint

by May 18, 2016.

**J.   Andrews' refusal  five times to let Plaintiff, the real party-in-interest substitute in as Plaintiff in the JPMorgan case shows collusion, racketeering with JPMorgan and IBM and the IBM Eclipse Foundation and denied her the right to appeal**

357.   In all the other Courts, every single Judge has recognized that Plaintiff is the

inventor and assignee of her patents and is the real party-in-interest and allowed her to be

substituted in as Plaintiff. Andrews refused to recognize Plaintiff as sole owner and real party-in-

interest in the JPMorgan case. Plaintiff filed at least 5 motions asking him to allow her to be

substituted in as Plaintiff, but he has not allowed this to date in the JPMorgan case. Andrews has

self-servingly and willfully done this because he is afraid that other evidences of his atrocities

and racketeering would be exposed. He has only evidenced that he wishes Plaintiff gone as

quickly as possible.

**K. Andrews willfully committed obstruction of justice when he willfully dismissed the legitimate malpractice causes of action against Pazuniak *et al* filed by Plaintiff, the real party-in-interest. In his Order, he stated that only her company Pi-Net can file this and not Plaintiff, even though she is the real party-in-interest and principal-client-beneficiary, as per the Retainer Agreement prepared by Pazuniak.**

358.    This is because he does not want to go over claim construction issues arising from

the JPMorgan case and George Pazuniak committing malpractice by putting forth wrong claim

constructions against Plaintiff's express instructions  not to do so. <u>**This is only further evidence of racketeering in collusion with JPMorgan, IBM and the IBM Eclipse Foundation**</u>. He

failed to address the fact that Judge Robinson's claim construction ruling is in legal error and not

based on law nor the facts of the case, in which JPMorgan willfully committed obstruction of

justice to not let Judge Robinson see the facts of the case. JPMorgan did not provide "clear and

convincing evidence" as required by Sec. 282 of the Patent Act that any of the claim terms were

indefinite. Key claim terms have been defined with great clarity both in the specification and in

the prosecution history in view of the prior art cited. For example, "value-added network

switch." Prosecution history estoppel prevents Andrews or Judge Robinson or JPMorgan or

Pazuniak *et al* from stating that "value-added network switch" is indefinite or that a "value-

added network switch" is a "web page…," as Pazuniak advanced to the USPTO, committing

malpractice against Plaintiff's instructions based on sound technical and legal grounds.

359.    Andrews willfully overlooked the atrocities of Pazuniak and dismissed the legitimate malpractice causes of action filed by Plaintiff, without trying the facts of the case. Andrews willfully colluded with JPMorgan in wanting to make the JPMorgan case and any other cases where it involves claim construction, and Plaintiff to go away. Andrews is willfully engaged in racketeering with JPMorgan and all the Defendants who are involved in the IBM Eclipse Foundation and the USPTO judges, Brian McNamara and Stephen Siu (a former IBM employee and former Microsoft employee), both of whom own direct stock in Microsoft and are conflicted to preside over Plaintiff's Microsoft and SAP re-examination cases, thereby voiding all rulings by these Judges in the USPTO and PTAB.

**L.  Andrews' Collusion with Judge Robinson and Racketeering with IBM and IBM Eclipse Foundation**

360.    Judge Robinson along with CAFC's Jan Horbaly, changed the definition of "financial interest" in 2001, contrary to IRS and public accounting standard definitions of the term, at the same time as the Executive Branch of the Government participated in the founding of the IBM Eclipse Foundation.

**M. Andrews' actions dramatically prejudiced Plaintiff's lawsuit against JPMorgan, Fulton Bank, Fremont Bank and Pazuniak *et al*. He and Judge Robinson engaged in racketeering with JPMorgan and IBM in allowing JPMorgan's tampering with its expert witness.**

361.    The law is clear:

> "Whoever corruptly--. . . (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1512(c).

362.    JPMorgan had its expert witness lie that the patents do not disclose POSvc application nor VAN switch. Applications have existed in the Back Office of Banks and enterprises for eons of years. It has never been the goal of the patents to teach applications that

137

have existed in Banks for eons of years. VAN switch has been clearly taught in the specification and in the prosecution history. Andrews willfully obstructed justice by colluding with JPMorgan in not allowing Plaintiff a chance to demonstrate that the Court ruled against Plaintiff despite the fact that JPMorgan did not provide "clear and convincing evidence" as required by Sec. 282 of the Patent Act.

**A. GOVERNMENT'S CULPABILITY: UNLAWFUL AND UNFAIR ACTS– USPTO/PTAB IN BREACH OF CONTRACT WITH INVENTOR/PLAINTIFF, RE-EXAMINATIONS OF GRANTED PATENTS TRIGGERED BY PETITIONS BY DEFENDANTS FOR RE-EXAMINATIONS: (If one thinks the Govt was not aware of the infringment when becoming partners with Microsoft; just see the movie Snowden and Antitrust.)**

363.   The USPTO is in breach of contract with the inventor/Plaintiff Dr. Arunachalam by violating U.S. Supreme Court Chief Justice Marshall's *'First Impression'* Constitutional *Res Judicata* ruling in *Fletcher v. Peck*, 10 U.S. 87 (1810) prohibiting the quashing of Government Patent Contract Grants once issued, by the most absolute power,  in re-examining many of  Dr. Lakshmi Arunachalam's Granted Patents; and failing to uphold Patent Prosecution Histoery Estoppel, as per Federal Circuit's ("CAFC") ruling in *Aqua Products v. Matal*, 15-1177, October 2017;  and denying Dr. Arunachalam due process in not providing her a neutral judge with no financial  holdings in the opposite party, namely Microsoft.

**B.      The RICO Operative Plan: Breach of Public Trust and Fraud on the Court**: The USPTO/PTAB engaged in complete lawlessness in PTAB Judge McNamara denying Dr. Arunachalam due process and electronic filing privilege simply because she filed a motion for him to recuse because he had direct stock in Microsoft, the Third Party Requester in Dr. Arunachalam's patent re-exams. The USPTO and PTAB failed to enforce Patent Prosecution History Estoppel upheld by the U.S. Supreme Court and CAFC  and U.S. Supreme Court Chief

Justice Marshall's *'First Impression'* Constitutional *Res Judicata* ruling in *Fletcher v. Peck*, 10 U.S. 87 (1810) prohibiting the quashing of Government Patent Contract Grants once issued, by the most absolute power; induced the public to come in and give the Patent Office the inventions of inventors like Dr. Arunachalam and to file patent applications; awarded a Patent Contract Grant; then re-examined on behalf of Defendants/infringers a Granted Patent in violation of U.S. Supreme Court Chief Justice Marshall's *'First Impression'* Constitutional *Res Judicata* ruling in *Fletcher v. Peck*, 10 U.S. 87 (1810);  and invalidated the Granted Patent(s); and let the infringers steal the inventions and the Granted Patents of inventors without compensation; all of which constitute intentional deception, deceiving the public, breach of public trust and fraud on the court. This is the RICO operative plan. The USPTO, PTAB and the District and Appellate Courts have made it expensive, hazardous, and burdensome for inventors to get the Defendants/infringers to pay up the royalties for use of the inventions, defeating the purpose of granting a patent and the mission of the USPTO as envisioned by our founding fathers of the nation.

C. **Agency Operating as a Criminal Enterprise:** USPTO is a closed system Revolving-Door enterprise inducing contract fraud for adjudicative **findings Government Contract Fraud Inducement and Adjudicative Corruption of the USPTO Designed To Antitrust Domestic and International Internet-of-Things (IoT) By the USPTO, Compromised Courts,** and colorful Legislative Enactment Coloring promoting The **Infringement of [T]he Single (most important) 1995 Patent by Copyright  Conversion In Breach of Solemn Oaths and Public Trust Nonfeasance, Misfeasance, and Malfeasance  In Corrupt Association with Corporate Defendants and Apple App Store and Google Play Web application developers Converting the Agency into a Continuing RICO Enterprise of Repetitious Wrongful Mandated Activity Concealing Crimes too Small to be Recognized as Crime Inconsistent with Legitimate Intent**.

D.    **False Advertising:** To induce Inventors to forfeit inventions to the USPTO, the Agency systematically propounds the 'Organized Dissemination of [Misleading.] Information'

regarding the 'Object' of its 'Public Contract-Patent Grant [Offer — Contingent upon Agency Certification of the Invention's 'Construction & Terms'.]' guaranteeing; a) that, the Invention [Acceptance Consideration.] will be used to 'Promote and Benefit Commerce, the Economy, and Public Use.'; b) that, the 'Patented' Invention's 'Agency Certified Construction and Terms' will be protected by 'Judicial Notice' of the attaching 'Patent Prosecution History Estoppel' upon any challenge; c) that, the Inventor will possess 'Unfettered Control and Use' of the patented invention for a 'Time Certain'; and d) that, by 'Government Grant,' the Inventor will have 'The Awarded Right' to collect royalties for any infringements of the patent's claims, construction and terms during the time certain in which the Inventor has control of the patent. Thereby 'Creating Satisfied Victims for a Period of Time.'

364. By 'Voluntary Victim Action in 'Accepting' the Government's 'Offer,' the Victim in fact 'Assisted by Constructive Admission' that the 'Revolving-Door Agency' contracted in 'Good Faith'; thereby, assisting in concealing the Agency's silence [as fraud.] regarding the USPTO's long practiced [Pre AIA Enactment 'Coloring'.] venue to the Appeals Division to 'Reexamine (Beneficial) Granted Patents' [Treasonably.] for rescinding patentability [Contrary to U. S. Supreme Court Chief Justice Marshall's 'First Impression' Mandated Prohibition, in *Fletcher v. Peck*, 10 U.S. 87 (1810).]. For reasons, of past crimes detectable and provable only through Audit Procedures.

E. **Eclipse Foundation (fraudulently operating as a non-profit) coloring in furtherance of antitrust:** The nexus significance of this single infringement; however, manifests itself by the USPTO 'Converting the Infringement into a Copyright for IBM and the Eclipse Foundation (fraudulently operating as a non-profit) coloring in furtherance of antitrust, whose Members, two of whom are Apple and Samsung, and IBM's distribution of the

infringement worldwide as freeware subject to licensing as a copyright licensing to capture the global market to monopolize and minimize domestic and international competition; discouraging, investigation by making the crime appear overwhelming in size and complexity.

F.   **Legislative Coloring of Antitrust through the unconstitutional AIA:** For over 200 years, the Patent Law Profession has produced boxcars of litigations, lawyers, federal judges, and legislative officials that have changed the patent law environment to the point of rendering the administration of it becoming a 'Closed System' requiring specialization.  Since the 2012 passing of the America Invents Act [Authorizing the 'Re-examination of Existing Patent Grants [Protected by 'Patent Prosecution History Estoppel'] [Already being practiced pre-AIA by the PTO Appeals Board in conjunction with the Federal Circuit.],  the administration has reduced the inducing 'Public Contract and Duty' to protect issued grants; into, a legal fraud being perpetrated on the public inventor (to obtain one's invention); under, false pretense that an awarded Patent Grant is protected.  It appears the entire Patent Administration and Federal Circuit have been ignorant of the very first Contract Law case heard by the Supreme Court; establishing, the *res judicata* Law of the Land prohibiting the quashing of government grants, once issued by the government even by the highest authority.  *Where Chief Justice Marshall's mandated prohibition has not been overturned to date; how, then can the USPTO, the Federal Circuit, or Legislature pass or make laws to the contrary — without being in breach of individual and collective solemn oaths to uphold the Law of the Land?*

G.   **Tortuous Acts against Plaintiff:** In 1995 [Prior to enactment of the America Invents Act *(AIA)*.], the USPTO breached its social contract with VICTIM/Plaintiff/Inventor. The USPTO, *a) **allowed**,* IBM to infringe VICTIM/ Plaintiff's protected patent [In corrupt association with other Web application developers in restraint of trade.] to avoid paying royalties

141

to VICTIM/ Plaintiff.  The USPTO, *b) allowed,* The Eclipse Foundation *(The RICO Enterprise)* to *(overtly))* convert the infringed patent *(immediately)* into a *(colorful)* trademark and copyright for international distribution as *'Freeware'* [To capture the 'Global Market'.]; *and c) in furtherance,* collusively moved to have the *(infringed)* patent *'Reexamined Administratively'* 13 times [In cohort with the USPTO Appeals Board.] by representation on behalf of **an initial infringing Apple's App Store Web application developer, Microsoft** *(in breach of trust, solemn oath, and in conflict of interest.).*

365.    In 1995, VICTIM/Plaintiff  was induced into *'Accepting'* the 'Standing Social Contract' *proffered* by the USPTO; *contingent,* upon USPTO *'Certification of the Invention's Construction and Terms'.  In consideration,* of VICTIM/Plaintiff forfeiting ownership of the invention to the USPTO for 'Public Use and Benefit', the contract guaranteed that; *VICTIM/Plaintiff, a.)* would have *'Unfettered Use and Control'* of the Invention for a *'Time Certain'; with, b)* patented *'Prosecution History Estoppel Protection Right'* against any challenges to the *(certified)* construction and terms of the invention; *and, c)* the granted right to bring an action for *'Infringements during the Time Certain; whereupon,* after the time-elapse, the USPTO would own the invention.  In *(good-faith)* reliance with the terms of the social contract, VICTIM/Plaintiff transferred ownership of her Invention [6] to the USPTO in trust for

---

[6] **THE SIGNIFICANCE OF VICTIM'S INVENTION:**  Called a 'VAN SWITCH'/Object Router/Service Network/Object Network/Internet of Things (IoT) [One of many other protected patents in VICTIM's/Plaintiff's portfolio with a priority date of 1995.], the invention is a Web application platform that enables two-way real-time Web transactions from Web applications displayed on a Web browser.  *In 1995,* what existed was mere one-way browsing, not two-way real-time Web transactions from Web applications, nor wireless Internet IoT transactions, nor Web application/IoT technologies.  It is little wonder why Microsoft wanted to purchase VICTIM's/Plaintiff's invention; *that,* failing sued VICTIM/Plaintiff twice *(and lost)* in effort to secure the invention [*That failing,* simply infringed the patent (in corrupt association with other Apple App Store Web application developers; *and,* the USPTO itself in cohort-*[five]* conflict and vested interest of federal judges and Patent Administrative  judges refusing to recuse).**This Court must take Judicial Notice of** Judge Alsup's ruling in No. C 08-05149 WHA (N.D. Ca) on 2/17/09: "Microsoft is using counterfeit logic to manufacture a controversy where none exists." (Exhibit 1.)

the *'Public's Benefit and Use'* to a) encourage Inventors to patent contract with the USPTO, advance commerce, and improve the American economy.

**H.     Federal Circuit and District Courts' Denial of Due Process and Equal Protection of Law to Inventor:** In the USPTO, Federal Circuit and District Courts denying Dr. Arunachalam due process and denying her fundamental rights to emergency medical care and dismissing her appeal without an Opening Appeal Brief or a Hearing when Dr. Arunachalam was in medical distress was utter lawlessness on the part of lawyers and judges, opposing counsel and courts. The courts and PTAB tampered with Plaintiff's filings in the docket, would not let her file electronically.

366.    Judges forfeited their immunities, lack jurisdiction in breaching their solemn oaths against the Constitution, thereby voiding their Orders, as per U.S. Supreme Court precedential ruling in *Cooper v. Aaron* (1958) and *Fletcher v. Peck* (1810).

---

These market-disruptive innovations should have allowed Dr. Arunachalam to grow into one of the largest technology companies in the United States, **but for Apple and its App Store, Samsung and Google Play Web application developers engaging in RICO tactics**, antitrust violations, unfair methods of competition and unfair acts in the unlawful importation into the United States, sale for importation into the United States, and/or sale within the United States after importation of certain IoT devices and components thereof (IoT, The Internet of Things — Web Applications displayed on a Web browser) — that infringe one or more claims of U.S. Patent No. 7,930,340. Each Web application is a grain of sand in the ocean of IoT devices and infinite Web applications, all of which are Dr. Arunachalam's inventions.

**EXHIBITS**